Michael Newdow
*Pro hac vice*
2985 Lakeshore Blvd
Upper Lake, CA  95485
(626) 532-7694
NewdowLaw@gmail.com

Thomas M. Horwitz
Ohio Bar #0062323
1991 Crocker Road, Suite 600
Westlake, OH   44145
(440) 892-3331
tmh@horwitzlpa.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

**Civil Action No. 5:16-cv-00059**

FIRST AMENDED COMPLAINT

NEW DOE CHILD #1; NEW DOE CHILD #2; NEW DOE PARENT; NEW ROE CHILD #1; NEW ROE CHILD #2; NEW ROE PARENT; NEW POE CHILD; NEW POE PARENT; NEW COE CHILD; NEW COE PARENT; NEW BOE CHILD; NEW BOE PARENT; NEW HOE CHILD #1; NEW HOE CHILD #2; NEW HOE PARENT #1; NEW HOE PARENT #2; HOLLY HUBER; MITCHELL KAHLE; BERNARD KLEIN; MARNI HUEBNER-TIBORSKY; LOREN MILLER; MARTIN MAIER; MICHAEL HOWARD; LARRY KNIGHT; DEVIN KUCHYNKA; TRACEY MARTIN; MARK PETRICCA; BEVERLY SHAPIRO; RON THOMAS; DEREK ROSE; GEORGE SHIFFER; NANCY DOLLARD; DENNIS ROSENBLUM; JOSEPH MILON; SALVATORE SALERNO; JESSICA MCQUARTER; SUSAN CARRIER; SARAH MAXWELL; STUART CHISHOLM; MICHAEL MARTINEZ; ADAM CLAYMAN; MICHIGAN ATHEISTS; NORTHERN OHIO FREETHOUGHT SOCIETY;

Plaintiffs,

v.

THE CONGRESS OF THE UNITED STATES OF AMERICA; THE UNITED STATES OF AMERICA; JACOB J. LEW, SECRETARY OF THE TREASURY; RHETT JEPPSON, PRINCIPAL DEPUTY DIRECTOR, UNITED STATES MINT; LEONARD R. OLIJAR, DIRECTOR, BUREAU OF ENGRAVING AND PRINTING;

Defendants.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

*New Doe Child #1 v. The Congress of the United States*

## <u>TABLE OF CONTENTS</u>

**CORPORATE DISCLOSURE STATEMENT** ........................................................v

**TABLE OF AUTHORITIES** ..........................................................................vi

**JURISDICTION AND VENUE** .....................................................................1

**PARTIES** ......................................................................................................2

  **A. PLAINTIFFS** ........................................................................................2

  **B. DEFENDANTS** ....................................................................................28

**INTRODUCTION** ......................................................................................29

**HISTORICAL BACKGROUND** ................................................................30

  **A. BRIEF HISTORY OF AMERICAN RELIGIOUS FREEDOM** ....................30

  **B. HISTORY OF "IN G-D WE TRUST" ON THE NATION'S MONEY** .........38

    **(1) THE ORIGINAL COINAGE ACTS** ......................................................38

    **(2) THE ORIGIN OF "IN G-D WE TRUST" ON THE COINAGE** ...........39

    **(3) THE ATTEMPT TO REMOVE "IN G-D WE TRUST" FROM THE
    COINAGE** .......................................................................................44

    **(4) THE LEGISLATIVE MANDATE FOR "IN G-D WE TRUST" ON
    <u>ALL</u> COINS AND ON THE CURRENCY** .............................................52

C. THE LEGISLATIVE MANDATE FOR "IN G-D WE TRUST" ON ALL
COINS AND CURRENCY REFLECTED THE (CHRISTIAN) RELIGIOUS
FERVOR AND ANTI-ATHEISM OF THE 1950s.........................................................58

D. CURRENT CIRCUMSTANCES ARE LITTLE CHANGED FROM THE
1950s .................................................................................................................68

 (1) "IN G-D WE TRUST" ON THE MONEY CONTINUES TO
REPRESENT (CHRISTIAN) MONOTHEISM AND TO BE
UTILIZED IN RELIGIOUSLY DISCRIMINATORY WAYS .............................68

  (a) Presidents Continue to Use the Motto to Advocate for (Christian)
Monotheism.................................................................................................68

  (b) Congress Continues to Use the Motto to Advocate for (Christian)
Monotheism.................................................................................................72

   i.  The Sequence of Events Regarding Edge-Incusion
Demonstrates that the Motto Stands for (Christian)
Monotheism .........................................................................................72

   ii. The 62 Congressmen Who Sponsored H. Con. Res. 411 Reveal
that Our Legislators Continue to Believe the Motto Stands for
(Christian) Monotheism.......................................................................73

   iii. Congress's Motto "Reaffirmations" Reveal that Our
Legislators Continue to Believe the Motto Stands for
(Christian) Monotheism.......................................................................74

   iv. Individual Congressmen Continue to Demonstrate that the
Motto Stands for (Christian) Monotheism .........................................78

   v. "In G-d We Trust" Clearly Has a (Christian) Monotheistic
Meaning to Congress's Chaplains .....................................................80

  (c) Society Continues to Use the Motto for (Christian) Monotheistic
Advocacy ....................................................................................................81

(2) IN EXTOLLING (CHRISTIAN) MONOTHEISM, "IN G-D WE TRUST" CONTRIBUTES TO A CULTURE THAT DENIGRATES ATHEISM AND ATHEISTS ........................................................ 82

(3) PURSUANT TO THEIR RELIGIOUS BELIEFS, PLAINTIFFS ARE BURDENED BY "IN G-D WE TRUST" ON THE MONEY ................... 84

CLAIMS FOR RELIEF ...................................................................... 91

CLAIM 1.   DEFENDANTS' ACTS SUBSTANTIALLY BURDEN PLAINTIFFS' EXERCISE OF RELIGION IN VIOLATION OF RFRA ............................................................................... 91

CLAIM 2.   DEFENDANTS' HAVE VIOLATED PLAINTIFFS' FREE EXERCISE RIGHTS ........................................................ 92

CLAIM 3.   DEFENDANTS HAVE VIOLATED PLAINTIFFS' FREE SPEECH RIGHTS........................................................... 92

CLAIM 4.   DEFENDANTS HAVE VIOLATED PLAINTIFFS' EQUAL PROTECTION RIGHTS........................................................ 93

PRAYER FOR RELIEF ...................................................................... 94

LIST OF APPENDICES ................................................................ APP-01

## <u>CORPORATE DISCLOSURE STATEMENT</u>

No corporate party to this action has any parent corporation or publicly held company that owns 10% or more of its stock.

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103 (2001) ................................................. 93

*Bradwell v. State*, 83 U.S. 130 (1873) ........................................................................... 84

*Employment Div. v. Smith*, 494 U.S. 872 (1990) ........................................................... 92

*Loving v. Virginia*, 388 U.S. 1 (1967) ........................................................................... 85

*McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005) .............................................. 78

*Minersville v. Gobitas*, 310 U.S. 586 (1940) .................................................................. 58

*Petition of Plywacki*, 107 F. Supp. 593 (1952) .............................................................. 64

*Petition of Plywacki*, 115 F. Supp. 613 (1953) .............................................................. 64

*Walker v. Texas Division, Sons of Confederate Veterans*, 135 S. Ct. 2239 (2015) ................. 92

*Wooley v. Maynard*, 430 U.S. 705 (1977) ............................................................... 90, 92

### Constitutional Provisions

Ark. Const. art. XIX, § 1 ............................................................................................ 83

Md. Const. art. XXXVII ............................................................................................ 83

Miss. Const. art. XIV, § 265 ...................................................................................... 83

N.C. Const. art. VI, § 8 ............................................................................................ 83

Pa. Const. art. I, § 4 ................................................................................................ 83

S.C. Const. art. XVII, § 4 ......................................................................................... 83

Tenn. Const. art. IX, § 2 ........................................................................................... 83

Tex. Const. art. I, § 4 .............................................................................................. 83

U.S. Const. amend. I ........................................................................................ passim

U.S. Const. amend. V ................................................................................................. 1

U.S. Const. art. I .................................................................................................... 28

U.S. Const. art. II ................................................................................................... 30

U.S. Const. art. VI ...................................................................................... 31, 34, 36

U.S. Const. pmbl. ....................................................................................... 30, 37, 41

**Statutes**

28 U.S.C. § 1331 ...................................................................................................... 1

28 U.S.C. § 1346 ...................................................................................................... 1

28 U.S.C. § 1361 ...................................................................................................... 1

28 U.S.C. § 1391 ...................................................................................................... 1

31 U.S.C. § 301 ...................................................................................................... 28

31 U.S.C. § 303 ...................................................................................................... 28

31 U.S.C. § 304 ...................................................................................................... 28

31 U.S.C. § 3112 .................................................................................................... 84

31 U.S.C. § 321 ...................................................................................................... 28

31 U.S.C. § 5112 ...............................................................................29, 57, 73, 94

31 U.S.C. § 5114 .......................................................................................29, 57, 94

36 U.S.C. § 119 ...................................................................................................... 62

42 U.S.C. § 2000bb through 2000bb-4.........................................................passim

Act in Amendment of 1857 Coinage Act, 13 Stat. 54 (1864) ................................ 42

Act of April 17, 1952, 66 Stat. 64 ......................................................................... 62

Act of July 11, 1955, 69 Stat. 290 ...................................................................57, 62

Act of July 30, 1956, 70 Stat. 732 ...................................................................62, 68

Act of June 14, 1954, 68 Stat. 249 ........................................................................ 62

Act of May 18, 1908, 35 Stat. 164 ......................................................................... 51

Act to Authorize the Coinage of Three-Cent Pieces, 13 Stat. 517 (1865) ............. 43

Act to Establish the Treasury Department, 1 Stat. 65 (1789)................................. 38

Act to Regulate the Time and Manner of Administering Certain Oaths, 1 Stat. 23 (1789)..... 32

Coinage Act of 1792, 1 Stat. 246 .......................................................................... 38

Coinage Act of 1837, 5 Stat. 136 .......................................................................... 38

Coinage Act of 1865, 13 Stat. 518 ........................................................................ 43

Consolidated Appropriations Act of 2008, 121 Stat. 1844 .................................... 73

H.R. Con. Res. 253, 109th Cong. (2005) .............................................................. 77

H.R. Con. Res. 60, 83d Cong. (1953)..................................................................... 62

Presidential $1 Coin Act of 2005, 119 Stat. 2664 (2005) ..................................... 72

*Statutes at Large … December 1863, to December 1865* (George P. Sanger ed., 1866)...42, 43

Treaty of Tripoli, 8 Stat. 154 (1796) ..................................................................... 34

Va. Code Ann. § 57-1 (2012) ................................................................................. 30

## Congressional Record and Reports

100 Cong. Rec. 14919 (1954) ............................................................... 61

100 Cong. Rec. 1700 (1954) ................................................................. 61

100 Cong. Rec. 6085 (1954) ................................................................. 61

100 Cong. Rec. 7764 (1954) ................................................................. 61

100 Cong. Rec. 7765 (1954) ................................................................. 61

100 Cong. Rec. 7833 (1954) ................................................................. 61

100 Cong. Rec. 8617 (1954) ................................................................. 62

101 Cong. Rec. 4384 (1955) ........................................................... 53, 55

101 Cong. Rec. 7796 (1955) ................................................................. 53

101 Cong. Rec. 8156 (1955) ................................................................. 61

101 Cong. Rec. 9448 (1955) ................................................................. 53

151 Cong. Rec. H6386 (daily ed. July 25, 2005) ................................ 80

153 Cong. Rec. H10311 (daily ed. Sept. 7, 2007) .............................. 72

153 Cong. Rec. H2674 (daily ed. Mar. 20, 2007) .............................. 80

157 Cong. Rec. H2334 (daily ed. Apr. 6, 2011) ................................. 80

157 Cong. Rec. H7169-75 (daily ed. Nov. 1, 2011) ............... 74, 75, 77

157 Cong. Rec. H7186 (daily ed. Nov. 1, 2011) ................................ 86

157 Cong. Rec. H949 (daily ed. Feb. 16, 2011) ........................... 78, 80

42 Cong. Rec. 3384-91 (1908) ...................................................... passim

97 Cong. Rec. 5863 (1951) ................................................................... 53

Annals of Cong., vol. 1 (1789) (J. Gales ed. 1834) ...................... 31, 33

H. Con. Res. 411, 109th Cong. (2006) ......................................... 73, 74

H.R. 619 (United States Currency Inscription), Hearing, 84th Cong. (1956) ................... passim

H.R. Doc. No. 234 (1956), Architect of the Capitol, *The Prayer Room in the United States Capitol* ............................................................. 62

H.R. Rep. 143 (1874) .......................................................................... 37

H.R. Rep. No. 1106 (1908) ........................................................... 46, 52

H.R. Rep. No. 271 (1830) ............................................................. 36, 37

H.R. Rep. No. 662 (1955) ........................................................... passim

S. Rep. No. 1287 (1954) ...................................................................... 57

S. Rep. No. 637 (1955) ........................................................................ 57

## Historical Documents

*A Compilation of the Messages and Papers of the Presidents, 1789-1897* (James D. Richardson ed., 1897)............................................................................ 34

Act for Religious Freedom (1786) ................................................................. 30

Articles of Confederation (1781).................................................................... 30

Benjamin Rush, *A Plan of a Peace-Office for the United States*, in *The Selected Writings of Benjamin Rush* 20 (Dagobert D. Runes ed., 1947). .......................................... 33

Benjamin Rush, *Letters* 517 (L.H. Butterfield ed., 1951) (letter of June 15, 1789)................ 33

*Debates in the Several State Conventions ... 1787* (J. Elliot ed., 2d ed. 1836)........................ 31

Declaration of Independence (1776) ............................................................... 30

James Madison, *To Edward Livingston*, in 9 *The Writings of James Madison* (Gaillard Hunt ed., 1910) ................................................................. 33

*Old Family Letters: Copied from the Originals* (Biddle ed., 1892) ........................................ 35

*Proceedings of the National Convention to Secure the Religious Amendment of the Constitution of the United States* (1872) ........................................................ 41

Raymund Harris, *Scriptural Researches on the Licitness of the Slave-Trade* (1788) ................................................................................................ 84

*Report [of the Director of the Mint]*, in *Report of the Secretary of the Treasury ... Year ... 1862* (1863)............................................................................ xiv, 40, 42

*Report of the Director of the Mint*, in *Report of the Secretary of the Treasury ... Year ... 1863* (1863)............................................................................ xiv, 40

*Report of the Director of the Mint*, in *Report of the Secretary of the Treasury ... Year 1864* (1864)............................................................................ xiv, 43

*Report of the Director of the Mint*, in *Report of the Secretary of the Treasury ... Year 1865* (1865)............................................................................ xiv, 44

*Report of the Director of the Mint*, in *Report of the Secretary of the Treasury ... Year 1866* (1866)............................................................................ xiv, 44

Sabbath Sch. Soc., *New England Primer* (rev. ed. 1843)....................................... 86

The Records of the Federal Convention of 1787 (Max Farrand ed. 1911) ............................. 32

Timothy Dwight, *A Discourse in Two Parts* (1812) ........................................... 35, 36

## Biblical References

*1 Timothy* 6:15 ...................................................................................................... 40

*2 Corinthians* 6:14 ............................................................................................... 66

*Leviticus* 24:16 ...................................................................................................... 66

*Proverbs* 3:5 ........................................................................................................... 84

*Psalms* 14:1 ............................................................................................................. 66

*Psalms* 46:9 ............................................................................................................. 43

*Psalms* 65:7 ............................................................................................................. 43

*Revelation* 17:14 .................................................................................................... 40

*Revelation* 19:16 .................................................................................................... 40

## Other Authorities

A. Roy Eckardt, *The New Look in American Piety*, 71 The Christian Century
    1395 (1954) ...................................................................................... 60

Am. Inst. of Pub. Op., Gallup Poll conducted July 21, 1965 ................................ 67

*American Aurora: A Democratic-Republican Returns* (1998) ................................ 35

Anson Phelps Stokes, *Church and State in the United States* (1950) ...................... 39

Ashley Parker, *In Romney's Hands, Pledge of Allegiance is Framework for
Criticism*, N.Y. Times (Sept. 9, 2012) ................................................................. 71

*Billy Graham: A New Kind of Evangelist*, Time, Oct. 25, 1954 ............................. 65

*Camden Man Asks Treasury to Put Religious Motto on Bills*, Ark. Gazette, Dec.
    6, 1953 ............................................................................................... 52

Clement D. Johnston, *The Spiritual Responsibility of American Business and
Industry*, 22 Vital Speeches of the Day, Dec. 15, 1955 ...................................... 65

*Coin Symbols*, N.Y. Times, Nov. 15, 1907 ........................................................... 45

D.W. Brogan, *Unnoticed Changes in America*, Harper's Mag., Feb. 1957 ........... 60

Douglas T. Miller & Marion Nowak, *The Fifties: The Way We Really Were*
    (1977) ...................................................................................... 60, 65, 66

Ed Rochette, *The Man Who Put G-d's Trust in Your Pocket*, Antiques &
Collecting, July 1987 ............................................................................................ 53

*Eisenhower Joins in a Breakfast Prayer Meeting*, N.Y. *Times*, Feb. 5, 1954 .......................... 64

Fred Petrucelli, *Almighty Dollar Mentions G-d Because of Arkansas,* Ark.
  Gazette, Mar. 4, 1955 ............................................................................................. 52

*Funk & Wagnalls New Practical Standard Dictionary of the English Language*
  (1956) ................................................................................................................... 66

*In G-d We Trust*, 63 The Independent 1196 (1907) ................................................. 45

J. Ronald Oakley, *G-d's Country: America in the Fifties* (1986) ..................... passim

Martin Marty, *Under G-d, Indivisible, 1941-1960* (1996) ................................. 58, 59

*Motto on Coinage*, 87 The Outlook 707 (1907) ....................................................... 45

*New Century Dictionary of the English Language* (1948) ....................................... 66

*New Legend on Our Coins*, N.Y. *Times*, Dec. 18, 1865 ........................................... 44

Norman Vincent Peale, *The Power of Positive Thinking* (1952) ............................ 65

Penny Edgell et al., *Atheists as "Other": Moral Boundaries and Cultural
  Membership in American Society*, 71 Am. Soc. Rev. 211 (2006) ....................... 83

Peter Lewis, *The Fifties* (1978) ............................................................................... 65

*President and the Motto on Our* Coins, 44 Current Literature 68 (Jan.-June 1908) ............... 46

*Report of the American Bible Society at Its 138th Annual Meeting*, Time, May
  24, 1954 .............................................................................................................. 65

Richard J. Ellis, *To the Flag* (2005) ....................................................................... 58

Samuel Stouffer, *Communism, Conformity, and Civil Liberties* (1955) ........... 66, 67

*Supreme Court on Church and State* (Joseph Tussman ed. 1962) ......................... 67

Ted Schwarz, *A History of United States Coinage* 228 (1980) ............................... 44

U.S. Mint, *2003 United States Mint Annual Report* ............................................... 87

*Webster's New Twentieth Century Dictionary of the English Language –
  Unabridged* (2d ed. 1956) ................................................................................. 66

*What Makes a Christian State?* 63 The Independent 1263 (1907) ......................... 45

Will Herberg, *Protestant-Catholic-Jew* (1960) ........................................... 60, 64, 65

Will M. Gervais et al., *Do You Believe in Atheists? Distrust Is Central to Anti-Atheist Prejudice*, 101 J. of Personality & Soc. Psychol. 1189 (2011) ................................ 82

William Lee Miller, *Piety Along the Potomac*. The Reporter, Aug. 17, 1954 ........................ 62

William Lee Miller, *The 'Moral Force' Behind Dulles's Diplomacy*, The Reporter, Aug. 9, 1956 ........................................................................................ 60

*William Randolph Hearst: A Portrait in his Own Words* (Edmond D. Coblentz ed. 1952) ........................................................................................................ 66

Wilton B. Persons, *Your Future: A Stupendous Stimulating Challenge* (May 30, 1954), in 20 *Vital Speeches of the Day* 688 (1954) .............................................. 60

*Words and Works*, Time, Sept. 20, 1954 ................................................................. 66

## Websites

archive.org/stream/ proceedingsofn00nati#page/1/mode/1up. ................................................. 41

Baptist Press, *Day of Prayer May Have Been Largest Ever* (May 3, 2012) www.bpnews.net/BPFirstPerson.asp?ID=37756 .................................. 81

Bureau of Engraving & Printing, U.S. Dep't of the Treas., Category: U.S. Currency, moneyfactory.gov/faqlibrary.html ...................................... 90

Bureau of Engraving and Printing, U.S. Dep't of the Treas., *About the BEP,* www.moneyfactory.gov/aboutthebep.html ........................................... 28

Colonial Charters, Grants and Related Documents, avalon.law.yale.edu/subject_menus/statech.asp ................................. 30

Congressional Prayer Caucus Foundation, Inc., *About the Cause: Why Is This Significant?* www.ingodwetrustmotto.us/ about-the-cause................................. 81

Dwight D. Eisenhower, *Remarks Recorded for the "Back-to-G-d" Program of the American Legion*, Feb. 20, 1955, www.presidency.ucsb.edu/ws/index. php?pid=10414 .......................................................................... 58, 68

Frank Newport, Gallup Politics, *In U.S., 46% Hold Creationist View of Human Origins* (June 1, 2012) (citing a Gallup poll conducted May 3-6, 2012, www.gallup.com/poll/155003/Hold-Creationist-View-Human-Origins.aspx ..................... 85

George H.W. Bush, *Remarks at the Annual National Prayer Breakfast,* May 4, 1989, bushlibrary.tamu.edu/research/public_papers.php?id=388&year= 1989&month=all ......................................................................... 69

George W. Bush, *50th Anniversary of Our National Motto, "In G-d We Trust,"* [July 27,] *2006*, http://georgewbush-whitehouse.archives.gov/news/releases/ 2006/07/20060727-12.html .................................................................................... 70

Gerald Ford, *Proclamation 4338 – National Day of Prayer,* [Dec. 5,] *1974*, http://www.presidency.ucsb.edu/ws/index.php?pid=23888&st=4338&st1 ......................... 68

Gerald Ford, *Remarks at the Professional Athletes Prayer Brunch*, Feb. 16, 1976, www.presidency.ucsb.edu/ws/?pid=5492 .......................................................... 68, 69

Jeffrey M. Jones, Gallup, *Atheists, Muslims See Most Bias as Presidential Candidates* (June 21, 2012), www.gallup.com/poll/155285/Atheists-Muslims-Bias-Presidential-Candidates.aspx ....................................................................... 83

Jessica Yellin, *Just In*, CNN.com Politics (Sept. 5, 2012), politicalticker.blogs. cnn.com/2012/09/05/ just-in-democrats-to-update-platform-with-jerusalem-reference/ ................................................................................................................ 71

Jimmy Carter, *Independence, Missouri Remarks and a Question-and-Answer Session at a Townhall Meeting,* Sept. 2, 1980, www.presidency.ucsb.edu/ ws/index.php?pid= 44975. ................................................................................... 69

Little League, *Pledge*, www.littleleague.org/learn/about/pledge.htm ................................... 65

Pew Forum on Religious & Pub. Life, *Public Expresses Mixed Views of Islam,* Mormonism (Sept. 25, 2007), pewforum.org/Public-Expresses-Mixed-Views-of-Islam-Mormonism.aspx ........................................................................................ 82

Pew Res. Ctr., The Pew Global Attitudes Project 33, Oct. 4, 2007, pewglobal.org/ files/pdf/258.pdf ................................................................................. 82

Ronald Reagan, *Proclamation 4826 – National Day of Prayer,* [Mar. 19,] *1981*, www.presidency.ucsb.edu/ws/?pid=61699. ........................................................... 69

Ronald Reagan, *Question-and-Answer Session with Students at Farragut High School in Farragut, Tennessee*, June 14, 1983, www.presidency.ucsb.edu/ws/ index.php? pid=41473. ...................................................................................... 69

*Transcript of Marco Rubio's Speech at the RNC,* FoxNews.com, Aug. 30, 2012, www.foxnews.com/politics/2012/08/30/transcript-marco-rubio-speech-at-rnc/ ................. 71

U.S. Dep't of the Treas., *About: History of 'In G-d We Trust'*, www.treasury.gov/about/education/Pages/in-god-we-trust.aspx ............................. 37, 39, 90

U.S. Mint, *About the United States Mint,* www.usmint.gov/about_the_mint/ ........................ 28

U.S. Mint, *In G-d We Trust,* www.usmint.gov/about_the_mint/fun_facts/?action= fun_facts5 ........................................ 42

White House, *James Madison*, www.whitehouse.gov/history/presidents/jm4.html. .............. 31

Wikipedia, *Symbols of Europe*, en.wikipedia.org/wiki/European_symbols#Motto................ 89

William J. Clinton, *Proclamation 6991, National Day of Prayer,* [Apr. 18,] 1997, www.presidency.ucsb.edu/ws/index.php?pid=54013 ................................................ 69

www.congress.gov/bill/109th-congress/ house-concurrent-resolution/411/all-info#cosponsors................................................................................................................. 73

www.frc.org/mission-statement ................................................................................. 81

www.goddiscussion.com/96308/congressman-urges-respect-for-nonbelievers-but-doesnt-think-atheists-truly-exist-in-america/.................................................. 86

www.lettersofnote.com/2009/ 10/word-god-is-product-of-human-weakness.html ................. 84

www.whitehouse.gov/the-press-office/2011/11/02/remarks-president-urging-congress-pass-infrastructure-piece-american-job. .............................................. 70

**"Congress shall make no law respecting an establishment of religion,**

**or prohibiting the free exercise thereof; …"**

- U.S. Const. amend. I

**"Our national coinage in its devices and legends should indicate the Christian character of our nation, and declare our trust in G-d."**

- 1862 Annual Report of the Director of the Mint

**"We claim to be a Christian nation -- … Our national coinage … should declare our trust in G-d -- in Him who is the 'King of Kings and Lord of Lords.'"**

- 1863 Annual Report of the Director of the Mint

**"Why should this distinct and unequivocal recognition of the sovereignty of G-d, of Him who is 'the King of kings and Lord of lords,' be confined to our bronze coinage? … Let our nation in its coinage honor Him …."**

- 1864 Annual Report of the Director of the Mint

**"[T]he gold and silver coins of the mint of the United States will have impressed upon them, by national authority, the distinct and unequivocal recognition of the sovereignty of G-d, and our nation's trust in Him. We have added to our nation's honor by honoring Him who is 'King of kings and Lord of lords.'"**

- 1865 Annual Report of the Director of the Mint

**"'Happy is that nation whose G-d is the Lord.'"**

- 1866 Annual Report of the Director of the Mint

1     Plaintiffs in this action challenge the use of the phrase "In G-d We Trust" on the nation's

2     money. They do so alleging as follows:

3

4                         **<u>JURISDICTION AND VENUE</u>**

5

6   1.   This is a civil action claiming violations of 42 U.S.C. § 2000bb through § 2000bb-4

7        (2012), the Religious Freedom Restoration Act of 1993 (RFRA). As such, this Court has

8        jurisdiction under 42 U.S.C. § 2000bb-1(c) and 28 U.S.C. § 1331.

9   2.   This is a civil action claiming violations of the First and Fifth Amendments of the

10       Constitution of the United States of America. As such, this Court has jurisdiction under 28

11       U.S.C. § 1331.

12   3.   This action is founded in part upon the Constitution of the United States of America. As

13       such, this Court has jurisdiction over Defendant United States of America under 28 U.S.C.

14       § 1346(a)(2).

15   4.   This action is in the nature of mandamus and seeks to compel the Congress of the United

16       States of America, the United States of America, its agents and its officers to perform their

17       duties owed Plaintiffs under RFRA and under the terms of the First and Fifth

18       Amendments of the Constitution of the United States. As such, this Court has jurisdiction

19       under 28 U.S.C. § 1361.

20   5.   Defendants are each an officer or employee of the United States, an agency of the United

21       States, or the United States. At least one individual Plaintiff resides in and/or has a

22       dwelling in this judicial district. Venue is therefore proper under 28 U.S.C. §

23       1391(e)(1)(C).

24   6.   A substantial part of the events or omissions giving rise to this claim occurred, occur, or

25       will occur in this judicial district. Venue is therefore proper under 28 U.S.C. § 1391(b)(2)

26       and § 1391(e)(1)(B).

27

**PARTIES**

**A.  PLAINTIFFS**

7.  Plaintiff New Doe Child #1 is a resident of Summit County, Ohio, being raised by her
    Atheist father, New Doe Parent. Because she is not being raised to believe in a G-d, she
    will understandably be led to inquire about such an entity when Defendants' inscriptions
    of "In G-d We Trust" are discussed in school. This will inevitably expose her to potential
    ridicule or peer pressure as a result of her Atheism. This is a substantial burden on her free
    exercise rights, inasmuch as small children have a right to attend public school without
    government setting the stage for religious persecution … especially when the government,
    itself, is a significant cause of the bigotry that might lead to the persecution. Moreover, to
    a child, seeing a blatantly religious message on something as ubiquitous and prestigious as
    the nation's money results in the impression that anyone who does not adhere to that
    religious message must somehow be different and not a full member of society. It may
    also cause her to question whether her own beliefs are false or wrong. After all, if the
    government says it is true, who is a little child to challenge that assertion?

8.  Plaintiff New Doe Child #2 is a resident of Summit County, Ohio, being raised by his
    Atheist father, New Doe Parent. Because he is not being raised to believe in a G-d, he will
    understandably be led to inquire about such an entity when Defendants' inscriptions of "In
    G-d We Trust" are discussed in school. This will inevitably expose him to potential
    ridicule or peer pressure as a result of his Atheism. This is a substantial burden on his free
    exercise rights, inasmuch as small children have a right to attend public school without
    government setting the stage for religious persecution … especially when the government,
    itself, is a significant cause of the bigotry that might lead to the persecution. Moreover, to
    a child, seeing a blatantly religious message on something as ubiquitous and prestigious as
    the nation's money results in the impression that anyone who does not adhere to that
    religious message must somehow be different and not a full member of society. It may
    also cause him to question whether his own beliefs are false or wrong. After all, if the
    government says it is true, who is a little child to challenge that assertion?

9.  Plaintiff New Doe Parent is a resident of Summit County, Ohio. He is also a veteran, a
husband, and a father. In order to engage in general commerce – including making
purchases for (and in view of) his children – he frequently uses United States currency.

Although raised as a Christian, Plaintiff New Doe Parent is now an Atheist. Having
reconsidered the passages he read in his earlier years, he now believes that the G-d of the
Bible is an affront to morality and goodness. Accordingly, when he is unwillingly forced
to confront Defendants' "In G-d We Trust" transcriptions, he is reminded that the
collective "We" in that phrase have placed our nation's trust in a being that (if the Bible is
to be believed) commanded genocide, rape, and slavery. This, to him, is a repulsive
notion, and to think that he must personally bear and further such a claim substantially
burdens his religious exercise, for – as an Atheist – he surely does not wish to participate
in that behavior. Even more egregiously, he is forced to proselytize for that ideology, so
diametrically opposed to his own.

Separate from the moral implications of our country's collective faith resting in the deity
described in the Old Testament is the issue of whether his country is representing him. He
is not only a veteran; he is a disabled veteran … of the Iraq War, having volunteered to
serve in the United States Marine Corps barely a month after the September 11th attacks.
He sacrificed more than five years of his life, his relationship with his wife and family,
and his health, serving his country. Yet, for all that immense sacrifice, Defendants now
force him to participate in an act of religious zealotry not all that dissimilar from the acts
perpetrated to this day by our nation's enemies, against which he battled. In complete
violation of the constitutional principles they have sworn to uphold, Defendants have
turned this hero into a political outsider on the basis of his lawful and sincerely held
religious views, and have treated those views with complete and utter denigration and
disrespect. To be forced to endure that baggage as the price for adhering to his Atheistic
belief system is surely a substantial burden.

Finally, as mentioned, Plaintiff New Doe Parent is a father. That he returned home from his service to the nation to find that Defendants are willing to subject his children to taunts and ridicule in the public schools so that the government can espouse an exclusionary religious ideal in violation of the first ten words of the Bill of Rights, is an outrageous affront. That Plaintiff New Doe Parent is among those that Defendants are excluding, and that the power, prestige and financial support of government are being used to possibly turn his children away from the religious beliefs he has every right to instill within them (free from governmental interference) is another substantial burden on his Atheistic free exercise.

10. Plaintiff New Roe Child #1 is a minor child who is a resident of Ohio who has ongoing contact with U.S. money at school, at home and during commerce. The phrase "In G-d We Trust" (which he unwillingly confronts on the money) is the direct opposite of his humanist belief system. Because that phrase is accepted and distributed by our federal government, Plaintiff Roe Child #1 is made to feel that his beliefs are abnormal and not accepted by the government or by society. He also feels uncomfortable when he repeatedly has to personally handle and use money that contains a religious statement that goes against his religious beliefs.

11. Plaintiff New Roe Child #2 is a minor child who is a resident of Ohio who uses money almost every week to buy books, magazines, treats and gifts.  When she does this, she is unwillingly confronted with the "In G-d We Trust" inscriptions. In fact, she does not trust in G-d. Rather, she trusts in herself and her family. Nonetheless, as an impressionable child, the power, prestige and financial support of the federal government is brought to bear upon her, thus interfering with the religious beliefs towards which she is leaning. This is a substantial burden upon her free exercise of religion. So, too, are the facts that (i) she is forced to declare a falsehood (i.e., that she – as a member of the "we" in the offensive phrase – trusts in G-d), and (ii) she is forced to spread to others a message directly contrary to her religious views.

Plaintiff New Roe Child #2 suffers confusion as a result of Defendants' actions, and is made to feel uncomfortable on the basis of her religious beliefs. She feels that her government is trying to make her believe in G-d. This influence has been especially damaging when she has discussed belief in G-d with her friends. As it is, she feels alienated due to the fact that they are all Monotheists. With the government throwing its weight behind her friends' religious views, Plaintiff New Roe Child #2 senses that she is thought of as a lesser and an unpatriotic American. She has learned to censor herself and not even discuss the subject for fear of not fitting in with her peers.

It is noteworthy that the foregoing circumstances have led Plaintiff New Roe Child #2 to limit her conversations about the "In G-d We Trust" motto to the confines of her family. This also interferes with her free exercise of religion, inasmuch as the contrary views to which she might otherwise be exposed (in an environment free of governmental religious intrusion) are now never heard.

12. Plaintiff New Roe Parent is a resident of Ohio who handles U.S. currency almost daily. As a Humanist, she does not believe nor trust in any g-d. Rather, her beliefs require that she trust in her own abilities and a general responsibility to lead an ethical life. In handling the money, therefore, she is repeatedly unwillingly confronted with the words "In G-d We Trust." Thus, she is forced against her will to accept and re-distribute to others a message that goes wholly against her beliefs.  Yet it is neither realistic nor reasonable for her to abandon the nation's currency and use other forms of payment for all of her transactions.

As a mother, Plaintiff New Roe Parent would like to raise her children to believe and trust in their own abilities and to use those abilities to lead ethical lives and improve the human condition.  She wants her children to trust validated science and rational thinking, and to objectively question the existence of a g-d.  Defendants' inscriptions of "In G-d We Trust" – delivered with the power, prestige and financial support of the federal government – subverts the Humanist religious belief system that she is trying to instill in her children when they are continuously confronted with the message on our national currency that – tells them to trust in an entity that she believes is non-existent.

1

2   Plaintiff New Roe Parent has had to actively contradict the impression her children

3   continually receive from our currency that our country's norm is a belief in a g-d, and that

4   our government not only accepts this, but promotes it as well. This governmental claim

5   implies that the beliefs that she and her children hold are inferior and less worthy than the

6   Monotheistic beliefs held by others. Because the New Roe family lives in a very small

7   religious community, she has had to seek outside help to prevent her children from being

8   alienated by such unconstitutional local government actions as prayers during public

9   school functions. The "In G-d We Trust" message placed by the federal government on

10  every coin and currency bill is a far more pervasive and imposing cause of alienation.

11

12  13. Plaintiff New Poe Child, a resident of Michigan, is a minor child being raised by Plaintiff

13  New Poe Parent. As one who engages in everyday commerce, Plaintiff New Poe Child has

14  had, continues to have, and will in the future have, regular and frequent contacts with the

15  nation's money.

16

17  Plaintiff New Poe Child is an Agnostic. As such, he definitely does not trust in any G-d.

18  Thus, when using United States currency, he is unwillingly confronted with the

19  governmentally-mandated "In G-d We Trust" phrase. This substantially burdens him in

20  the exercise of his religion in a number of ways. First, he is essentially forced to choose

21  between either relinquishing the convenience of carrying the nation's money, or bearing

22  on his person a religious message that is the complete antithesis of his beliefs. Second,

23  exercise of his beliefs requires that he maintain honesty, and it is absolutely dishonest for

24  him to carry the false message that "We" (i.e., Americans, of which he is one) trust in any

25  G-d. Third, as an impressionable child, his religious belief system is impermissibly

26  influenced by the power, prestige and financial support of the federal government. Finally,

27  by passing American money to others (at times during foreign travel), New Poe Child is

28  proselytizing for a religious notion (i.e., Monotheism) that he finds false. Such

29  proselytizing is absolutely forbidden in the exercise of his beliefs.

30

1   The governmental influence on Plaintiff New Poe Child is especially great when he is
2   confronted with "In G-d We Trust" at school. Desirous of fitting in with his peers, he feels
3   a need to hide his religious beliefs. Moreover, in the school environment, the power,
4   prestige and financial support of government are especially strong, and those influences
5   send a clear message that his mother's (and his own) Atheism/Agnosticism is false.
6   Taught to carry and promote a religious message his mother is teaching him to at least
7   consider denying, he is also coerced to make a completely false declaration as to what is
8   likely to be his own religious view on the matter of G-d's existence. With the alienation he
9   suffers in such an environment, Plaintiff New Poe Child is taught that, solely on the basis
10  of sincere religious beliefs, his family exists as outsiders in their own homeland.

11

12  14. Plaintiff New Poe Parent is a resident of Michigan who frequently handles United States
13      currency. She is also an Atheist who denies G-d's existence. Thus, when handling the
14      nation's money, she is unwillingly forced to confront the "In G-d We Trust" phrase
15      inscribed by Defendants on all of the nation's coins and currency bills.

16

17  As a result of the "In G-d We Trust" inscriptions, Plaintiff New Poe Parent is substantially
18  burdened in the exercise of her religion in a number of ways. First, she is essentially
19  forced to choose between either relinquishing the convenience of carrying the nation's
20  money, or bearing on her person a religious message that is the complete antithesis of her
21  Atheistic beliefs. Second, exercise of her Atheism requires that she maintain honesty, and
22  it is absolutely dishonest for her to carry the false message that "We" (i.e., Americans, of
23  which she is one) trust in G-d. Finally, by passing American money to others, she is
24  forced to proselytize for a religious notion (i.e., Monotheism) that she finds false. Such
25  proselytizing is absolutely forbidden in the exercise of her Atheism.

26

27  Plaintiff New Poe Parent suffers alienation as she is constantly reminded that – solely on
28  the basis of her sincerely-held religious views – she is an outsider in her own country.
29  This constrains her from revealing her religious beliefs in professional or personal settings
30  due in no small part to the pervasive governmental message of denigration for Atheistic
31  belief.

15. Plaintiff New Coe Child is a resident of Ohio and a minor child being raised by Plaintiff New Coe Parent. She is frequently confronted with "In G-d We Trust" on all currency she handles, whether coin or bills. With each exchange comes a message, sanctioned by the federal government, that her father's (and her own) Atheism is false. Additionally, she is compelled to carry and unwillingly promote a religious message she denies, and to make a false declaration as to what is her own religious view on the matter of G-d's existence. She also suffers alienation and other harms as she finds that, solely on the basis of sincere religious beliefs, her family exists as outsiders in their own homeland. In fact, more than once, she has been verbally assaulted in the public schools by students voicing the idea that the government only supports those who agree with the motto "In G-d We Trust."

16. Plaintiff New Coe Parent is a lifelong resident of the State of Ohio. Although he was raised and confirmed in the Catholic Church, he continually questioned the validity of its teachings. Finding no convincing answers, he has been a non-believer since the age of twelve. Adhering to no theistic beliefs or dogmas, he is today a proud and vocal atheist.

Plaintiff New Coe Parent is also a father. Due to his renown as a non-believer, it's not uncommon for him to hear that his daughter has been confronted by others about her (and his) lack of Monotheistic beliefs. A frequent taunt is that both she and he are not good Americans, since good Americans believe in G-d. "It says so on the money," those others will say. This jibe substantially burdens his free exercise of religion by causing a sense of alienation whenever he chooses to publicly profess his Atheistic ideals.

Plaintiff New Coe Parent has explained to his daughter that the First Amendment guarantees the right to disbelieve and still hold citizenship, and that the Supreme Court has stood for the principle that ours is a secular government. However, when every coin and bill they use to barter for goods specifically undermines this ideal, it serves to reinforce the taunt that they are not "real" Americans, making his assurances ring hollow. Accordingly, Plaintiff New Coe Parent worries that his daughter will claim beliefs she doesn't actually hold just to fit in. This weakening of his parenting on the basis of religious beliefs is also a substantial burden on his free exercise rights.

17. Plaintiff New Boe Child is a minor child who lives in Michigan, and is being raised by her father, who is an Atheist. She has had, continues to have, and will in the future have regular and frequent contacts with the nation's money. She is currently learning to pay for items in stores on her own as well as learning/counting the values of each coin/currency. When she is confronted with "In G-d We Trust" on every coin and currency bill she handles or learns about in school, the power and prestige of the federal government is brought to bear upon her with the message that her father's (and her own) Atheism is false. Additionally, she is taught to carry and promote a religious message her father is teaching her to at least consider denying, and to also make a completely false declaration as to what is likely to be her own religious view on the matter of G-d's existence. In addition to substantially burdening her in religious exercise, this bearing of the "In G-d We Trust" message causes her alienation and other harms as she finds that, solely on the basis of their sincere religious beliefs, her family exists as a collection of outsiders in its own homeland.

18. Plaintiff New Boe Parent is a resident of Michigan who is a lifelong Atheist and a lifetime member of Freedom the From Religion Foundation (FFRF). Each time he deals with U.S. currency, he is unwillingly confronted with the "In G-d We Trust" message. To Plaintiff New Boe Parent, this is an extremely offensive falsehood, and being forced to bear that message substantially burdens him in following his Atheistic religious views. Moreover, the espousal of that phrase by government gives those who believe in its ideology a sense of righteousness in their Monotheistic outlook and an associated tendency towards discrimination and aggression towards nonbelievers. As a result, Plaintiff New Boe Parent has been forced to choose between either not using U.S. currency (which is virtually impossible to do when engaging in everyday commerce) or to sacrifice his Atheistic beliefs. Additionally, by giving this currency/coin to others, he feels compelled to participate in a Monotheistic religious endorsement that troubles him greatly every day.

Plaintiff New Boe Parent is the parent of a minor child whom he wishes to raise questioning the existence of any G-d(s). Defendants' placement of "In G-d We Trust" on the coins and currency – which uses the power and prestige of the federal government to

1   say, essentially, that Americans do not question G-d's existence – interferes with Plaintiff
2   New Boe Parent's decisions in this regard and undermines his parental role in rearing his
3   child in a manner consistent with the family's religious values. In fact, Plaintiff New Boe
4   Parent has felt obligated at times to instruct his children to avoid even discussing the "In
5   G-d We Trust" message in school in order to protect them from the adverse consequences
6   that might result from their voicing Atheistic views. In these ways and others, Defendants'
7   actions substantially burden Plaintiff New Boe Parent's ability to exercise his religion.
8
9   19. Plaintiff New Hoe Child #1 is a minor child who is a resident of Michigan. He has had,
10   continues to have, and will in the future have, regular and frequent contacts with the
11   nation's money. He is being raised by two Atheist parents. When he is confronted with "In
12   G-d We Trust" on every coin and currency bill he handles or learns about in school, the
13   power and prestige of the federal government is brought to bear upon him with the
14   message that his parent's (and his own) Atheism is false. Additionally, he is taught to
15   carry and promote a religious message his parents are teaching him to at least consider
16   denying, and to also make a completely false declaration as to what is likely to be his own
17   religious view on the matter of G-d's existence. Moreover, he suffers alienation and other
18   harms as he finds that, solely on the basis of sincere religious beliefs, his family exists as a
19   collection of outsiders in their own homeland.
20
21   20. Plaintiff New Hoe Child #2 is a minor child who is a resident of Michigan. She has had,
22   continues to have, and will in the future have, regular and frequent contacts with the
23   nation's money. She is being raised by two Atheist parents. When she is confronted with
24   "In G-d We Trust" on every coin and currency bill she handles or learns about in school,
25   the power and prestige of the federal government is brought to bear upon her with the
26   message that her parents' (and her own) Atheism is false. Additionally, she is taught to
27   carry and promote a religious message her parents are teaching her to at least consider
28   denying, and to also make a completely false declaration as to what is likely to be her own
29   religious view on the matter of G-d's existence. Moreover, she suffers alienation and other
30   harms as she finds that, solely on the basis of sincere religious beliefs, her family exists as
31   a collection of outsiders in their own homeland.

21. Plaintiff New Hoe Parent #1 is a resident of Michigan, and former resident of Tennessee. In both locations he frequently handles/handled United States currency. Plaintiff New Doe Parent #1 is also an Atheist. Accordingly, he definitely does not trust in any G-d. Thus, when using United States currency, he is unwillingly confronted with the governmentally-mandated "In G-d We Trust" phrase. This substantially burdens him in the exercise of his religion in a number of ways. First, he is essentially forced to choose between either relinquishing the convenience of carrying the nation's money, or bearing on his person a religious message that is the complete antithesis of his Atheistic beliefs. Second, exercise of his Atheism requires that he maintain honesty, and it is absolutely dishonest for his to carry the false message that "We" (i.e., Americans, of which he is one) trust in G-d. Finally, by passing American money to others (at times during foreign travel), he is proselytizing for a religious notion (i.e., Monotheism) that he finds false. Such proselytizing is absolutely forbidden in the exercise of his Atheism.

Plaintiff New Hoe Parent #1 is the parent of two minor children. As such, he wishes to raise those children to question the existence of any G-d. Defendants' placement of "In G-d We Trust" on the coins and currency – which uses the power and prestige of the federal government to say, essentially, that Americans do not question G-d's existence – interferes with Plaintiff New Hoe Parent #1's parental decisions in this regard and undermines his parental role in rearing his children in a manner consistent with his family's religious values. In fact, he has felt obligated at times to have his children avoid even discussing this matter with others in order to protect them from the adverse consequences that might result from their voicing Atheistic views. In these ways and others, Defendants' actions substantially burden Plaintiff New Hoe Parent #1's ability to exercise his religion.

Finally, Plaintiff New Hoe Parent #1 suffers alienation as he is constantly reminded that – solely on the basis of his sincerely-held religious views – he is an outsider in his own country. He has felt pressured to hide his religious beliefs, and has been excluded from social events due in no small part to the pervasive governmental message of denigration for Atheists.

22. Plaintiff New Hoe Parent #2 is a resident of Michigan, and former resident of Tennessee. In both locations she frequently handles/handled United States currency. Plaintiff New Hoe Parent #2 is also an Atheist. Accordingly, she definitely does not trust in any G-d. Thus, when using United States currency, she is unwillingly confronted with the governmentally-mandated "In G-d We Trust" phrase. This substantially burdens her in the exercise of her religion in a number of ways. First, she is essentially forced to choose between either relinquishing the convenience of carrying the nation's money, or bearing on her person a religious message that is the complete antithesis of her Atheistic beliefs. Second, exercise of her Atheism requires that she maintain honesty, and it is absolutely dishonest for her to carry the false message that "We" (i.e., Americans, of which she is one) trust in G-d. Finally, by passing American money to others (at times during foreign travel), she is proselytizing for a religious notion (i.e., Monotheism) that she finds false. Such proselytizing is absolutely forbidden in the exercise of her Atheism.

Plaintiff New Hoe Parent #2 is the parent of two minor children. As such, she wishes to raise those children to question the existence of any G-d. Defendants' placement of "In G-d We Trust" on the coins and currency – which uses the power and prestige of the federal government to say, essentially, that Americans do not question G-d's existence – interferes with Plaintiff New Hoe Parent #2's parental decisions in this regard and undermines her parental role in rearing her children in a manner consistent with her family's religious values. In fact, she has felt obligated at times to have her children avoid even discussing this matter with others in order to protect them from the adverse consequences that might result from their voicing Atheistic views. In these ways and others, Defendants' actions substantially burden Plaintiff New Hoe Parent #2's ability to exercise her religion.

Finally, Plaintiff New Hoe Parent #2 suffers alienation as she is constantly reminded that – solely on the basis of her sincerely-held religious views – she is an outsider in her own country. she has felt pressured to hide her religious beliefs, and has been excluded from social events due in no small part to the pervasive governmental message of denigration for Atheists.

23. Plaintiff Holly Huber is a resident of Michigan who was raised in the Catholic tradition, but has been an Atheist for more than two decades. She is a life member of the Freedom from Religion Foundation, and also a member of the American Civil Liberties Union, Americans United for the Separation of Church and State, American Atheists and People for the American Way. She is also co-founder and current member of the Michigan Association of Civil Rights Activists.

Plaintiff Huber is a self-employed technology and media consultant who frequently uses United States money for both business and personal transactions. In doing so, she is unwillingly confronted with the "In G-d We Trust" motto, which she believes is both false and offensive. Moreover, in various debates regarding state-church separation, Huber has often had that motto used as "proof" that "America is a Christian nation." It is used by pro-Christian debaters repeatedly to denigrate and marginalize Huber's atheism and state-church separation views. Monotheists even claim that Huber has no right to use U.S. currency because she does not believe in G-d. Such statements send the message that Huber and other non-theists are not true Americans and deserve to be subordinate to the religious majority under the authority of government and law.

Defendants' activities, therefore, substantially burden Plaintiff Huber in the exercise of her religious beliefs as pervasive government-supported Monotheism constantly taints her environment. When it is realized that she is additionally forced to proselytize for the religious beliefs of those whose demean and belittle her heartfelt Atheism, the statutory and constitutional violations of her liberties are undeniable.

24. Plaintiff Mitchell Kahle is a resident of Michigan who was raised by parents who identified as Christian (Presbyterian). Nonetheless, he is a lifelong atheist who has never held a single moment of Monotheistic religious belief and has never been a member of any Monotheistic church or religious organization. In fact, he is so deeply and personally offended by Monotheistic religious dogma that he declined to attend the religious funerals of both of his parents (father deceased 2006; mother deceased 2014). Plaintiff Kahle did attend both non-religious visitations.

1      Plaintiff Kahle is a member of the Freedom From Religion Foundation (life member), the

2      American Civil Liberties Union, Americans United for the Separation of Church and

3      State, American Atheists, and People for the American Way, among others. He is a co-

4      founder and current member of the Michigan Association of Civil Rights Activists. He is a

5      self-employed technology and media consultant (since 1992) who frequently uses U.S.

6      currency for many business and personal transactions.

7

8      In the course of his personal, business, and activist life, Plaintiff Kahle is unwillingly

9      forced to confront the phrase "In G-d We Trust." In order to simply engage in everyday

10     commerce, he is forced to bear upon his person a claim that he finds deeply offensive to

11     his sincerely-held religious convictions. Moreover, he has been confronted by individuals

12     (including elected and sworn politicians) who point to the inscriptions of that phrase as

13     "proof" that "America is a Christian nation." Such claims marginalize Plaintiff Kahle, and

14     impugn his character as he is forced to bear a message that is a provable falsehood, for he

15     – a member of the "We" whom the motto reflects – definitely does not trust in G-d.

16

17     The foregoing substantially burdens Plaintiff Kahle in the exercise of his Atheistic beliefs.

18     So, too, does the fact that the "In G-d We Trust" inscriptions send an unequivocal

19     message that Atheists are subordinate to Monotheists in this nation. This has been

20     demonstrated by those who use the Monotheistic motto to demean and belittle Atheists,

21     which Plaintiff Kahle has witnessed firsthand. In fact, he has himself suffered overt

22     discrimination by state legislators and city council members who have ridiculed his

23     sincerely held Atheistic beliefs. He has also lost friends and business opportunities

24     because he is identified as an Atheist. In such a milieu, forcing him to not only bear the

25     "In G-d We Trust" language on his body, but to proselytize for that message as well,

26     clearly burdens his exercise of religion in a markedly substantial way.

27

28    25. Plaintiff Bernard Klein is a resident of Michigan and a member of American Atheists,

29       Michigan Atheists,  the Freedom From Religion Foundation,  Americans United for

30       Separation of Church and State, and the ACLU. An octogenarian, he often feels more

31       comfortable using cash rather than credit cards or checks.

1   Although raised Catholic, Plaintiff Klein has identified as an Atheist for more than five
2   decades. Accordingly, when he receives or proffers cash, he is unwillingly forced to
3   confront the "In G-d We Trust" motto. This results in a substantial burden to the exercise
4   of his Atheism as he is forced to carry a message that is contrary to his sincerely-held
5   personal religious view that there are not G-d(s).  Moreover, having lived through
6   American society when "In G-d We Trust" was mandated for all coins and currency bills,
7   it is beyond question to Plaintiff Klein that the "G-d" on his money is the Christian G-d.
8   Accordingly, Defendants' acts compel him to be an unwilling proselytizer for Christian
9   Monotheism – a religion that demeans his personal religious convictions. This, too,
10  substantially burdens him in the exercise of his religious beliefs, as does the fact that he is
11  forced to feel dishonest as conveys a message that states that he (as a member of the "We"
12  in the motto) trusts in G-d. Ironically, as he is forced to further this message, the use of
13  that first person plural pronoun actually causes him to suffer a sense of exclusion. In other
14  words, he is made to feel like an outsider in his own country on the basis of his sincerely-
15  held religious views, and forced to bear the message that leads to that feeling.
16
17  26. Plaintiff Marni Huebner-Tiborsky is a resident of Ohio who frequently uses U.S. coins
18      and currency bills. As a lifelong Atheist, she has been and continues to be repeatedly and
19      unwillingly confronted with the "In G-d We Trust" verbiage. She finds that phrase to be
20      insulting, frustrating and demeaning, and its omnipresent nature substantially burdens her
21      in the free exercise of her Atheistic beliefs. She definitely does not trust in G-d, and
22      Defendants' insistence upon inscribing that motto on the money she must carry to engage
23      in everyday commerce forces her to bear on her person an utter falsehood. That she must
24      also further that message – which is completely contrary to her deeply and sincerely held
25      religious views – is a further insult to and burden upon her religious exercise.
26
27  27. Plaintiff Loren Miller is a resident of Ohio who often handles United States currency. He
28      is an Atheist who is a member of the Northern Ohio Freethought Society and the Atheist
29      Nexus website. He finds governmental expressions of any religious orthodoxy to be
30      divisive, and personally experiences alienation when that orthodoxy excludes him and his
31      religious belief system.

1    Defendants' inscriptions of "In G-d We Trust" result in that divisiveness and exclusion,
2    which Plaintiff Miller experiences every time he bears a United States coin or currency
3    bill. As an Atheist, Plaintiff Miller definitely does not trust in any G-d. Thus, when using
4    United States currency, he is unwillingly confronted with the governmentally-mandated
5    "In G-d We Trust" phrase. This substantially burdens him in the exercise of his religion in
6    a number of ways. First, he is essentially forced to choose between either relinquishing the
7    convenience of carrying the nation's money, or bearing on his person a religious message
8    that is the complete antithesis of his Atheistic beliefs. Second, exercise of his Atheism
9    requires that he maintain honesty, and it is absolutely dishonest for him to carry the false
10   message that "We" (i.e., Americans, of which he is one) trust in G-d. Finally, by passing
11   American money to others (at times during foreign travel), he is proselytizing for a
12   religious notion (i.e., Monotheism) that he finds false. Such proselytizing is absolutely
13   forbidden in the exercise of Plaintiff Miller's Atheism.

14

15   28. Plaintiff Martin Maier is a resident of Michigan who frequently handles the nation's
16       money in transacting everyday commerce. He is an Atheist who serves as a member of the
17       Board of Directors and Trustee of co-Plaintiff Michigan Atheists. As such, he is forced to
18       unwillingly confront Defendants' "In G-d We Trust" inscriptions every time he spends his
19       hard-earned money. This, in addition to his being forced to express a falsehood (for he
20       certainly does not trust in any "G-d") and the proselytization that occurs as he passes the
21       money to others, substantially burdens Plaintiff Maier in the exercise of his Atheism.

22

23   29. Plaintiff Michael Howard is a resident of Michigan who handles U.S. currency both as an
24       individual and as a business owner. He is an Atheist who does not believe in the existence
25       of any G-d.  When using currency he is unwillingly confronted with the governmentally-
26       mandated "In G-d We Trust" phrase.  This substantially burdens Plaintiff Howard in the
27       free exercise of his religion in a number of ways.  First, he is forced to carry with him a
28       government-mandated religious message in order to use the nation's currency. Thus, he is
29       forced to appear as if he implicitly agrees with this message every time he uses coins or
30       currency bills since he believes the phrase implies that "G-d" is the ultimate guarantor of
31       the currency, and the "We" deemed to trust in that deity him as a United States citizen.

1     Plaintiff Howard's Atheistic beliefs require that he advocate for logic, reason, and the
2     scientific method. When bearing the nation's money, he is unwillingly confronted with
3     and forced to carry an illogical, unreasonable, and not scientifically provable message that
4     there is a G-d in which trust can be placed. Carrying that message is impermissible under
5     his religious belief system. Of note is that others have repeatedly cited the fact that "In G-
6     d We Trust" is on the money as evidence that the United States is a Monotheistic nation.
7     Arguments regarding this claim (and other sequelae from his unwilling exposures to that
8     government-mandated message) have strained relationships and caused other harms as the
9     pervasive governmental endorsement of "G-d," has turned Plaintiff Howard into a
10    political outsider solely due to his religious beliefs.
11
12    30. Plaintiff Larry Knight is a resident of Michigan who also maintains a home and business
13        in Costa Rica (where U.S. currency is widely used). He is a member of numerous secular
14        groups that cater to and lobby for a society that prides itself on reason-based policy
15        making, informed by the tools of logic. In terms of religion, Plaintiff Knight is a proud
16        Atheist. Accordingly, a trust in any G-d is outside of his religious worldview. Thus, he
17        feels that any implication that he trusts in G-d – as is provided by the "In G-d We Trust"
18        inscriptions on all United States coins and currency bills – is egregious in the extreme.
19
20    When using U.S. currency, Plaintiff Knight is unwillingly confronted with those
21    inscriptions which – in itself – substantially burdens him in the exercise of his religion. He
22    is also substantially burdened by being forced to choose between either relinquishing the
23    convenience of carrying the nation's money or conveying a religious message that is the
24    complete antithesis of his Atheistic beliefs. Additionally, the exercise of his Atheism
25    requires a level of honesty that he feels is missing from Monotheistic religion. It is
26    dishonest in the extreme for him to carry the false message that "We" (i.e., citizens of the
27    United States of America) trust in G-d. Finally, passing American money to others (at
28    times during foreign travel) places him in the uncomfortable position of proselytizing for a
29    religious notion (i.e., Monotheism) that he finds false and repulsive. He finds this forced
30    proselytizing to be, by far, the most offensive assault on his exercise of his Atheism.
31

1        Plaintiff Knight notes that while Catholicism is the official State religion of Costa Rica, its

2        currency (the Colon) displays nothing in terms of religion. Yet the money of the United

3        States – which holds itself out as a "beacon of religious liberty," and has a constitutional

4        mandate for religious neutrality – exhibits a purely religious claim that divides individuals

5        on the basis of their religious beliefs. Plaintiff Knight finds it quite uncomfortable, if not

6        difficult, to conduct business in the face of such hypocrisy.

7

8    31. Plaintiff Devin Kuchynka resides and works in Ohio. Accordingly, he frequently uses

9        United States currency. He is an Atheist, however, and therefore is often unwillingly

10       forced to confront the governmentally-mandated "In G-d We Trust" phrase. This greatly

11       burdens him in the exercise of his religion in a number of ways. First, he is required to

12       choose between either giving up the convenience of carrying the nation's money, or

13       bearing on his person a religious message that is the complete antithesis of his Atheistic

14       beliefs. Second, exercise of his Atheism requires that he maintain honesty, and it is quite

15       dishonest for him to carry the false message that "We" (i.e., Americans, of which he is

16       one) trust in G-d. Finally, by passing American money to others, he is proselytizing for a

17       religious notion (i.e., Monotheism) that he finds false. Such proselytizing is absolutely

18       forbidden in the exercise of his Atheism.

19

20       In addition to needing money to transact everyday commerce, Plaintiff Kuchynka has

21       worked in a variety of jobs where accepting and returning coins and currency bills is an

22       integral component of his work. For instance, he has worked as a cashier. In that position,

23       Defendants' actions have substantially burdened him in the exercise of his Atheism as he

24       has been placed in a situation where he feels he is not only proselytizing a religious

25       ideology he finds offensive, but he is conveying a falsehood that denies his true religious

26       beliefs. This required misrepresentation of himself to others also constantly reminds

27       Plaintiff Kuchynka that – solely on the basis of his sincerely-held religious views – he is

28       an outsider in his own country. Others are similarly reminded, and have denied him job

29       opportunities and excluded him from social events due in no small part to the pervasive

30       governmental message of denigration for Atheists.

31

32. Plaintiff Tracey Martin is a resident of Michigan who frequently handles U.S. currency in transacting everyday commerce. Although now retired, she held the position of an instructor in American history for many years. Thus, she has continued expertise and awareness of the Framers' views on the intersection of religion and government, and is appalled to see the theocracy that has developed since those extraordinary men bequeathed to their future generations a secular government.

Plaintiff Martin is also an Atheist (as well as an advocate of humanist precepts), who is substantially burdened by Defendants' inscriptions of "In G-d We Trust" on the money. In exercising her Atheism, she is forced to unwillingly confront the antithesis of her religious beliefs whenever she wishes to use the nation's legal tender in order to make a purchase. She must personally bear a religiously offensive message that results in her own exclusion. Moreover, she is forced to spread this Monotheistic message, also against her will, in a loathsome repudiation of her self-esteem.

33. Plaintiff Mark Petricca is a resident of Michigan who frequently handles the nation's monetary instruments while engaging in everyday commerce. As someone who does not believe in the existence of deities, he is therefore often forced to unwillingly confront Defendants' Monotheistic inscriptions. Not only is seeing "In G-d We Trust" an affront to his sincerely held religious beliefs, but that phrase constantly reminds him of his marginalized social status (as has been repeatedly demonstrated by social science data).

Plaintiff Petricca experiences that marginalization in the form of discrimination, distrust, sneers and attempts by others to convert him to Monotheistic religion. He believes these adverse occurrences are directly related to the pervasive Monotheistic espousals by government, especially the religious inscriptions being challenged in this litigation. Due to the constant reminders of his ostracism, those inscriptions substantially burden him in the exercise of his Atheism. Furthermore, his religious exercise is substantially burdened because he is forced to bear on his person a religious statement that causes him to sense his government legitimizing, promoting and reinforcing negative and injurious attitudes not only against Atheists in general, but against him personally.

34. Plaintiff Beverly Shapiro is a resident of Michigan who is a member of Michigan Atheists, Detroit Atheist Meet-up, and Humanists of Southeast Michigan. Although she was raised Presbyterian and subsequently converted to Judaism, she ultimately found solace in Atheism, which has been her religious home now for nearly forty years.

She frequently handles United States money, not only when engaging in everyday commerce, but when she handles cash as the Humanists of Southeast Michigan's Treasurer. Especially in this latter role, the forced unwilling confrontations with Defendant's "In G-d We Trust" inscriptions are intrusive and offensive, as the idea of G-d-belief interrupts and interferes not only with her non-theistic religious experiences, but her non-theistic religious duties as well. Thus, her free exercise rights are substantially burdened.

Those rights are burdened, too, by the fact that the motto references "We," the people of America, among which Plaintiff Shapiro feels she belongs. As someone who definitely does not trust in G-d, the inscriptions introduce an element of dishonesty, which clearly taints her Atheistic practices. When she interacts with her four grandchildren, Defendants' actions again substantially burden her free exercise as she finds that giving them coins for their piggy banks, for example, can only be done by passing on a message that runs entirely counter to her sincerely-held religious ideology.

These unwanted invasions into the sphere of her Atheism, along with the forced proselytization for a religious claim she most definitely does not wish for advance any time she hands money to others, substantially burden her in the exercise of her religious beliefs.

35. Plaintiff Ron Thomas is a resident of Michigan who owns a business that produces small sports performances throughout the continental United States and, occasionally, overseas. Thus, throughout the nation (and, at times, beyond), he frequently exchanges currency with businesses and individuals. Being an Atheist, those exchanges cause him to regularly and unwillingly confront the "In G-d We Trust" inscriptions on U.S. currency.

1    Moreover, Plaintiff Thomas is unwillingly forced to advance that state sponsored religious
2    propaganda, which directly contradicts his sincerely-held religious views. Additionally,
3    because he considers himself among the "We" in those inscriptions. Plaintiff Thomas is
4    forced to participate in what is a lie about his own views. Because lying is an act not
5    permitted by his Atheistic ideology, this participation – like the other listed actions –
6    substantially burden Plaintiff Thomas in the free exercise of his religion.
7    Plaintiff Thomas is unable to view the "In G-d We Trust" language on the money without
8    having the calm enjoyment of his religious exercise disrupted. Inasmuch as he often must
9    use cash (since frequently there are no practical alternatives), Defendants' actions cause
10   this disruption on a regular basis. They also force Plaintiff Thomas to proselytize for
11   (Christian) Monotheism, which he abhors, and also remind him that he is an outcast
12   within his own nation solely on the basis of his sincerely-held religious views. All of these
13   effects are substantial burdens upon his religious free exercise.
14
15   36. Plaintiff Derek Rose is a resident of Michigan. He engages in multiple activities, including
16   billiards and golf, which require him to handle coins and currency bills.
17
18   Raised as a Catholic, Plaintiff Rose experienced early on that questioning the existence of
19   G-d was frowned upon and met with displeasure. Even after coming to the conclusion that
20   G-d is a myth, he remained closeted about it, fearing that disclosure of his Atheism would
21   make him an outcast in his own family. Finally, he put aside his years of Monotheistic
22   indoctrination and found the courage to own up to his beliefs and ideologies.
23
24   Nonetheless, due to Defendants' mandatory inscriptions, Plaintiff Rose is reminded of the
25   times when he was shamed for not trusting in G-d whenever he unwillingly is forced to
26   confront the "In G-d We Trust" language. This angst and discomfort substantially burdens
27   him in the exercise of his religious beliefs.
28
29   37. Plaintiff George Shiffer is a resident of  Michigan who frequently handles United States
30   money. As an Atheist (who serves as Director of Michigan Atheists), he is unwillingly
31   forced to confront the "In G-d We Trust" inscriptions that Defendants inscribe.

1     For Plaintiff Shiffer, those unwilling confrontations cause him to reflect on such evils as

2     slavery, most wars, terrorism, bigotry and theft, which Plaintiff Shiffer associates with

3     both Monotheism and the forced interpositions of unwanted religious beliefs (as has

4     occurred throughout much of human history). Those unwanted confrontations also result

5     in his sensing exclusion and existing as a second class citizen. Such negative effects

6     burden his free exercise of Atheism in a quite substantial manner.

7

8     Defendants have placed Plaintiff Shiffer in an untenable position: Stop using the nation's

9     currency or participate in advocacy for a religious claim that directly contradicts his

10    personal religious beliefs. To be placed in such a position is also a substantial burden upon

11    Plaintiff Shiffer's religious free exercise.

12

13   38. Plaintiff Nancy Dollard is a resident of Ohio and the mother of two minor children. She is

14      also an Atheist, raising those children without belief in G-d. In using the nation's money

15      for normal commerce, she is unwillingly confronted with the "In G-d We Trust" verbiage.

16      This reminds her that her religious beliefs, unlike the religious beliefs of her Monotheistic

17      fellow citizens, are not supported by her government.

18

19      Plaintiff Dollard often has no choice but to use cash in order to make purchases, especially

20      when at activities involving her daughters. Thus, she must personally bear a religious

21      message that she believes to be false. In addition to being turned into a political outsider

22      on the basis of her sincere religious views, this situation substantially burdens her in the

23      exercise of her Atheism.

24

25   39. Plaintiff Dennis Rosenblum is a citizen of Michigan who uses U.S. currency in the course

26      of his daily life. He is also an Atheist. Thus, in handling the money, he is unwillingly

27      forced to confront the "In G-d We Trust" inscriptions. Handling the money substantially

28      burdens his exercise of his Atheism since he is forced to bear a message which is

29      completely contrary to his religious belief system. Additionally, when he transfers money

30      to others, he is unwillingly proselytizing for (Christian) Monotheism. Such proselytizing

31      further burdens his Atheistic exercise.

40. Plaintiff Joseph Milon is a resident of Michigan who frequently uses United States coins and currency bearing the "In G-d We Trust" inscriptions. He is an Atheist and as such he does not believe in g-ds or anything supernatural in nature. Accordingly, he is substantially burdened by being in essence forced to bear on his person a religious claim that by its very nature implies that his own religious views are wrong. Moreover, because his Atheism requires that he always seek to uphold truth, he is substantially burdened in the exercise of his religious beliefs by being forced to carry an inscription that he believes is based on a complete fallacy. The exercise of his religion specifically incorporates a decision to avoid religious symbols, bibles, or anything which suggests there is a g-d. Being compelled, therefore, not only to bear the "In G-d We Trust" message, but to proselytize that idea is surely a substantial burden on the exercise of his religious beliefs.

41. Plaintiff Salvatore Salerno is a resident of Ohio who often bears the nation's coins and currency bills as he engages in everyday commerce. In doing so, he is forced to confront the "In G-d We Trust" motto against his will. Being an Atheist, this obligation to carry that message is a substantial burden on the exercise of his religious beliefs. Moreover, in debating Christians, he finds that his opponents often point to the "In G-d We Trust" inscriptions as proof that America is a (Christian) Monotheistic nation.

The foregoing results in Plaintiff Salerno feeling as if he is a second-class citizen. That message is reinforced as he collects coins, which obviously results in significantly diminished enjoyment of that hobby.

42. Plaintiff Jessica McQuarter is a resident of Michigan who works and rents property in Michigan. She is a Rotarian, Board Member of The Bay City Food Cooperative, volunteer with Little Forks Nature Conservancy, past film festival volunteer, and past President and Secretary of the Central Michigan Roller Derby. She is also a co-proprietor of a small business. In these varied roles, she frequently and repeatedly handles United States currency.

1   Plaintiff McQuarter is an Atheist. Accordingly, she does not trust in any G-d, and the
2   repeated undesired exposure to the "In G-d We Trust" inscriptions causes her to sense that
3   – solely on the basis of her strongly-held religious views – she is an outsider in her own
4   country. Such alienation is unavoidable as she is forced to choose between either
5   relinquishing the convenience of carrying the nation's money, or bearing a religious
6   message that is the complete antithesis of her Atheistic beliefs. This is a substantial burden
7   on her exercise of religion. So, too, is the fact that she must carry the false message that
8   "We" (i.e., Americans, of which she is one) trust in G-d. Perhaps most egregious (in terms
9   of the substantial burdens imposed by Defendants) is that by carrying and using the
10  nation's coins and currency bills, Plaintiff McQuarter is complicit in advocating for a
11  religious notion (i.e., Monotheism) that she finds to be completely untrue. Such
12  proselytizing is forbidden in the exercise of her Atheism.

13

14  43. Plaintiff Susan Carrier is a resident of Michigan, where she runs a home child care
15      business. She frequently handles U.S. coins and currency bills.

16

17  She has been an Atheist for approximately fifteen years. As such, she is unwillingly
18  confronted with the "In G-d We Trust" inscriptions on a regular basis, which she finds to
19  be an affront to everything that she believes in. With her Atheism being a key part of who
20  she is, she is substantially burdened by the unavoidable carriage on her person of a phrase
21  that is completely contrary to all her religious tenets. She finds it particularly offensive to
22  know that, at times, she is passing the money to other Atheists, so that she herself is
23  inflicting upon her religious brethren the very offense that she finds so painful.

24

25  As a child care provider teaching mathematical concepts to young children some of the
26  educational media that she uses contain pictures of coins or bills that show the "In G-d We
27  Trust" inscriptions. Even when she was a Monotheist (years ago), she felt uncomfortable
28  having to deal with religious concepts in a setting that should not involve religion. As an
29  Atheist, she has increased antipathy as she (in the role of an authority figure) is forced to
30  participate in inculcating a religious message in the minds of her impressionable students.
31  Similarly, she is forced to deal with this same situation in her role as a grandparent. With

1   some of her grandchildren being raised by their parents as Atheists and others being raised
2   as Monotheists, Defendants' inscriptions place Plaintiff Carrier in a position where she is
3   forced to deal with questions about G-d's existence in circumstances where she does not
4   wish to be discussing that issue. Especially when there are large family gatherings, she
5   believes that so divisive a matter should be avoided. Yet Defendants' acts have made the
6   issue pervasive in our society and, at times, unavoidable.
7
8   Outside of her family, as well, the pervasive "In G-d We Trust" contention has caused
9   difficulties for Plaintiff Carrier. Aware of the anti-Atheist bias that Defendants have
10  helped to create, she often wishes to completely avoid discussions of her disbelief for fear
11  of negative repercussions. In all of the foregoing ways, she is substantially burdened in the
12  exercise of her Atheistic beliefs.
13
14  44. Plaintiff Sarah Maxwell is a resident of Ohio who frequently uses U.S. money in everyday
15  commerce. She considers herself a rationalist, i.e., one who does not adhere to the
16  irrational concept of an imaginary supreme being, but instead respects science, reason, and
17  the inherent essence of humans as good, social beings who have respect for others and for
18  the environment. She is a member of the Freedom from Religion Foundation.
19
20  Plaintiff Maxwell is unwillingly forced to encounter "In G-d We Trust" when she uses the
21  nation's coins and currency. This claim is, to Plaintiff Maxwell, a religious falsehood. By
22  being essentially forced to bear that falsehood on her person, Plaintiff Maxwell is
23  substantially burdened in the exercise of her religious belief system. Moreover her
24  religious belief system does not permit her to falsely claim that she trusts in such an entity.
25  The result is that she suffers distress and revulsion when she transacts cash business. This
26  is particularly painful in her work as an independent contractor at a Christian church.
27  There she is unable to counter the impression, espoused by Defendants, that disbelief in
28  G-d is a religious view less worthy of respect as compared to Monotheism. In fact, any
29  step she might take to disagree with that contention might well cost her her job.
30

1   45. Plaintiff Stuart Chisholm is a resident of Michigan who runs a small business in suburban
2       Detroit. He, therefore, frequently handles United States coins and currency not only when
3       making his own purchases, but when his customers pay him for his services. In doing so,
4       Mr. Chisholm (who is an Atheist) is not only unwillingly forced to confront the "In G-d
5       We Trust" message that is contrary to his personal religious views, but is also unwillingly
6       forced to transmit that religiously offensive message to others. In other words, each and
7       every time he passes a coin or currency bill to others, he is unwillingly complicit in
8       advocating for a religious concept that he opposes.
9
10      Believing that any G-d is a myth that repudiates his religious understanding, Plaintiff
11      Chisholm finds that carrying and passing currency amounts to endorsing a philosophy he
12      opposes. Further, it not only forces him to perpetuate what he sees as a blatant lie, but
13      what he believes is a statement that demeans his own sincerely held religious ideology.
14
15  46. Plaintiff Michael Martinez is a resident of Ohio, a scientist by training, and an engineer by
16      trade. He uses United States coins and currency on a regular basis, not only in everyday
17      commerce within this country, but when he travels on business to Europe.
18
19      Plaintiff Martinez is an Atheist who holds his religious views with such fervor that he has
20      had "NO G-DS" as his license plate since 2009. Yet, due to Defendants' actions, he has
21      been forced against his will to not only confront, but to carry on his person, a religious
22      claim that completely contradicts his strongly held personal religious views. This is a
23      substantial burden of religious exercise. So, too, is the fact that he is forced to be
24      untruthful, when honesty is a key aspect of his Atheism. In no way does he – a member of
25      the "We" referenced by the "In G-d We Trust" verbiage – trust in G-d. Finally, he is
26      substantially burdened in the exercise of his religion by being forced to proselytize for G-
27      d-belief when he carries the nation's money, especially as he travels to foreign lands.
28
29  47. Plaintiff Adam Clayman is domiciled in Ohio. He often has needs to use U.S. currency in
30      the course of his daily life. Unlike the other plaintiffs in this case, he is a firm believer in
31      the existence of G-d.

1      To Plaintiff Clayman, participation in any activity that ultimately leads to the superfluous

2      printing of G-d's name on secular documents or to the destruction of G-d's printed name

3      is sinful. Thus, aware that – due to the acts being challenged in this case – G-d's printed

4      name on the nation's money will ultimately be destroyed,[1] Plaintiff Clayman has to

5      choose between engaging in sin or not using the nation's coins and currency bills. This

6      choice substantially burdens him in the exercise of his religion.

7

8      Plaintiff Clayman also wishes to run for both private and public office. Because

9      fundraising and cash contributions are integral to all political campaigns, he cannot

10     compete equally with his rivals without violating his religious beliefs. This substantially

11     burdens his free exercise of religion as well.

12

13  48. Plaintiff Michigan Atheists is a social and educational organization dedicated to defending

14     Atheists' civil rights and maintaining the separation of church and state. Formed in 1975,

15     it is the nation's oldest local Atheist group. As an organization, it is offended every time it

16     (through its officers and members) is forced to unwillingly confront the "In G-d We

17     Trust" inscriptions on the nation's money. It is also substantially burdened in its exercise

18     of religion as it is (and its members are) forced to choose between not using the nation's

19     currency in everyday commerce, or carrying that currency, thus violating its (and its

20     members') core religious beliefs.

21

22  49. Plaintiff Northern Ohio Freethought Society, the Ohio chapter of the Freedom From

23     Religion Foundation, adheres to the principles of separation of state and church. It highly

24     values the freedom its members have of being able to live in this country as non-believers.

25     However, its members are constantly reminded every time they use the nation's currency

26     that the United States government has decided for its citizens that they all trust in G-d.

27     This is not only offensive and demeaning to Atheists (and other non-believers) as citizens,

28     but is in blatant disregard of state/church separation which the nation's elected officials

29     swore an oath to uphold.

---

[1] *See, e.g.,* Treasury Order 135-01, http://www.treasury.gov/about/role-of-treasury/orders-directives/Pages/to135-01.aspx.

1    **B.** <u>**DEFENDANTS**</u>

2

3    50. Defendant the Congress of the United States of America is the branch of government

4        granted all legislative powers under Article I, Section 1, of the United States Constitution.

5

6    51. Defendant the United States of America is the constitutionally established government of

7        the United States of America.

8

9    52. Defendant Jacob J. Lew is being sued in his official capacity as the nation's Secretary of

10       the Treasury. Pursuant to 31 U.S.C. § 301(b), he is "head of the Department [of the

11       Treasury]." Pursuant to 31 U.S.C.  § 321(a)(4), Defendant Lew "shall … mint coins, [and]

12       engrave and print currency."

13

14   53. Defendant Rhett Jeppson is being sued in his official capacity as the Principal Deputy

15       Director of the Mint. "The primary mission of the United States Mint is to serve the

16       American people by manufacturing and distributing circulating, precious metal and

17       collectible coins and national metals, and providing security over assets entrusted to us."2

18       Defendant Jeppson, pursuant to 31 U.S.C. § 304(b)(2), "shall carry out duties and powers

19       prescribed by the Secretary of the Treasury."

20

21   54. Defendant Leonard R. Olijar is being sued in his official capacity as the Director of the

22       Bureau of Engraving and Printing (BEP). According to the BEP website, "The mission of

23       the Bureau of Engraving and Printing is to develop and produce United States currency

24       notes, trusted worldwide. As its primary function, the BEP prints billions of dollars –

25       referred to as Federal Reserve Notes – each year for delivery to the Federal Reserve

26       System."3 Defendant Olijar, pursuant to 31 U.S.C. § 303(b)(1), "shall carry out duties and

27       powers prescribed by the Secretary [of the Treasury]."

28

---

2 U.S. Mint, *About the United States Mint,* www.usmint.gov/about_the_mint (last visited on
Dec. 9, 2015).
3 Bureau of Engraving & Printing, U.S. Dep't of the Treas., *About the BEP,*
www.moneyfactory.gov/about.html (last visited on Dec. 9, 2015).

# **INTRODUCTION**

1

2

3  55. Defendants produce the coins and currency bills that serve as this nation's legal tender.

4  56. Pursuant to 31 U.S.C. § 5112(d)(1)[4] and 31 U.S.C. § 5114(b),[5] Defendants inscribe the

5  phrase "In G-d We Trust" on every one of those coins and currency bills.

6  57. In order to transact much of their everyday commerce, Plaintiffs wish to utilize the coins

7  and currency bills that Defendants produce.

8  58. Pursuant to their religious beliefs, Plaintiffs either specifically do not trust in any "G-d"

9  (with NOT trusting in G-d being a basic tenet of their belief systems) or hold G-d's name

10  so dear and exalted that to inscribe it on a monetary instrument is deemed sinful.

11  59. Additionally, their religious ideologies mandate that they act with honesty.

12  60. Accordingly, by being compelled to personally bear and propagate the religious claim that

13  "In G-d We Trust," they are substantially (and doubly) burdened in their religious

14  exercise.

15  61. In other words, Defendants' acts force Plaintiffs to choose between either relinquishing

16  their rights to participate in much of their everyday commerce (by using the nation's

17  monetary instruments) or violating their religious beliefs.

18  62. Forcing individuals to make such a "choice" is impermissible under both the Free

19  Exercise Clause and under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §

20  2000bb through § 2000bb-4, unless Government has a compelling interest, and uses the

21  least restrictive means to serve that interest.

22  63. Government has no compelling interest in placing "In G-d We Trust" on the money. In

23  fact, the only compelling interest in regard to that motto is to NOT inscribe it, since (as

24  provided in the first ten words of the Bill of Rights) "Congress shall make no law

25  respecting an establishment of religion."[6]

26  64. In view of the foregoing, and for the further reasons set forth in this Complaint, Plaintiffs

27  are challenge the legality of 31 U.S.C. § 5112(d)(1) and 31 U.S.C. § 5114(b) and

28  Defendants' inscriptions of "In G-d We Trust" pursuant to those statutes.

---

[4] "United States coins shall have the inscription 'In G-d We Trust'." 31 U.S.C. § 5112 (d)(1).
[5] "United States currency has the inscription 'In G-d We Trust' in a place the Secretary
decides is appropriate." 31 U.S.C. § 5114 (b).
[6] U.S. Const. amend. I.

1                           **HISTORICAL BACKGROUND**

2

3       **A.  BRIEF HISTORY OF AMERICAN RELIGIOUS FREEDOM**

4

5 65. The text of the Constitution of the United States does not reference any deity. This is in

6       striking contrast to the Articles of Confederation it replaced,[7] to the state constitutions

7       then in existence,[8] to the Declaration of Independence,[9] and even to Virginia's Act for

8       Religious Freedom.[10]

9 66. Thus, there is no reference to G-d in the Preamble to the United States Constitution.[11]

10 67. Similarly, the only oath in the Federal Constitution is completely secular.[12]

11

---

[7] The Articles of Confederation (1781) referenced "the Great Governor of the World." *See* Art. XIII, *available at* avalon.law.yale.edu/18th_century/artconf.asp.

[8] In four of the original thirteen colonies, governmental officials were required to be Protestant (New Jersey, Georgia, North Carolina and South Carolina). Delaware required its legislators to state, "I … do profess faith in G-d the Father, and in Jesus Christ His only Son, and in the Holy Ghost, one G-d, blessed for evermore; and I do acknowledge the holy scriptures of the Old and New Testament to be given by divine inspiration." Pennsylvania similarly mandated adherence to Christianity ("I do believe in one G-d, creator and governor of the universe, the rewarder of the good and the punisher of the wicked. And I do acknowledge the Scriptures of the Old and New Testament to be given by Divine inspiration."), as did Massachusetts, New Hampshire and Maryland. Although the constitutions of New York and Virginia did not have religious test oaths, neither prohibited such a requirement. Only the federal constitution contained this unique notion. *All available at* Colonial Charters, Grants and Related Documents, http://avalon.law.yale.edu/subject_menus/statech.asp and/or Center for Constitutional Studies Source Documents, http://www.nhinet.org/ccs/docs.htm.

[9] The Declaration of Independence (1776) has four references to a supernatural power: "Nature's G-d," "their Creator," "the Supreme Judge of the World," and "Divine Providence." *See* www.archives.gov/exhibits/charters/declaration_transcript.html.

[10] The Act, passed by Virginia's General Assembly on January 16, 1786, began: "Whereas, Almighty G-d hath created the mind free … ." Va. Code Ann. § 57-1 (2012). It also speaks of "the Holy author of our religion." *Id.*

[11] "We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America." U.S. Const. pmbl.

[12] "Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:--'I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States.'" U.S. Const. art. II, § 1, cl. 8.

68. Moreover, the Constitution specifically states that "no religious test shall ever be required as a qualification to any office or public trust under the United States."[13]

69. In other words, as James Madison (the "Father of the Constitution"[14]) wrote: "There is not a shadow of right in the general government to intermeddle with religion. Its least interference with it would be a most flagrant usurpation."[15]

70. The extent to which this governmental design was meant to apply can be seen by examining the very first statute of the government of the United States.

71. That statute, promulgated by the First Federal Congress and signed into law by President Washington, had its inception on April 6, 1789, when a quorum was finally obtained in both houses of Congress.

72. Meeting in New York City, the members of the House of Representatives recognized that, pursuant to the Constitution's Article VI, they "shall be bound by Oath or Affirmation, to support this Constitution."

73. Accordingly, the House members resolved:

> That the form of the oath to be taken by this House, as required by the third clause of the sixth article of the Constitution of the Government of the United States, be as followeth, to wit: "I, A B, a Representative of the United States in the Congress thereof, do solemnly swear (or affirm, as the case may be) **in the presence of Almighty G-D**, that I will support the Constitution of the United States. **So help me G-d**."[16]

74. Consequentially, on April 8, 1789, this oath was subscribed to by thirty-four of the thirty-six House members who attended the Congress after arriving in New York.[17]

---

[13] U.S. Const. art. VI, cl. 3.

[14] *See* White House, *James Madison*, www.whitehouse.gov/history/presidents/jm4.html (last visited Dec. 9, 2015).

[15] 3 *The Debates in the Several State Conventions … 1787* 330 (J. Elliot ed., 2d ed. 1836), *available at* press-pubs.uchicago.edu/founders/documents/amendI_religions49.html.

[16] 1 Annals of Cong. 101 (1789) (J. Gales ed. 1834), memory.loc.gov/cgi-bin/ampage?collId=llac&fileName=001/llac001.db&recNum=51 (enter p. 101) (emphases added).

[17] *Id*. at 106.

75. Despite this precedent, Congress reconsidered the oath (pursuant to "the third clause of the sixth article of the Constitution"). In fact, the oath was addressed in some manner sixteen times during that April and May.[18]

76. The result was a revised oath specified in the nation's first statute: "An Act to Regulate the Time and Manner of Administering Certain Oaths."[19] The revised oath was identical to the oath that had been taken, except that three phrases were deleted.

77. The first deleted phrase was "a representative of the United States in the Congress thereof." This was because the new oath would not only be required for our federal legislators, it would be mandatory for "the members of the several State Legislatures, and all executive and judicial officers of the several States"[20] as well.

78. The second and third deleted phrases were "in the presence of Almighty G-D" and "So help me G-d." Accordingly, signed into law on June 1, 1789, was "the oath or affirmation required`` by the sixth article of the Constitution … : 'I, A.B., do solemnly swear or affirm (as the case may be) that I will support the Constitution of the United States.'"

79. In other words, **the very first statute of the government of the United States involved the specific and affirmative removal of the two references to G-d** in the oath of office that had already been used by Congress itself.

80. This is not to say that none sought an alternative governmental framework. Luther Martin – Maryland's attorney general for 28 years (1778-1805) and one of that state's delegates to the Constitutional Convention[21] – complained about his colleagues' failure to require "a belief in the existence of a Deity" as part of the oath to support the Constitution, arguing that "in a Christian country, it would be at least decent to hold out some distinction between the professors of Christianity and downright infidelity or paganism."[22]

---

[18] Actions related to formulating the oath occurred on nine different occasions in the House (April 6, 14, 16, 20, 22, 25, 27 and May 6, with the Speaker signing the bill on May 21) and on seven different occasions in the Senate (April 28, 29 and May 2, 4, 5, 7, with the Vice President signing the bill on May 22).

[19] 1 Stat. 23 (1789), *available at* memory.loc.gov/cgi-bin/ampage?collId=llsl&fileName=001/llsl001.db&recNum=2 (enter p. 23).

[20] *Id*. at 24. A separate oath – also with no reference to G-d – was specified for Secretary of the Senate and the Clerk of the House of Representatives. *Id*.

[21] 3 The Records of the Federal Convention of 1787, at 172 (Max Farrand ed. 1911).

[22] *Id*., at 227.

81. That Martin lost that debate is evidenced not only by the Oath Act (which, again, was the very first "law" promulgated by United States government), but by the Bill of Rights.

82. Introduced into Congress by James Madison exactly one week after the Oath Act was signed into law, the suggested prose included:

> The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed."[23]

83. Again, a desire to favor (Christian) Monotheism (and to limit the ideals of complete religious freedom and equality inherent in Madison's words) was soon voiced.

84. Such a desire can be seen in a letter penned by the esteemed physician and renowned statesman, Benjamin Rush (who claimed that, in America, "the Christian religion should be preferred to all others," and that "every family in the United States [should] be furnished at public expense … with a copy of an American edition of the BIBLE."[24]).

85. Addressed to John Adams – who, as Vice President, was President of the Senate (where the Bill of Rights would be debated) – Rush wrote:

> Many pious people wish the name of the Supreme Being had been introduced somewhere in the new Constitution. Perhaps an acknowledgement may be made of his goodness or of his providence in the proposed amendments.[25]

86. When the Bill of Rights was finalized, however, the language of the Religion Clauses ran completely counter to Rush's request: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[26]

87. In other words, as was later expressed by Madison: "Every new & successful example … of a perfect separation between ecclesiastical and civil matters, is of importance. … [R]eligion & Govt. will both exist in greater purity, the less they are mixed together."[27]

---

[23] 1 Annals of Cong. 451 (1789) (J. Gales ed. 1834), available at memory.loc.gov/cgi-bin/ampage?collId=llac&fileName=001/llac001.db&recNum=51 (enter p. 451).

[24] Benjamin Rush, *A Plan of a Peace-Office for the United States*, in *The Selected Writings of Benjamin Rush* 20 (Dagobert D. Runes ed., 1947).

[25] 1 Benjamin Rush, *Letters* 517 (L.H. Butterfield ed., 1951) (letter of June 15, 1789).

[26] U.S. Const. amend. I.

[27] James Madison, *To Edward Livingston* (letter of July 10, 1822), in 9 *The Writings of James Madison* 101-02 (Gaillard Hunt ed., 1910).

88. The extraordinary reach of this principle can be seen in the deliberations that occurred regarding the first census, which took place in 1790. To Madison, simply tallying the numbers of "those employed in teaching and inculcating the duties of religion"[28] was problematic. This was because, under the Establishment Clause, "the general government is proscribed from interfering, in any manner whatever, in matters respecting religion; and it may be thought to do this, in ascertaining who, and who are not, ministers of the gospel."[29]

89. The separation principle was further illustrated in what has become known as the Treaty of Tripoli,[30] which the Senate approved unanimously less than six years after the Bill of Rights was ratified.

90. That treaty specifically stated that "the government of the United States of America is not in any sense founded on the Christian religion."[31]

91. Thus, when the treaty was signed on June 10, 1797, a specific component of the "supreme Law of the Land"[32] was that the nation lacked any Christian foundation.

92. That the original intention of those in the founding era was to have the federal government stay out of the religion business was seen again when President John Adams, in 1798 and 1799, issued proclamations directing the citizenry to engage in "solemn humiliation, fasting, and prayer" to G-d.[33]

---

[28] *Available at* press-pubs.uchicago.edu/founders/documents/a1_2_3s19.html. *See also* founders.archives.gov/documents/Madison/01-13-02-0017 (James Madison, 1790, Papers, 13:16).

[29] *Id.*

[30] 8 Stat. 154. The treaty was officially entitled the "Treaty of Peace and Friendship." *Available at* memory.loc.gov/cgi-bin/ampage?collId=llsl&fileName=008/llsl008.db&recNum=14 (enter p. 154).

[31] *Id.* (enter p. 155).

[32] U.S. Const. art. VI, cl. 2 ("This Constitution … and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land.").

[33] John Adams, Proclamations of March 23, 1798, and March 6, 1799, in *A Compilation of the Messages and Papers of the Presidents, 1789-1897* 269, 285 (James D. Richardson ed., 1897).

93. The response was a severe criticism:

> Because there is nothing in the constitution giving authority to proclaim fasts ... Because prayer, fasting, and humiliation are matters of religion and conscience, with which government has nothing to do ... And Because we consider a connection between state and church affairs as dangerous to religious and political freedom and that, therefore, every approach towards it should be discouraged ...[34]

94. In fact, according to Adams himself:

> The National Fast recommended by me turned me out of office. ... This principle is at the bottom of the unpopularity of national Fasts and Thanksgiving. Nothing is more dreaded than the National Government meddling with Religion.[35]

95. Thus it was an attempt to involve the government in religious activity that led to the only occasion in the first forty years of our nation's existence that the President was voted out of office after only one term.[36]

96. The subsequent wails of those that bemoaned the lack of an official (Christian) Monotheistic foundation for our nation further attests to the original understanding of the Constitution as one opposed to "the National Government meddling with Religion."

97. Timothy Dwight, for instance, President of Yale College from 1795 to 1817, spoke of "*the sinful character of our nation*"[37] when he referred to the Framers' failure to invoke G-d's name.

---

[34] Benjamin Franklin Bache, *Aurora*, May 9, 1798, as cited in Richard N. Rosenfeld, *American Aurora: A Democratic-Republican Returns* 113 (1998).

[35] Letter from John Adams to Benjamin Rush (June 12, 1812), in *Old Family Letters: Copied from the Originals for Alexander Biddle*. Ser. A, at 392 (Alexander Biddle ed., 1892). Interestingly, after noting in that he had been "represented as a Presbyterian," Adams wrote that his enemies were of the opinion that it would be better to have "'Jefferson, Madison, Burr, any body, whether they be Philosophers, Deists, **or even Atheists**, rather than a Presbyterian President.'" *Id.* (emphasis added).

[36] In 1829, Adams's son, John Quincy Adams became the next President to suffer that fate. *See* Terms of Office for United States Presidents, www.loc.gov/exhibits/treasures/inaugural-terms.html (last visited Dec. 9, 2015).

[37] Timothy Dwight, *A Discourse in Two Parts: Delivered July 23, 1812, on the Public Fast, in the Chapel of Yale College* 46 (1812).

1  98.  As Dwight accurately argued:

2           We formed our Constitution without any acknowledgement of G-
3           D; without any recognition of his mercies to us, as a people, of his
4           government, or even of his existence. The Convention, by which it
5           was formed, never asked, even once, his direction, or his blessing
6           upon their labours. Thus we commenced our national existence
7           under the present system, without G-D.[38]

8

9  99.  Not everyone, however, was complaining. In fact, Congress (i.e., the entity to whom the

10       First Amendment is addressed) strongly supported the prohibition against the National

11       Government "meddling with Religion." This can be seen in an 1830 report from a

12       House committee that responded to a religious lobby's request to halt Sunday mail

13       delivery.[39]

14  100.  Alluding to both the Constitution's Article VI Test Oath Clause and to the Religion

15        Clauses of the First Amendment, the committee determined that the matter "does not

16        come within the cognizance of Congress,"[40] because it "would constitute a legislative

17        decision of a religious controversy."[41]

18  101.  Referencing the history of religious intolerance in the world, the Report's authors

19        highlighted that the framers of our Constitution "evinced the greatest possible care in

20        guarding against the same evil."[42]

21  102.  In other words, halting Sunday mail delivery was an issue "involving the dearest rights

22        of all – the rights of conscience."[43]

23  103.  Noting that "Religious zeal enlists the strongest prejudices of the human mind,"[44] the

24        1830 congressmen highlighted that "[w]ith the exception of the United States, the whole

25        human race … is in religious bondage."[45]

26  104.  Thus, they found that "the conclusion is inevitable, that the line cannot be too strongly

27        drawn between Church and State."[46]

---

[38] *Id.*
[39] H.R. Rep. No. 271 (1830). *See* Appendix A.
[40] *Id.* at 1.
[41] *Id.* at 2.
[42] *Id.*
[43] *Id.*
[44] *Id.* at 3.
[45] *Id.*

1    105.  Perfectly applicable to the gravamen of the instant action, the reporters wrote that "if

2          their motive be to induce Congress to sanction, by law, their *religious opinions* and

3          *observances*, then their efforts are to be resisted."[47]

4    106.  Remarkably, they continued: "So far from stopping the mail on Sunday, the committee

5          would recommend the use of all reasonable meanse [sic] to give it a greater expedition

6          and a greater extension."[48]

7    107.  In other words, "It is the duty of this Government to afford to *all*–to Jew or Gentile,

8          Pagan or Christians, the protection and the advantages of our benignant institutions, on

9          *Sunday*, as well as every day of the week."[49]

10   108.  In 1874, a similar view was expressed in response to a proposal to amend the

11         Constitution by inserting "'an acknowledgment of Almighty G-d and the Christian

12         religion'" into its preamble.[50] Rejecting the proposal, the House Judiciary Committee

13         wrote:

14                     [T]he fathers of the Republic in the convention which framed the
15                     Constitution … with great unanimity [decided] that it was
16                     inexpedient to put anything into the Constitution or frame of
17                     government which might be construed to be a reference to any
18                     religious creed or doctrine.[51]
19

20   109.  Between those two eras, however, came the Civil War, with the nation on the verge of

21         dissolution. As Defendant Lew's Treasury Department has noted, that brought along

22         "increased religious sentiment,"[52] leading to a fracturing of Defendant Congress's

23         adherence to constitutional principles.

---

[46] *Id.*
[47] *Id.* at 4 (emphases in original).
[48] *Id.* at 5.
[49] *Id.* at 5-6 (emphases in original). As an aside, it is noteworthy that Defendant Jeppson's Mint is open on Sundays, with live customer service representatives available for taking orders at (202) 756-6468, 8:00 am - 12:00 midnight ET.
[50] H.R. Rep. 143 (1874).
[51] *Id.*
[52] U.S. Dep't of the Treas., *About: History of 'In G-d We Trust'*, www.treasury.gov/about/education/Pages/in-g-d-we-trust.aspx (last visited Dec. 9, 2015).

B. **HISTORY OF "IN G-D WE TRUST" ON THE NATION'S MONEY**

    **(1) The Original Coinage Acts**

110. The Treasury Department was established by Defendant Congress of the United States on September 2, 1789.[53]

111. Two and a half years later (in 1792) Defendant Congress passed "An Act establishing a Mint, and regulating the Coins of the United States."[54]

112. That Coinage Act of 1792 specified the coins to be minted.[55] The Act further prescribed that:

> Upon one side of each of the said coins there shall be an impression emblematic of liberty, with an inscription of the word Liberty, and the year of the coinage ; and upon the reverse of each of the gold and silver coins there shall be the figure or representation of an eagle, with this inscription, "UNITED STATES OF AMERICA" and upon the reverse of each of the copper coins, there shall be an inscription which shall express the denomination of the piece, namely, cent or half cent, as the case may require.[56]

113. On January 18, 1837, Defendant Congress enacted "An Act supplementary to the act entitled 'An Act establishing a mint, and regulating the coins of the United States.'"[57]

114. That Coinage Act of 1837 provided that "[t]he engraver shall prepare and engrave, with the legal devices and inscriptions, all the dies used in the coinage of the mint and its branches."[58]

---

[53] An Act to Establish the Treasury Department, 1 Stat. 65 (1789), *available at* memory.loc.gov/cgi-bin/ampage?collId=llsl&fileName=001/llsl001.db&recNum=2 (enter p. 65).

[54] Coinage Act of 1792, 1 Stat. 246 (1792), *available at* memory.loc.gov/cgi-bin/ampage?collId=llsl& fileName=001/llsl001.db&recNum=2 (enter p. 246).

[55] *Id*. (enter p. 248). The prescribed coins were "Eagles" ("each to be of the value of ten dollars or units"), "Half Eagles," "Quarter Eagles," "Dollars or Units," "Half Dollars," "Quarter Dollars," "Dismes," "Half Dismes," "Cents," and "Half Cents."

[56] *Id*.

[57] Coinage Act of 1837, 5 Stat. 136, *available at* memory.loc.gov/cgi-bin/ampage?collId=llsl& fileName=005/llsl005.db&recNum=2 (enter p. 136).

[58] *Id*.

115. That Act also provided for "an inscription of the word Liberty, and the year of the coinage" in language virtually identical to that used in the Act of 1792:

> [U]pon one side of each of said coins there shall be an impression emblematic of liberty, with an inscription of the word Liberty, and the year of the coinage ; and upon the reverse of each of the gold and silver coins, there shall be the figure or representation of an eagle, with the inscription United States of America, ....[59]

116. It is to be noted that – in keeping with the constitutionally-derived notion "that it was inexpedient to put anything into the … frame of government which might be construed to be a reference to any religious creed or doctrine"[60] – there was no religious inscription of any kind on any United States coin through 1837.

117. That situation would change, however, with the "increased religious sentiment"[61] that erupted during the nation's great civil war.

### (2) The Origin of "In G-d We Trust" on the Coinage

118. On November 13, 1861, Rev. M.R. Watkinson – characterizing himself as a **"Minister of the Gospel"**[62] – wrote to Secretary of the Treasury Salmon P. Chase seeking "the **recognition of the Almighty G-d** in some form in our coins."[63]

119. Noting to the Secretary that "**[y]ou are probably a Christian**," Rev. Watkinson claimed that such recognition was important to "relieve us from the ignominy of heathenism."

120. Additionally, the minister argued that such recognition "would place us under the Divine protection we have personally claimed. From my heart I have felt **our national shame in disowning G-d** as not the least of our present national disasters."[64]

---

[59] *Id.* at 138.

[60] *See supra* ¶ 108.

[61] *See supra* note 52.

[62] H.R. Rep. No. 662, at 2 (1955) (emphases added).

[63] *Id.* (emphasis added).

[64] *Id.* (emphasis added). Other clergy also felt that a reference to G-d should be on the nation's coins. *See* 3 Anson Phelps Stokes, *Church and State in the United States* 601 (1950). In fact, as provided by the U.S. Dep't of the Treas., *supra* note 52, "Secretary of the Treasury Salmon P. Chase received many appeals from devout persons throughout the country, urging that the United States recognize the Deity on United States coins."

121.  In response, on November 20, 1861, Secretary Chase wrote a short note to James Pollock, then the Director of the Mint in Philadelphia, making the purely religious claim that "**No nation can be strong except in the strength of G-d**, or safe except in His defense. **The trust of our people in G-d** should be declared on our national coins."[65]

122.  Secretary Chase then instructed Director Pollock to "cause a device to be prepared without unnecessary delay with a motto expressing in the fewest and tersest words possible this national recognition."[66]

123.  Director Pollock took this directive to heart, commenting upon it in each of the annual reports he submitted to Secretary Chase during his five year tenure as Mint Director.

124.  In his official 1862 Annual Report, for example, Director Pollock wrote that "[t]he **distinct and unequivocal recognition of the divine sovereignty** in the practical administration of our political system is **a duty of the highest obligation**."[67]

125.  Thus, continued the Director: "Our national coinage in its devices and legends should indicate **the Christian character of our nation, and declare our trust in G-d**."[68]

126.  The following year (in the 1863 official Annual Report), Director Pollock again called for a "distinct and unequivocal National **recognition of the Divine Sovereignty**"[69] on the nation's coins.

127.  He then continued:

> **We claim to be a Christian nation.** Why should we not vindicate our character by **honoring the G-d of Nations**, in the exercise of our political Sovereignty as a Nation?  Our national coinage should do this.  Its legends and devices **should declare our trust in G-d**; **in Him who is the "King of kings and Lord of lords."** … Let us **reverently acknowledge his sovereignty**, and let our coinage **declare our trust in G-d**.[70]

---

[65] H.R. Rep. No. 662, at 3 (emphases added).

[66] *Id.*

[67] *Report on the Finances*, in *Report of the Secretary of the Treasury … Year Ending June 30, 1862* 46 (1863), *available at* fraser.stlouisfed.org/docs/publications/treasar/ AR_TREASURY_1862.pdf  (emphases added).

[68] *Id.* (emphasis added).

[69] *Report of the Director of the Mint*, in *Report of the Secretary of the Treasury … Year Ending June 30, 1863* 190 (1863), *available at* fraser.stlouisfed.org/docs/publications/ treasar/AR_TREASURY_1863.pdf  (emphasis added).

[70] *Id.* at 190-91 (emphases added). "King of kings and Lord of lords" is, of course, explicitly Christian. 1 *Timothy* 6:15, *Revelation* 17:14 and 19:16.

1   128.  It is noteworthy that, while Mint Director, Pollock was a vice president in an

2         organization that began with an 1863 convention of "representatives from eleven

3         different denominations of Christians"[71] seeking to amend the Constitution so that its

4         preamble would read:

5              We, the people of the United States, [**recognizing the being and**

6              **attributes of Almighty G-d, the Divine Authority of the Holy**

7              **Scriptures, the law of G-d as the paramount rule, and Jesus,**

8              **the Messiah, the Saviour and Lord of all**], in order to form a

9              more perfect union … .[72]

10

11  129.  Those individuals met again in 1864, forming "The National Association to secure the

12        Religious Amendment to the Constitution of the United States."[73]

13  130.  When the Association re-convened in November of that year, it was James Pollock, still

14        serving as Mint Director, who presided.[74] Under his leadership, it was resolved:

15              **That a national recognition of G-d, the Lord Jesus Christ, and**

16              **the Holy Scriptures, as proposed in the memorial of this**

17              **Association to Congress, is clearly a scriptural duty, which it is**

18              **national peril to disregard.**[75]

19

20

---

[71] *Proceedings of the National Convention to Secure the Religious Amendment of the Constitution of the United States* iv (1872), *available at* archive.org/stream/ proceedingsnati00statgoog#page/n8/mode/2up. (The vice presidency is noted at page 2.)

[72] *Id*. at v (brackets in original; emphasis added).

[73] *Id*. at viii.

[74] *Id*. at xiii.

[75] *Id*. (emphasis added). Also at that convention was William Strong, who served on Pennsylvania's Supreme Court while Pollock was that state's governor. In 1870, President Grant appointed Strong to the Supreme Court of the United States, where he remained until he retired in 1880. In 1871 (while on the nation's high court) he was also president of the National Association, seeking "to secure the recognition of G-d as over all in our fundamental law." *id.* at 13. In 1873, leading its national convention, he spelled out the Association's goal:

> [S]ecuring such an amendment to the Constitution as will suitably acknowledge Almighty G-d as the author of the nation's existence and the ultimate source of its authority, Jesus Christ as its Ruler, and the Bible as the fountain of its laws, and thus indicate that this is a Christian nation … .

*See* APPENDIX B (included in this Complaint because of the remarkable parallels between the claims then (when Constitutional principles prevailed) and the claims here (where those principles, so far, have been disturbingly violated)). *See also* archive.org/stream/ proceedingsofn00nati#page/1/mode/1up.

1   131. Prior to presiding over this convention to interlard the Constitution with Christian

2        religious verbiage, Director Pollock had responded to Secretary Chase's request,

3        suggesting "Our country; our G-d," and "G-d our trust" as monetary inscriptions.[76]

4   132. Secretary Chase replied on December 9, 1863:

5        I approve your mottoes, only suggesting that on that with the
6        Washington obverse the motto should begin with the word "Our,"
7        so as to read, "Our G-d and our country." And on that with the
8        shield it should be changed so as to read: "In G-d we trust."[77]
9

10  133. On April 22, 1864, a coinage act amendment was passed. That amendment stated that

11       "there shall be from time to time struck and coined at the mint a two-cent piece … ; and

12       the shape, mottoes, and devices of said coin[] shall be fixed by the director of the mint,

13       with the approval of the Secretary of the Treasury … ."[78]

14  134. What specific "mottoes" or "devices" would be permissible was obviously not

15       addressed in this prose.

16  135. However, as Director Pollock himself noted, any decision to have coins that "**indicate**

17       **the Christian character of our nation, and declare our trust in G-d** … [or] to

18       introduce **a motto** upon our coins, **expressing a national reliance on divine support**

19       … is under the control of Congress; and without a change in the existing laws, no

20       alteration in the legends and devices of most of our national coins can be made; … ."[79]

21  136. Immediately following these words, Director Pollock made the contradictory contention

22       that "a motto, however, may be added without additional authority or violation of the

23       present law."[80] Thus, lacking the congressional authorization he had just acknowledged

24       was necessary, he arranged for the first time to have "In G-d We Trust" inscribed upon

25       United States coinage, using the above-mentioned two-cent piece for that purpose.[81]

26

---

[76] H.R. Rep. No. 662, at 3 (1955).

[77] *Id.*

[78] An Act in Amendment of 1857 Coinage Act, 13 Stat. 54-55 (1864), in 13 *The Statutes at Large … December 1863, to December 1865* (George P. Sanger ed., 1866), *available at* memory.loc.gov/cgi-bin/ampage?collId=llsl&fileName=013/llsl013.db&recNum=2 (enter p. 54).

[79] *Report on the Finances*, *supra* note 67, at 46-47 (emphases added).

[80] *Id.* at 47.

[81] U.S. Mint, *In G-d We Trust,* www.usmint.gov/about_the_mint/fun_facts/?action= fun_facts5 (last visited Dec. 9, 2015).

137. Director Pollock described the change as follows in the Mint's annual report for 1864:

> The two-cent piece is a most convenient and popular coin. Its size and weight contribute to its usefulness. The motto—"In G-d we trust"—stamped upon this coin, has been highly approved by the public, not only as improving the artistic beauty of the piece, but also **expressive of our nation's reliance upon the "G-d of nations"** in this hour of peril and danger.[82]

138. He then wasted no time in seeking to expand the inscription, asking rhetorically, "Why should this **distinct and unequivocal recognition of the sovereignty of G-d, of Him who is 'the King of kings and Lord of lords,'** be confined to our bronze coinage?"[83]

139. With the question posed in such a purely Christian manner, he answered himself by quoting from the Bible:

> The silver and the gold are **His**, and upon it should be impressed, by national authority, the declaration of **our nation's confidence and trust in Him** "who maketh war to cease unto the ends of the earth," and "who stilleth the raging of the sea and the tumult of the people." **Let our nation in its coinage honor Him, in whom is our strength and salvation.**[84]

140. On March 3, 1865, with this religious precedent now in place, another Act of Congress was passed. That Act authorized the creation of a three-cent piece, and it allowed that "the shape, mottoes, and devices of said coin shall be determined by the director of the mint, with the approval of the Secretary of the Treasury."[85]

141. That Act also included the first codified reference to religious dogma on the coinage:

> *And be it further enacted*, That, in addition to the devices and legends upon the gold, silver, and other coins of the United States, it shall be lawful for the director of the mint, with the approval of the Secretary of the Treasury, to cause the motto "In G-d we trust" to be placed upon such coins hereafter to be issued as shall admit of such legend thereon.[86]

---

[82] *Report of the Director of the Mint*, in *Report of the Secretary of the Treasury ... Year 1864* 213 (1864), *available at* fraser.stlouisfed.org/docs/publications/treasar/AR_ TREASURY_1864.pdf  (emphasis added).

[83] *Id*. at 213-14 (emphasis added).

[84] *Id*. at 214 (quoting *Psalms* 46:9 and 65:7, respectively) (emphases added).

[85] An Act to Authorize the Coinage of Three-Cent Pieces (Coinage Act of 1865), 13 Stat. 517 (1865), in 13 *Statutes at Large* (1866), *available at* memory.loc.gov/cgi-bin/ampage? collId= llsl&fileName=013/llsl013.db&recNum=2 (enter p. 517).

[86] Coinage Act of 1865, 13 Stat. 518.

142.  Society immediately recognized that this act was purely religious. The *New York Times*, for instance, characterized the placement of "In G-d We Trust" on the coins as a "**new form of national worship**."[87]

143.  Director Pollock apparently agreed. In his Mint Director's Report of 1865, he once more used his now familiar religious prose:

> [T]he gold and silver coins of the mint of the United States will have impressed upon them, by national authority, **the distinct and unequivocal recognition of the sovereignty of G-d, and our nation's trust in Him. We have added to our nation's honor by honoring Him who is "King of kings and Lord of lords."**[88]

144.  The following year, Director Pollock concluded his tenure at the Mint. His last report (for the year 1866) also had a section on the motto, ending this time with the words "**Happy is that nation whose G-d is the Lord**."[89]

### (3)  The Attempt to Remove "In G-d We Trust" from the Coinage

145.  Although the March 3, 1865 Act permitted "the director of the mint, with the approval of the Secretary of the Treasury, to cause the motto 'In G-d we trust' to be placed upon such coins hereafter to be issued as shall admit of such legend thereon," *see supra* ¶ 141, that placement was discretionary.

146.  Thus, when President Theodore Roosevelt, in 1905, commissioned the sculptor Augustus Saint-Gaudens to help create new coinage, the latter designed a twenty-dollar gold coin without the motto, which he considered to be "an inartistic intrusion not required by law."[90]

---

[87] *The New Legend on Our Coins*, N.Y. Times, Dec. 18, 1865, at 4, *available at* www.nytimes.com/1865/12/18/news/the-new-legend-on-our-coins.html (emphasis added).

[88] *Report of the Director of the Mint*, in *Report of the Secretary of the Treasury ... Year 1865* 233 (1865), *available at* fraser.stlouisfed.org/docs/publications/treasar/AR_TREASURY_1865.pdf  (emphasis added).

[89] *Report of the Director of the Mint*, in *Report of the Secretary of the Treasury ... Year 1866* 237 (1866), *available at* fraser.stlouisfed.org/docs/publications/treasar/AR_TREASURY_1866.pdf  (emphasis added).

[90] Ted Schwarz, *A History of United States Coinage* 228 (1980) (citing a work by Saint-Gaudens's son).

147. President Roosevelt supported the omission of the "In G-d we trust" verbiage "**in the very interest of religion**."[91]

148. "[T]o put such a motto on coins," the President wrote, "… not only does no good, but does positive harm, and is in effect irreverence, which comes dangerously close to sacrilege."[92]

149. The motto on the coins, claimed the President, was "a constant source of jest and ridicule" (referencing "the innumerable cartoons and articles based on phrases like 'In G-d we trust for the other eight cents'; 'In G-d we trust for the short weight'; 'In G-d we trust for the thirty-seven cents we do not pay'; and so forth.").[93]

150. When the issue arose of a congressional response mandating that the phrase be inscribed on the coin, President Roosevelt opined, "I very earnestly trust that **the religious sentiment** of the country … will prevent any such action being taken."[94]

151. The President was quite mistaken. The absence of what the *New York Times* then referred to as "**one of the holiest religious expressions**"[95] was immediately decried by those wishing to maintain this governmental endorsement of (Christian) Monotheism.

152. That the hostility was religion-based can be immediately recognized by reports of "protests or expressions of regret **from many clergy**"[96] and from "**various religious organizations and individuals, especially clergymen**."[97]

153. After all, "a great many people … think that to take such an inscription off the coin is to disavow all trust in G-d and is therefore **an act of irreligion**. One clergyman is reported to have spoken of '**the religious sentiment of the American people**' as being 'effaced.'"[98]

---

[91] Editorial, *What Makes a Christian State?* 63 The Independent 1263, 1263 (1907) (emphasis added).
[92] Letter from Theodore Roosevelt to William Boldly (November 11, 1907), *reprinted in* Schwarz, *supra* note 90, at 230.
[93] *Id*.
[94] *Id*. (emphasis added).
[95] *Coin Symbols*, N.Y. Times, Nov. 15, 1907, at 8 (emphasis added).
[96] *In G-d We Trust*, 63 The Independent 1196, 1196 (1907) (emphasis added).
[97] *The Motto on Coinage*, 87 The Outlook 707, 707 (1907) emphases added).
[98] *Id*. at 708 (emphases added).

154. Another report spoke of the "great number of **religious people** in this country"[99] who considered President Roosevelt's decision "'a huge blunder.'"[100]

155. Further highlighting the fact that religion was at the root of the controversy, it was considered "'strange that he did not foresee that the great majority of **religious people, Protestant, Catholic, many Jews**, would be sensitive at the removal of those words at a time when every vestige of **national recognition of G-d** is of importance.'"[101]

156. Moreover, religious organizations "passed resolutions condemning the President's action" and "[s]imilar views [we]re expressed **by clergymen of all denominations.**"[102]

157. Using the coin-based (Christian) Monotheism, believers also disregarded and denigrated Atheists as they touted their self-assessed superiority. One clergyman, for instance, contended that the removal of the motto "would cause the deepest regret among a vast number of our most substantial citizens."[103] "Substantial citizens," obviously, were those who had trust in G-d, which somehow had become a requirement for one to be considered patriotic: "I have never heard of any body of men who believe in the sacred principles of patriotism passing resolutions asking to have the sentiment removed, but from my childhood I have heard **the blatant protests of infidels and unbelievers** against this custom.'"[104]

158. Of greater weight is the activity undertaken by the nation's legislators.

159. Specifically, a congressional subcommittee examined the matter, releasing its Report on February 26, 1908.[105] In that Report the subcommittee determined that the move to restore "In G-d We Trust" to the Saint-Gaudens coin "reflects **the reverent and religious conviction which underlies American citizenship**."[106]

---

[99] *The President and the Motto on Our* Coins, 44 Current Literature 68, 68 (Jan.-June 1908) (emphasis added).

[100] *Id*. (citation omitted).

[101] *Id*. at 69 (citing "the leading Methodist paper") (emphases added).

[102] *Id*. (emphasis added).

[103] *Id*. (citing the Rev. Dr. Charles Edward Locke) (emphasis added).

[104] *Id*. (emphasis added).

[105] H.R. Rep. No. 1106, at 1 (1908).

[106] *Id*. (emphasis added).

160. That each of the subcommittee members considered Christianity to be the "reverent and religious conviction" represented by "In G-d We Trust" was highlighted in the Report:

> Your subcommittee is unanimous in the belief that as **a Christian nation** we should restore the motto to the coinage of the United States upon which it was formerly inscribed "as an outward and visible form of the inward and spiritual grace," which should possess and inspire American citizenship, and **as an evidence to all the nations of the world** that the best and only reliance for the perpetuation of the republican institution is upon **a Christian patriotism**, which, **recognizing the universal fatherhood of G-d**, appeals to the universal brotherhood of man as the source of the authority and power of all just government.[107]

161. A month after the Report was issued, the matter was debated by the full House of Representatives.[108] During that debate, nine congressmen gave speeches. In each of these speeches, it was made clear that the "In G-d We Trust" phrase is religious and that it is intended to support (Christian) Monotheism.

162. Providing the introductory oration, Rep. Charles Creighton Carlin (VA) stated that "[t]his action … furnishes a lesson … that **this is a Christian nation** … [and] the world already understands that **we are a Christian, G-d-fearing, G-d-loving people**.[109]

163. He continued by citing to a litany of other societies and governments that throughout history had Monotheistic verbiage on their coins.[110]

164. In doing so, however, Rep. Carlin failed to note what is most important: none of those other societies and governments had an Establishment Clause.

165. Thus, Rep. Carlin freely admitted that "In G-d We Trust" represented **the nation's "faith in the Supreme Ruler of the Universe"** and that placing those words on the coins was a way "of giving expression to **religious belief**."[111]

166. Rep. Carlin also contended that, "**In every Christian heart** there beats the hope that you will by your action determine that the circulating coin of this country shall carry the knowledge that **we are a Christian people**,"[112]

---

[107] *Id.* (emphases added).
[108] 42 Cong. Rec. 3384-91 (1908).
[109] *Id.* at 3384 (emphases added).
[110] *Id.* at 3384-85.
[111] 42 Cong. Rec. at 3385 (statement of Rep. Carlin) (emphases added).
[112] *Id.* (emphases added).

167. Rep. Carlin ended his remarks by expressing "the hope and belief that … **Christian thought and Christian ideas** will control the hearts and minds of all men and upon the wall of every home throughout the universe there will hang, for the enlightenment and encouragement of all who may follow, the sacred motto, 'In G-d We Trust.'"[113]

168. Next to make a speech was Rep. Ollie M. James (KY), who began by asserting that "[t]he President of the United States made a great mistake in the judgment **of the Christian people of this Republic**."[114] Rep. James continued:

> This country is not only **a Christian nation**, but we are engaged in sending to foreign countries and to distant people our missionaries **to preach the religions of Jesus Christ**, and we want our money so that when this gold that you say is so good goes across the ocean and is held in the hands of those who do not know of **the existence of the Saviour of the world**, we can say: "Here are the dollars of the greatest nation on earth, one that does not put its trust in floating navies or in marching armies, but **places its trust in G-d**."[115]

169. Demonstrating intentional and specific disrespect for the Atheists in his congressional district, Rep. James included in his oration the Biblical statement, "The fool hath said in his heart 'there is no G-d,'" to which his audience immediately responded with applause.[116]

170. He then reinforced the favoritism for his own religion by stating that "**the Christian legions of this nation** will hail with delight favorable action upon this bill."[117]

171. Although the third speaker in the debate, Rep. Gustav Küstermann (WI), supported President Roosevelt's decision to remove the "In G-d We Trust" inscription, he did so because "I do not believe in … any person that always hangs out his shingle '**I am a Christian**,'" and because he, too, felt that having the motto on coins was "'in effect irreverence, which comes dangerously close to sacrilege.'"[118]

---

[113] *Id.* (emphasis added).
[114] *Id.* (statement of Rep. James) (emphasis added).
[115] *Id.* (emphases added).
[116] *Id.*
[117] *Id.* (emphasis added).
[118] *Id.* at 3386 (quoting the President) (emphasis added).

172.   The next speaker, Rep. John P. Moore (PA), stated he felt the motto belongs on the coins "because in my community there was a desire that it should be made known to the world generally that in this country **we do trust in G-d**."[119]

173.   Rep. Moore then felt it necessary to respond to what he called an "unsavory extract"[120] that he had previously read in a newspaper editorial:

> "Those who do not believe in G-d in this country look upon his removal of that unconstitutional, untruthful, and unwarranted deific motto from our coinage as one of the most sensible acts ever performed by the President. They do not trust in G-d, … and, therefore, they do not see why every coin issuing from our mints should carry forth to the world an unofficial lie."[121]

174.   That paragraph (written more than a century ago and quite accurately representing the religious views of Plaintiffs here) was then deemed to be a "challenge" by Atheistic Americans, and "when such a challenge is put forth, … then I feel it is time to rise and declare, even by law, that **this is a G-d-fearing nation**, and that Congress can do no harm in making that declaration emphatic."[122]

175.   Rep. Morris Sheppard (TX) also felt that affirmative rejection was warranted in regard to the views of Atheists. Therefore, "the fact that almost every infidel in the country has openly rejoiced over the removal of this motto"[123] was his focus:

> The fact that the infidels openly object to [the "In G-d we trust" phrase's] restoration, the fact that [its] removal would be used as an argument to destroy reverence rather than to inculcate it, ought to prompt Congress unanimously to restore the words, "In G-d we trust."[124]

176.   After Rep. Charles Gordon Edwards (GA) spoke of how the motto favored "all churches, all creeds, who have a belief in G-d," he offensively proclaimed, "**A man who is not sound in his belief in G-d has no right in high office**."[125]

---

[119] *Id.* (statement of Rep. Moore) (emphasis added).
[120] *Id.*
[121] *Id.* (citation not provided by Rep. Moore).
[122] *Id.* (emphasis added).
[123] *Id.* at 3386-87 (statement of Rep. Sheppard).
[124] *Id.* at 3387.
[125] *Id.* (statement of Rep. Edwards) (emphasis added).

177. Speaking to his congressional colleagues, Rep. Edwards contended that **"[w]e represent G-d-fearing people, and we, their representatives, should be G-d-fearing representatives**."[126] Moreover (echoing Rep. James's earlier claim that the religious message was intended to be spread far beyond our borders, *see supra* ¶ 168), Rep. Edwards also argued that the "In G-d We Trust" phrase "is a declaration not only to our people at home, but to all peoples, and to all nations, all over the world, that **ours is a nation with a firm and steadfast faith in G-d**."[127]

178. It is noteworthy that Rep. Edwards saw the issue – which, of course, arose solely due to the acts of federal officials – as pitting Atheistic Americans against Americans who believed in G-d: "The removal of these words was a victory for infidelity. The restoration of them to our coin will be a blow to infidelity and **a victory for the G-d-fearing people** of this great nation."[128]

179. Obviously of the latter camp, the Congressman was apparently oblivious to the self-contradictory nature of his words when he wrote, "I dare say that every form of religious thought is represented in America, and **yet we are one in the recognition of a supreme and all-wise G-d**."[129]

180. Rep. Edwards concluded: "Let us not put an 'infidel money' out upon the world, but let us put out the coin **that says to all the world 'Americans are a G-d-fearing and G-d-loving people.'**"[130]

181. Rep. George W. Gordon (TN) followed Rep. Edwards. Like Rep. Küstermann (and the President before him), Rep. Gordon also felt that the words "In G-d We Trust" were **too holy and sacrosanct** to be placed on "a medium of commerce … [and] of secular, and not sacred, transactions."[131]

182. The next speaker was the subcommittee chairman, George A. Pearre (MD), who sought to emphasize that there was not "any suggestion of irreverence or lack of **Christian spirit** upon the part of the President when he took that action."[132]

---

[126] *Id*. (emphasis added).
[127] *Id*. (emphasis added).
[128] *Id*. (emphasis added).
[129] *Id*. (emphasis added).
[130] *Id*. at 3389 (emphasis added).
[131] *Id*. (statement of Rep. Gordon) (emphasis added).
[132] *Id*. (statement of Rep. Pearre) (emphasis added).

1  183. On the contrary, stated Rep. Pearre, "[The President] **is a Christian man** in every

2  relation of life; and not only **a Christian man**, but **a practical Christian man**, both as

3  an individual and as a public servant, and he has endeavored to impress **Christian**

4  **principles** upon public affairs."[133]

5  184. Last to speak was Rep. Washington Gardner (MI). He began by referencing children

6  who were exposed – *by their parents* – to "literature [with] an avowed purpose to banish

7  G-d from the minds of the rising generation."[134] Wishing "to put myself on record as

8  against th[is] purpose," Rep. Gardner revealed that, to him, those minds should instead

9  be taught – *by their government* – about "**[t]he ignominious cross** upon which was

10  consummated the sublimest sacrifice in human history" and "[t]he sacrificial wood upon

11  which was pinioned **the body of the Nazarene**."[135]

12  185. According to Rep. Gardner, "In G-d We Trust" on the nation's coinage would aid in this

13  goal because:

14  The teaching influence and the rallying power of emblems and
15  mottoes have been recognized in all ages and by all nations. As a
16  rule, they concrete in material form or express in briefest language
17  some great thought or purpose or movement until they become
18  dear to the people adopting them. The origin of these mottoes and
19  emblems is often of greatest interest and lends enduring influence
20  and value.[136]

22  186. The bill was voted upon after Rep. Gardner spoke. It contained the following language :

23  That the motto "In G-d we trust," heretofore inscribed on certain
24  denominations of the gold and silver coins of the United States of
25  America, shall hereafter be inscribed upon all such gold and silver
26  coins of said denominations as heretofore.[137]

28  187. It passed overwhelmingly, with the 268 Representatives who were present casting 259

29  yea votes, 5 nay votes, and 4 answering "present."[138]

30  188. Two months later, on May 18, 1908, President Roosevelt signed the bill into law.[139]

[133] *Id*. (emphases added).
[134] *Id*. (statement of Rep. Gardner).
[135] *Id*. (emphases added).
[136] *Id*.
[137] *Id*. at 3384.
[138] *Id*. at 3391.
[139] Act of May 18, 1908, Pub. L. 60-120, ch. 173, § 1, 35 Stat. 164, 164.

189. Thus, more than a century after the Framers wrote that "Congress shall make no law respecting an establishment of religion" (and more than seventy-five years after a congressional committee wrote "that the line cannot be too strongly drawn between Church and State"[140]), the purely religious phrase "In G-d We Trust" was not only permitted, but mandated to appear on United States money.

190. With that action designed to reflect "the … **religious conviction which underlies American citizenship**"[141] (which is itself founded "upon **a Christian patriotism**, which, recognize[s] the universal fatherhood of G-d[142]), it is incontrovertible that Congress not only intended to use the motto to advocate for (Christian) Monotheism, but that it also intended to exclude Atheists from the "We" in that four-word phrase.

### (4) The Legislative Mandate for "In G-d We Trust" on <u>All</u> Coins and on the Currency

191. Because the Act of May 18, 1908, only required "In G-d we trust" to "be inscribed upon all such gold and silver coins of said denominations as heretofore,"[143] some coins continued to be minted without that religious language.

192. Additionally, the "In G-d We Trust" phrase was not being used on any of the nation's currency bills, as was noticed in 1953 by an Arkansas businessman and numismatist named Matthew H. Rothert "as the collection plate was being passed" in church.[144]

193. Mr. Rothert (acting in a manner not dissimilar to that of Rev. Watkinson nearly a century earlier, *see supra* ¶ 118) wrote to the Secretary of the Treasury, George M. Humphrey. In his letter, Rothert suggested placing those religious words on the currency in order to **"affirm our trust in G-d** in such a manner that it will be **heard around the world** and give moral and spiritual strength to those who realize **a great nation humbly and reverently places its trust in the Almighty**."[145]

---

[140] *See supra* ¶ 103.
[141] H.R. Rep. No. 1106, at 1 (1908) (emphasis added).
[142] *Id.* at 2 (emphasis added).
[143] *See supra* ¶ 186 (referencing the bill that became the Act of May 18, 1908).
[144] Fred Petrucelli, *Almighty Dollar Mentions G-d Because of Arkansan,* Ark. Gazette, Mar. 4, 1955, at 2F.
[145] *Camden Man Asks Treasury to Put Religious Motto on Bills*, Ark. Gazette, Dec. 6, 1953, at 10C (emphases added).

194. This matter – subsequently described as "**the affirmation of our nation's belief in Divine Guidance**"[146] – was also brought to the attention of the president of the Florida Bar, who in turn informed Congressman Charles E. Bennett (FL).[147]

195. Rep. Bennett contacted the Department of the Treasury. Upon learning that "In G-d We Trust" was not only not required on the currency, but that it was still permissible to mint some coins without that religious verbiage, Rep. Bennett introduced H.R. 619 ("the inscription 'In G-d We Trust' … shall appear on all United States currency and coins") on the first day of the first session of the 84th Congress.[148]

196. In his remarks explaining his purpose for sponsoring the legislation, Rep. Bennett stated:

> At the base of our freedom is **our faith in G-d** and the desire of Americans **to live by His will and by His guidance**. As long as this country **trusts in G-d**, it will prevail. To remind all of us of this self-evident truth, it is proper that our currency should carry these inspiring words, coming down to us through our history: "In G-d we trust."[149]

197. Obviously blind to the sincere beliefs of Atheists, Rep. Bennett later noted, "In G-d We Trust" was appropriate because "**the sentiment of trust in G-d is universal.**"[150]

198. Other legislators similarly disregarded the fact that many Americans hold contrary religious beliefs. Then-Senator Lyndon B. Johnson, for example, pushed for the Bill in the Senate, stating that the motto "**reflect[s] the spiritual basis** of our way of life."[151]

199. That "spiritual" was synonymous with "(Christian) Monotheistic" is evident from the words of Sen. Homer Ferguson, who had earlier pressed for a National Day of Prayer. "We must do something more than marshal our material strength," the Senator stated. "We must marshal all of our **spiritual** resources, as well."[152] The Senator then asked for unanimous consent to place in the record an article which had as its first sentence "The United States is generally classified as **a Christian Nation**."[153]

---

[146] Ed Rochette, *The Man Who Put G-d's Trust in Your Pocket*, Antiques & Collecting, July 1987, at 80.

[147] 101 Cong. Rec. 4384 (1955) (statement of Sen. Bennett).

[148] *Id.*

[149] *Id.* (emphases added).

[150] 101 Cong. Rec. 7796 (1955) (statement of Sen. Bennett) (emphasis added).

[151] 101 Cong. Rec. 9448 (1955) (statement of Sen. Johnson) (emphasis added).

[152] 97 Cong. Rec. 5863 (1951) (remarks of Sen. Ferguson) (emphasis added).

[153] *Id.* (emphasis added).

200. The article's second sentence was "If that means anything at all, it means that **the vast majority of our people accept the basic tenets of the Christian faith**."[154]

201. In this atmosphere of congressional advocacy for (Christian) Monotheism, the political disenfranchisement of Atheists, *see also infra* ¶¶ 226-288, was highlighted by the unanimous passage – in both the House and the Senate – of Rep. Bennett's resolution mandating "In G-d We Trust" on all currency and coins.[155]

202. Accompanying H.R. 619 was a Report of the House Committee on Banking and Currency.[156] This Report – as well as the key hearing that led to its creation – confirms (once again) that the use of "In G-d We Trust" was intended to be religious.

203. The main portion of the Report was entitled, "**Religious Inscriptions** on Coins in the United States."[157] Its prose referenced Rev. Watkinson's 1861 letter to Treasury Secretary Chase (stating "**You are probably a Christian**" and decrying the "fact touching our currency [that] has been seriously overlooked … **the recognition of the Almighty G-d** in some form in our coins.").[158]

204. At the hearing, Rep. Bennett stated, "as far as I know there is no opposition to this legislation,"[159] suggesting that he had very little exposure to (or interest in the rights of) the Atheists in his congressional district that it was his duty to represent.

205. Accordingly, he contended that "this motto … expresses so tersely and with such dignity **the spiritual basis** of our way of life."[160]

206. Rep. Bennett then proclaimed that:

> Most of us agree wholeheartedly with the first advance of this motto, Secretary of the Treasury S. P. Chase, when he said: "No nation can be strong except in the strength of G-d, or safe except in His defense. **The trust of our people in G-d should be declared on our national coins.**"[161]

---

[154] *Id*. (emphasis added).

[155] *Id*.

[156] H.R. Rep. No. 662 (1955).

[157] *Id*. at 2 (emphasis added).

[158] *Id*. (emphases added).

[159] *H.R. 619: United States Currency Inscription*, in *Miscellaneous Hearings: Hearings Before the Comm. on Banking & Currency, House of Representatives*, 84th Cong., 47, 49 (1956).

[160] *Id*. at 48 (emphasis added).

[161] *Id*. (emphasis added)

207. Rep. Bennett then concluded with:

> At the base of our freedom is **our faith in G-d** and the desire of Americans **to live by His will and by His guidance**. As long as **this country trusts in G-d,** it will prevail.[162]

208. Rep. Abraham J. Multer (NY) spoke next. After stating "I don't want to get **into an argument on religion**,"[163] he echoed President Roosevelt's view from 1908:

> I think **I am as religious as any man** in this House … but I feel very strongly that it was a mistake to put it on coins in the first place, and this is perpetuating a grievous error. I think it is the base of **all of those who believe in G-d**; to put anything like that on anything so materialistic as our coins and our currency – I don't think anybody is made more religious by putting it on the coins and currency. … If we are going to have **religious concepts** – and I am in favor of them – I don't think the place to put them is on our currency or on our coins.[164]

209. Of note is that Rep. Multer's inclusion of "In G-d We Trust" among "**religious concepts**" was disputed by no one at the hearing.

210. Nor did any speaker show consideration for the religious view that G-d is nonexistent. Rather, Atheists were (at best) totally disregarded. Rep. William E. McVey (IL), for instance, maintained, "I can't possibly see any objection to having the inscription "In G-d We Trust" on all of our currency, and I am very glad to support it."[165]

211. The Committee chairman, Rep. Brent Spence (KY), joined in:

> I think if there ever was a nation that has, by its course, demonstrated that G-d had a hand in its making and its progress, it is this country. **I always believe that G-d was present in the Convention Hall where our Constitution was formed.**[166]

212. The desire to intrude Monotheism into our government was so pervasive that Rep. Gordon L. McDonough (CA) exclaimed, "I don't think we can insert that phrase in too many places in regard to the Government of the United States."[167]

---

[162] *Id*. at 49 (emphases added). *See also* 101 Cong. Rec. 4384 (1955) (statement of Rep. Bennett).

[163] *H.R. 619*, *supra* note 159, at 49 (emphasis added).

[164] *Id*. at 50 (emphases added).

[165] *Id*. at 51.

[166] *Id*. (emphasis added).

[167] *Id*. at 52.

213. Rep. Herman P. Eberharter (PA) showed his support for the "In G-d We Trust" language by placing in the record a resolution passed by the American Legion's National Convention that asserted that America "is **a G-d-fearing country**."[168]

214. Rep. Eberharter had just recently recovered from an illness. Accordingly, Rep. Barratt O'Hara (IL) commended him for coming "at great sacrifice to himself, to testify for this bill, which affirms his faith and **the faith of all others in our country, in G-d**."[169]

215. Rep. Oren Harris (AR) stated "It does not take the inscription on our coins for me to **proclaim my faith and trust in G-d**." Then, essentially illuminating how the action being considered violates the Establishment Clause, he explained that "[w]ith the inscription on our coins it is another expression, not only individually but collectively, in this country, **of our faith**."[170]

216. Rep. Harris, who also could "see no objection whatsoever to this further expression of this quotation on the currency that we use in this country,"[171] placed a Resolution in the record from the American Numismatic Association. That Resolution stated that "this legend relating to **the power of Almighty G-d** shall be placed upon the currency."[172]

217. Rep. Lawrence H. Fountain (NC) referred to the motto as one of the "many instances indicat[ing] **our belief in the existence of G-d**."[173]

218. Rep Fountain further noted that:

> **The Bible begins** with the words "In the beginning, G-d" and I think more and more it is essential for us to recognize the fact that we as individuals and as a nation are merely the custodians of the things which **G-d has so graciously granted** to us.[174]

219. That the motto refers to explicitly religious dogma was further evidenced when Rep. Fountain added that "by having this inscription on our coins and on our currency … we are indicating … because of **the goodness of G-d** we have become a prosperous and powerful nation."[175]

---

[168] *Id*. at 54 (emphasis added).
[169] *Id*. (emphasis added).
[170] *Id*. at 55 (emphases added).
[171] *Id*.
[172] *Id*. at 56 (emphasis added).
[173] *Id*. (emphasis added).
[174] *Id*. (emphases added).
[175] *Id*. (emphasis added).

220. He continued by contending that "that inscription indicates that even though this coin is necessary, it is not in this coin we trust, but **it is in G-d that we trust**."[176]

221. Rep. Harris spoke once again as the hearing was brought to a close. In signaling his agreement with the previous speaker, Rep. Harris demonstrated that it was not only Monotheism that Congress was endorsing, but Christian Monotheism, as he recalled a "very famous statement of **our Lord and Saviour**."[177]

222. Thus, it should be noted that not one person at the key hearing that led to the mandatory inscription of "In G-d We Trust" on all of the nation's coins and currency ever even suggested that the phrase was anything other than a "statement of faith [that] has appeared on billions of coins."[178]

223. As the House and the Senate both lauded the "**spiritual** basis of our way of life,"[179] the religious views of non-believer Americans were further ignored.

224. Thus, "An Act to provide that all United States currency shall bear the inscription 'In G-d We Trust'" became the law of the land on July 11, 1955.[180]

225. This Act is now codified at 31 U.S.C. § 5112 (d)(1) ("United States coins shall have the inscription 'In G-d We Trust'") and at 31 U.S.C. § 5114 (b) ("United States currency has the inscription 'In G-d We Trust' in a place the Secretary decides is appropriate.").

---

[176] *Id.*

[177] *Id*. (remarks of Rep. Harris) (emphasis added).

[178] S. Rep. No. 1287, at 2 (1954) (remarks of Sen. Ferguson).

[179] *See* H.R. Rep. No. 662, at 4 (1955) (emphasis added). *See also* S. Rep. No. 637, at 2 (1955), *reprinted in* 1955 U.S.C.C.A.N. 2417, 2417. *See also supra* note 199.

[180] Act of July 11, 1955, ch. 303, Pub. L. 84-140, 69 Stat. 290.

**C. THE LEGISLATIVE MANDATE FOR "IN G-D WE TRUST" ON ALL COINS AND CURRENCY REFLECTED THE (CHRISTIAN) RELIGIOUS FERVOR AND ANTI-ATHEISM OF THE 1950s**

226. The 1950s were largely characterized by the Cold War and a national desire to distinguish our nation from the communistic Soviet Union.

227. A key distinguishing feature was religious freedom. Whereas that freedom was guaranteed to our people, the Soviets demanded adherence to one religious view.

228. Although this difference – i.e., freedom versus totalitarianism – deserved to be celebrated, the nation actually denigrated the religious liberty upon which we rely by focusing instead on the Soviets' specific religious choice: Atheism.

229. In other words, a favored religious belief (i.e., (Christian) Monotheism) rather than a favored political principle (i.e., religious freedom) was officially touted by our governmental agents as the ideological difference between us and our rivals.

230. President Eisenhower was chief among such agents, as he (like Congress) demonstrated a total disregard for those Americans who adhere to Atheistic religious belief.

231. For instance, he placed **"G-d's Float"** at the fore in his 1953 inauguration.[181]

232. He also sought "legislative support for a national day of prayer, attend[ed] annual presidential prayer breakfasts, and appoint[ed] a minister to a new special presidential post for religious matters."[182]

233. Also on his Monotheistic agenda was participation in the American Legion's "Back to G-d" crusade,[183] where he made the extraordinary statement that:

> **Recognition of the Supreme Being is the first, the most basic, expression of Americanism. Without G-d, there could be no American form of government, nor an American way of life.**[184]

---

[181] J. Ronald Oakley, *G-d's Country: America in the Fifties* 320 (1986).
[182] Martin Marty, *Under G-d, Indivisible, 1941-1960* 302 (1996).
[183] It might be noted that the American Legion, through both its leadership and its members, had been largely responsible for the brutalization of Jehovah's Witnesses in the aftermath of the Supreme Court's ruling in *Minersville v. Gobitas*, 310 U.S. 586 (1940). *See* Richard J. Ellis, *To the Flag* 106-07 (2005).
[184] Dwight D. Eisenhower, *Remarks Recorded for the "Back-to-G-d" Program of the American Legion*, Feb. 20, 1955 (emphasis added), www.presidency.ucsb.edu/ws/index.php?pid=10414.

234. As one author put it:

> [The President] often used religious phrases and talked about the need for religious faith and spiritual values. He frequently called on divine aid for himself and his country in speeches, held prayer breakfasts, received church delegations in his office, and had Billy Graham and Norman Vincent Peale as overnight guests at the White House. He also began cabinet meetings with a prayer.[185]

235. Another wrote:

> His priesthood was part of his role as leader of a "crusade," as he called it, against "g-dless Communism" … "The things that make us proud to be Americans are of the soul and of the spirit," Eisenhower declared. And being American, for a president who was baptized and who joined a church for the first time after having been elected, meant being a theist.[186]

236. That the motto was a part of this Monotheistic religiosity was shown by the first stamp containing the "In G-d We Trust" phrase, which "was introduced to a nationwide television and radio audience during a 15-minute program in which President Dwight D. Eisenhower, Secretary of State John Foster Dulles and Postmaster General Arthur E. Summerfield participated **with the leaders of the Nation's three largest religious groups**."[187]

237. That 1954 event was described as "[t]he most impressive and most widely publicized ceremony of its kind in the history of the United States Post Office Department,"[188] and it marked "'the first time that **a religious tone** ha[d] been incorporated into a regular or ordinary stamp.'"[189]

238. This religious focus might be contrasted with the principles adhered to by Congress (in reference to the Postal Service) more than a century earlier. *See supra* ¶¶ 94-107.

239. Unfortunately, this new-found governmental sectarianism (advocating for (Christian) Monotheism) was not limited to the Postal Service.

---

[185] Oakley, *supra note* 181, at 153.

[186] Marty, *supra note* 182, at 296.

[187] *"In G-d We Trust" – New Postage Stamp to Carry Message to World*, The Gideon, May 1954, at 24, 25 (emphasis added), *available at* members.purespeed.com/~mg/images/IGWT_TheGideon195405.pdf.

[188] *Id.* at 24.

[189] *Id.* at 25 (citing Postmaster General Summerfield) (emphasis added).

240.  On the contrary, it pervaded the executive branch. Secretary of State Dulles, for
      example, contended, "'there is no way to solve the great perplexing international
      problems **except by bringing to bear on them the force of Christianity**.'"[190]

241.  Speaking to the nation's future servicemen, Deputy Assistant to the President Wilton B.
      Persons claimed that the purpose of our military academies was "**to build good, strong,
      G-d-fearing character in men like ourselves** – men who, before long, will have the job
      of running this great country of ours."[191]

242.  Accordingly, President Eisenhower implemented the *Code of Conduct for Members of
      the Armed Forces*. Under that Code, "all members of the armed forces of the United
      States" were required to "**trust in my G-d and in the United States of America**."[192]
      An Atheist who sought to remain true to his religion, therefore, was essentially
      precluded from serving in the military.

243.  In fact, the executive branch was so religious that one writer referred to the Secretary of
      Defense as "the only man in the Administration who doesn't talk about G-d."[193]

244.  Thus, as it became "un-American to be unreligious,"[194] "Atheists or agnostics were not
      tolerated,"[195] and "being a Protestant, a Catholic, or a Jew [wa]s understood as the
      specific way, and increasingly perhaps the only way, of being an American and locating
      oneself in American society."[196]

245.  In other words, "**in the fifties … atheists were automatically considered to be
      unpatriotic, un-American, and perhaps even treasonous**."[197]

---

[190] As quoted in William Lee Miller, *The 'Moral Force' Behind Dulles's Diplomacy*, The Reporter, Aug. 9, 1956, at 17, 18 (emphasis added).

[191] Wilton B. Persons, *Your Future: A Stupendous Stimulating Challenge* (May 30, 1954), in 20 *Vital Speeches of the Day* 688, 688 (1954) (emphasis added).

[192] *Executive Order 10631—Code of Conduct for Members of the Armed Forces* (Aug 17, 1955), www.presidency.ucsb.edu/ws/?pid=59249. *See also* 3 C.F.R. 266 (1954-1958).

[193] D.W. Brogan, *Unnoticed Changes in America*, Harper's Mag., Feb. 1957, at 27, 33.

[194] A. Roy Eckardt, *The New Look in American Piety*, 71 The Christian Century 1395, 1396 (1954).

[195] Douglas T. Miller & Marion Nowak, *The Fifties: The Way We Really Were* 92 (1977).

[196] Will Herberg, *Protestant-Catholic-Jew* 53 (1960).

[197] Oakley, *supra* note 181, at 324 (emphasis added).

246. As can be readily seen by reviewing the statements made by individual legislators, Congress eagerly joined in to take advantage of this religious revival.

247. Senator Homer Ferguson, for example, claimed in 1954 that "In G-d We Trust" over the door of the Senate **recognizes that we believe there is a Divine Power, and that we, our children, and children's children should always recognize it.**"[198]

248. That same year, Rep. Louis C. Rabaut (MI) placed in the Congressional Record the incredibly offensive claim that "**An atheistic American … is a contradiction in terms.**"[199] Rep. Rabaut would later argue that "**[w]e cannot afford to capitulate to the atheistic philosophies of g-dless men.**"[200]

249. Also in 1954, Rep. Francis E. Dorn (NY) referenced "In G-d We Trust" on United States coins by declaring that "**He is the G-d, undivided by creed, to whom we look, in the final analysis, for the well-being of our Nation.**"[201]

250. To Rep. Peter Rodino (NJ), the religious motto "expresses the constant attitude of the American people … that **we wish now, with no ambiguity or reservation, to place ourselves under the rule and care of G-d.**"[202]

251. After informing us that "**our citizenship is of no real value … unless we can open our souls before G-d** and before Him conscientiously say, 'I am an American,'" Rep. Hugh J. Addonizio (NJ) proclaimed that "**G-d is the symbol of liberty to America.**"[203]

252. His colleague, Rep. Charles A. Wolverton (NJ), stated that "In G-d we trust," taken "in conjunction" with "under G-d" in the Pledge of Allegiance, "can be taken as evidence of **our faith in that divine source of strength** that has meant and always will mean so much to us as a nation."[204]

253. Moreover, contended Rep. Wolverton, **those who deny G-d purvey "forces of evil**."[205]

---

[198] 100 Cong. Rec. 7833 (1954) (statement of Sen. Ferguson) (emphasis added).
[199] 100 Cong. Rec. 1700 (1954) (statement of Rep. Rabaut) (emphasis added).
[200] 101 Cong. Rec. 8156 (1955) (statement of Rep. Rabaut) (emphasis added).
[201] 100 Cong. Rec. 6085 (1954) (statement of Rep. Dorn) (emphasis added).
[202] 100 Cong. Rec. 7764 (1954) (statement of Rep. Rodino) (emphasis added).
[203] 100 Cong. Rec. 7765 (1954) (statement of Rep. Addonizio) (emphases added).
[204] 100 Cong. Rec. 14919 (1954) (statement of Rep. Wolverton) (emphasis added).
[205] *Id.* (emphasis added).

254. The environment was so infused with (Christian) Monotheism that Vermont's Senator Ralph Flanders went so far as to propose a Constitutional Amendment stating that "**this nation devoutly recognizes the authority and law of Jesus Christ, Saviour and Ruler of Nations**, through whom are bestowed the blessings of Almighty G-d."[206]

255. Although that amendment never came to fruition, a barrage of (Christian) Monotheistic actions was spatchcocked into government by Congress in the 1950s.

256. In 1952, for instance, a National Day of Prayer was instituted.[207]

257. In 1953, a prayer room was constructed in the United States Capitol Building.[208]

258. In 1954 (**with "Onward Christian Soldiers" chosen as the music to be played** at the official ceremony as the flag was being raised[209]), "under G-d" was intruded into the previously secular Pledge of Allegiance.[210]

259. In 1955, the inscription of "In G-d We Trust" was mandated for every coin and currency bill produced by the Department of the Treasury.[211]

260. In 1956, the secular *de facto* national motto "E Pluribus Unum" was replaced with an official motto: "In G-d we trust."[212]

261. Of exceptional relevance to the gravamen of this lawsuit, 1956 was also the year that Defendant Congress authorized and directed the Architect of the Capitol to prepare a document (produced by the United States Government Printing Office) which succinctly clarified the purpose and effect of placing "In G-d We Trust" on the coins: to "**witness our faith in Divine Providence**."[213]

---

[206] William Lee Miller, *Piety Along the Potomac*. The Reporter, Aug. 17, 1954, at 25, 25.

[207] Act of April 17, 1952, Pub. L. 82-324, ch. 216, 66 Stat. 64 (now codified at 36 U.S.C. § 119 (2012)).

[208] H.R. Con. Res. 60, 83d Cong. (1953).

[209] 100 Cong. Rec. 8617 (1954).

[210] Act of June 14, 1954, Pub. L. 83-396, ch. 297, § 7, 68 Stat. 249. As noted, 1954 also marked a new Code of Conduct for the military, requiring every solder to "trust in my G-d and in the United States of America," *see supra* ¶ 242, and the first time a religious postage stamp was produced, *see supra* ¶¶ 236-237.

[211] Act of July 11, 1955. *See supra* ¶¶ 224-225.

[212] Act of July 30, 1956, Pub. L. 84-851, ch. 795, 70 Stat. 732 (now codified at 36 U.S.C. § 302 (2012)).

[213] Architect of the Capitol, *The Prayer Room in the United States Capitol*, H.R. Doc. No. 234, at 5 (1956) (emphasis added), *available at* digitalcollections.baylor.edu/cdm/compoundobject/ collection/cs-vert/id/11518/rec/1.

262. This (Christian) Monotheistic bent can be graphically demonstrated by examining the entries placed in the Congressional Record. There, the number of entries that pertained to (Christian) Monotheistic religion increased **fifty fold** from the five years prior to 1954 to the five subsequent years. *See* Appendix C.

263. The Index volumes starting in 1954 show such extraordinary titles as "Meditation, Christ, our hope," "Christians in Politics," "Duty of Christian Politician," "G-d's Answer to Communism," "Strengthening America Under G-d," "We Pray or We Perish," "Drive to Erect World's Largest Cross," "G-d Meant Us To Find Atom," "G-d and U.N.," "Great Christian," "Free Government Based on Faith," "President Honored for Religious Aim," "What Did Jesus Believe About Wealth?," "Who Are Disciples of Christ?," "I Speak for Christian Citizenship," "Communists versus G-d," "Seeking G-d's Way for World Peace," "Eisenhower Should Lead G-dly Against Reds," "Our Home and G-d," "Religious Illiteracy Is Problem for Home," "Thanks Be to Providence," "The Christian Leader and Politics," "'I Met G-d There,'" "Bible ABC Verses," "Christ Did Not Wear Crown of Thorns To Teach Appeasement," "Threats to Christianity and Democracy," "Christianity, Patriotism, and Myth of National Communism," "Unfair Trial of Jesus," "Christian Survival at Stake," "Convert Russia Through Prayer," "G-d's Time," "Christian Impact," "Prayer Is Power," "Christian Life," "Christian and Jew," "Christ in Marketplace," "Politics and Christian Service," "Millennium of Christianization," "In the beginning G-d," "Why Not Teach Religion?," "Errors in trial of Jesus," "Atheistic Character of Communism," "Antichrists on Prowl," "Moses, Prophets, Jesus Fought To Erase Inequality," "Speak for Christian citizenship," "Subsidy for ministers," "Reaffirm Christian faith in Middle East crisis," "139 Joined Church During Crusade," "Aggressive Secularism Undermining Nation," "Can-Do Christians," "Christianity or Communism?," "For G-d and Country," "Christian Philosophy of Civil Government," "We Believe in Prayer," "With Faith and Flag They Called It America," "Lecture: Existence of G-d," "What Faith in G-d Has Meant to Me," "Christ and Politics," "Power of Prayer," "Union of Church and State," "Jesus, the Perfect Man," "Washington's Lady Ambassador for Christ," "Make yourself a rubberstamp for G-d," "Man Sent From G-d," and "Bible: eternal source of strength." *See* Appendix D.

264. Even the judicial branch engaged in this (Christian) Monotheistic religious bias.

265. Chief Justice Earl Warren, for example, spoke of the United States as "**a Christian land governed by Christian principles**."[214]

266. More egregious was the ruling by the Chief Judge for the United States District Court for the District of Hawaii when an Atheist petitioned to become a naturalized citizen.

267. To Judge J. Frank McLaughlin, belief in G-d was key among "the principles which delicately support our free government."[215] Thus, when the petitioner attempted to take the oath of citizenship without the "so help me G-d" language, Judge McLaughlin denied the petition.

268. Denial, wrote Judge McLaughlin, was appropriate because "**the atheist philosophy upon which petitioner predicates his position demonstrates a lack of attachment to the United States Government's first principle: a belief in a Creator**."[216]

269. Particularly relevant to this case is the fact that the judge specifically referenced "the inscription of 'In G-d We Trust' upon the Liberty half-dollar and other United States coins" to support his ruling.[217]

270. Precisely as the Framers of our Constitution feared, this pervasive governmental support for one religious ideology (and denigration of another) helped fuel similar sentiments in the public square. Thus, (Christian) Monotheism was officially supported (and Atheism officially disfavored) as "the conservative fifties saw a major revival of religion. Year after year the statistics pointed to unprecedented increases in church membership."[218]

271. In 1955, "of adult Americans … 96.9 per cent were found to identify themselves religiously (70.8 per cent Protestants, 22.9 per cent Catholics, 3.1 per cent Jews)."[219]

---

[214] *Eisenhower Joins in a Breakfast Prayer Meeting*, N.Y. Times, Feb. 5, 1954, A10 (emphasis added).

[215] *Petition of Plywacki*, 107 F. Supp. 593, 593 (1952), *rev'd* 205 F.2d 423 (9th Cir. 1953). *District Court opinion available at* www.leagle.com/xmlResult.aspx?xmldoc= 1952700107FSupp593_1552.xml&docbase=CSLWAR1-1950-1985.

[216] *Petition of Plywacki*, 115 F. Supp. 613, 614 (1953) (emphasis added), *available at* www.leagle.com/xmlResult.aspx?page=3&xmldoc=1953728115FSupp613_1596.xml&docba se=CSLWAR1-1950-1985&SizeDisp=7.

[217] *Plywacki*, 107 F. Supp. at 593.

[218] Oakley, *supra* note 181, at 185.

[219] Herberg, *supra* note 196, at 78, n.2 (citing Pub. Opinion News Serv., Mar. 20, 1955).

1   272. From 1949 to 1953, "the distribution of Scripture in the United States increased 140 per
2         cent."[220]

3   273. Clergymen – with remarkably successful books, radio shows, television shows, crusades
4         and the like – became increasingly popular and influential.[221] Thus, Billy Graham,[222]
5         Fulton Sheen[223] and Norman Vincent Peale,[224] for example, became household names.

6   274. Whereas religious leaders came in third when Americans were questioned about which
7         groups did the most "good" for the country in 1942, "[n]o other group – whether
8         government, congressional, business, or labor – came anywhere near matching the
9         prestige and pulling power of the men who are the ministers of G-d" when the question
10        was repeated in the mid-1950s.[225]

11  275. The Chairman of the Board of the Chamber of Commerce of the United States spoke
12        unhesitatingly in stating that "our Christian religion and our competitive business
13        system are in themselves the two most revolutionary forces in the world today."[226]

14  276. A new Little League Pledge, beginning with "I trust in G-d," was published in the
15        February 1955 issue of the *Little Leaguer* magazine.[227]

---

[220] *Id.* at 14 (citing *Report of the American Bible Society at Its 138th Annual Meeting*, Time, May 24, 1954).
[221] Oakley, *supra* note 181, at 321-327.
[222] Billy Graham's masterful crusades are legendary. *See, e.g., Billy Graham: A New Kind of Evangelist*, Time, Oct. 25, 1954, at 54. "Like many other evangelists of the day, [Rev. Graham] also often equated Christianity with Americanism and with anticommunism." Oakley, *supra* note 181, at 322. As Graham characterized it, "a great sinister and anti-Christian movement masterminded by Satan has declared war upon the Christian G-d." Peter Lewis, *The Fifties* 73-74 (1978).
[223] *Life Is Worth Living*, a TV show with Rev. Fulton J. Sheen, aired from 1952 to 1957. Rev. Sheen "warned that no peace was possible with Russia, the leader of international g-dless communism." Oakley, *supra* note 181, at 322-23.
[224] Peale's *The Power of Positive Thinking* (1952) "quickly went to the top of the nonfiction best-seller list and stayed there for 112 consecutive weeks. In 1954 it sold more copies than any other book except the Bible." Oakley, *supra* note 181, at 323.
[225] Polls conducted by Elmo Roper, as reported in Miller & Nowak, *supra* note 195, at 85-86.
[226] Clement D. Johnston, *The Spiritual Responsibility of American Business and Industry*, 22 Vital Speeches of the Day, Dec. 15, 1955, at 151.
[227] Little League, *Pledge*, www.littleleague.org/learn/about/pledge.htm (last visited Dec. 9, 2015).

277. So great was "the resurgence of religious feeling and practice in America" that the Ideal Toy Company manufactured "praying dolls" with flexible knees for kneeling.[228]

278. It should be recalled that the Bible (i.e., the book the (Christian) Monotheistic majority considers most holy) frequently denigrates Atheists. For instance, it:

    (i) Claims that "[t]he fool hath said in his heart, There is no G-d. They are corrupt, they have done abominable works, there is none that doeth good." *Psalms* 14:1.

    (ii) Associates unbelievers with "wickedness" and "darkness." 2 *Corinthians* 6:14.

    (iii) Decrees that those who deny G-d's existence "shall surely be put to death." *Leviticus* 24:16.

279. Moreover, the dictionaries of the time included "sinful" and "wicked" among their definitions of "g-dless"[229] and "ung-dly."[230]

280. Thus, not surprisingly, there was significant antipathy towards Atheists accompanying the era's pro-Christian, pro-G-d fervor.

281. This antipathy was intensified in the Cold War environment, where, "[b]elieving that 'atheistic Communism' threatened America both without and within, Americans saw the world in terms of good and evil, g-dly and g-dless."[231]

282. Accordingly, it was believed that "Communists were our mortal enemies and they were atheists. Religion, therefore, came to seem essential in the fight against communism."[232]

283. With media moguls molding public opinion by speaking of "atheism, anarchism and G-dless despotism,"[233] data revealed the extent to which Atheists were reviled.

284. In 1954, for instance, a poll showed **that 60% of the population felt it was proper to deny Atheists the right to express their religious views in a speech**.[234]

---

[228] *Words and Works*, Time, Sept. 20, 1954, at 65.

[229] *See, e.g., Webster's New Twentieth Century Dictionary of the English Language – Unabridged* 749 (2d ed. 1956) and 1 *Funk & Wagnalls New Practical Standard Dictionary of the English Language* (1956).

[230] *See, e.g.,* 2 *The New Century Dictionary of the English Language* 2095 (1948).

[231] Miller & Nowak, *supra* note 195, at 82.

[232] *Id.* at 91.

[233] *William Randolph Hearst: A Portrait in his Own Words* 302-03 (Edmond D. Coblentz ed. 1952).

[234] Samuel Stouffer, *Communism, Conformity, and Civil Liberties: A Cross Section of the Nation Speaks Its Mind* 423-33 (1955) (citing a joint survey conducted in 1954 by Gallup and the Nat'l Op. Res. Ctr. of the Univ. of Chi.).

285. The same poll showed that **60% favored removing all books on Atheism from the public libraries**, and that a **whopping 84% believed that Atheists should be prohibited from teaching in colleges or universities**.[235]

286. In 1958 **more than three-quarters of the population stated they would not vote for an otherwise qualified candidate for President if that person were an Atheist**.[236]

287. In a 1962 treatise on the Supreme Court and the Religion Clauses, it was noted that, "Atheism is fair game for the sniper, and overtones of 'blasphemy' and 'sacrilege' still linger."[237]

288. In 1965, **27% of the population stated that they didn't think Atheists should even be allowed to vote**. This was more than four times the percentage who felt that basic right of citizenship should be denied to "people who have quit school and never completed high school."[238]

289. In sum, (Christian) Monotheistic religious fervor, and its associated anti-Atheism, characterized the Cold War era in the middle of the twentieth century. That milieu explains why the presence of "In G-d We Trust" – already unconstitutionally inscribed on every coin (albeit as a matter of discretion for some) – was mandated for all coins and currency bills in the Act of 1955.

---

[235] *Id*.

[236] The poll, which included figures for those who would not vote for candidates of other religions (and races as well), is revealing: Would not vote for a: "Baptist" (4%), "Catholic" (27%), "Jew" (29%), "Negro" (54%), "Atheist" (77%). *Id*.

[237] *The Supreme Court on Church and State* xxi (Joseph Tussman ed. 1962).

[238] Am. Inst. of Pub. Op., Gallup Poll conducted July 21, 1965.

D. **CURRENT CIRCUMSTANCES ARE LITTLE CHANGED FROM THE 1950s**

    (1) **"In G-d We Trust" on the Money Continues to Represent (Christian) Monotheism and to Be Utilized in Religiously Discriminatory Ways**

290.  The "In G-d We Trust" phrase has continued to be a tool used to perpetuate favoritism for (Christian) Monotheism. It has also continued to perpetuate anti-Atheistic bias.

    (a) **Presidents Continue to Use the Motto to Advocate for (Christian) Monotheism**

291.  As noted previously, President Eisenhower stated:

> **Recognition of the Supreme Being is the first, the most basic, expression of Americanism. Without G-d, there could be no American form of government, nor an American way of life**,[239]

shortly before he signed into law Congress's act establishing "In G-d We Trust" as the national motto.[240] Subsequent Presidents have expressed similar sentiments.

292.  President John F. Kennedy, for instance, stated, "The guiding principle and prayer of this Nation has been, is now, and ever shall be 'In G-d We Trust.'"[241]

293.  In his 1974 National Day of Prayer proclamation, President Gerald R. Ford began by stating that "Ours is a Nation built upon a belief in a Creator … and **faith in that Creator permeates every aspect of our way of life**."[242] This statement was followed by a reiteration of President Eisenhower's extraordinary words: "'**Without G-d, there could be no American form of government, nor an American way of life**.'"[243]

294.  Speaking at a brunch two years later, President Ford contended that "'In G-d We Trust' is much more than a national motto."[244]

---

[239] *See supra* ¶ 233.
[240] Act of July 30, 1956, *see supra* note 212.
[241] As reported in H.R. Con. Res. 13, 112th Cong., at 3 (2011).
[242] Gerald Ford, *Proclamation 4338 – National Day of Prayer,* [Dec. 5,] *1974* (emphasis added), http://www.presidency.ucsb.edu/ws/index.php?pid=23888&st=4338&st1.
[243] *Id.* (emphasis added).
[244] Gerald Ford, *Remarks at the Professional Athletes Prayer Brunch*, Feb. 16, 1976, www.presidency.ucsb.edu/ws/?pid=5492.

295. President Ford elaborated by speaking of "the religious life for which the ultimate reward is nothing less than a place in the kingdom of G-d." [245]

296. During a 1980 town hall meeting, President Jimmy Carter was asked about his being "a born-again Christian."[246]

297. In answering, the President found it relevant that "'In G-d We Trust' is on our coins."[247]

298. President Ronald Reagan's 1981 National Day of Prayer proclamation began by claiming, "**Our Nation's motto 'In G-d We Trust' … reflects a basic recognition that there is a divine authority in the universe to which this Nation owes homage**."[248]

299. At a subsequent event, President Reagan also referenced the religious verbiage on the money: "**And we are still a nation under G-d. It says so on our coins—'In G-d We Trust.'**"[249]

300. George H.W. Bush stated that "we are one nation under G-d. And **we were placed here on Earth to do His work**. And our work has gone on now for more than 200 years in the Nation -- a work **best embodied in four simple words: In G-d we trust**."[250]

301. In his 1997 National Day of Prayer proclamation (just prior to noting that Congress "has called our citizens to reaffirm annually our dependence on Almighty G-d"), President William J. Clinton asserted, "may our national resolve be matched **by a firm reliance on the Author of our lives—for truly it is in G-d that we trust**."[251]

---

[245] *Id.*

[246] Jimmy Carter, *Independence, Missouri Remarks and a Question-and-Answer Session at a Townhall Meeting,* Sept. 2, 1980, www.presidency.ucsb.edu/ws/index.php?pid= 44975.

[247] *Id.*

[248] Ronald Reagan, *Proclamation 4826 – National Day of Prayer,* [Mar. 19,] *1981* (emphasis added)*,* www.presidency.ucsb.edu/ws/?pid=61699.

[249] *Question-and-Answer Session with Students at Farragut High School in Farragut, Tennessee*, June 14, 1983 (emphasis added), www.presidency.ucsb.edu/ws/index.php?pid=41473.

[250] George Bush, *Remarks at the Annual National Prayer Breakfast,* May 4, 1989 (emphases added), bushlibrary.tamu.edu/research/public_papers.php?id=388&year=1989&month= all.

[251] William J. Clinton, *Proclamation 6991, National Day of Prayer,* [Apr. 18,] 1997 (emphasis added), www.presidency.ucsb.edu/ws/index.php?pid=54013.

302. Commemorating the fiftieth anniversary of the "In G-d We Trust" phrase as our national motto, President George W. Bush in 2006 proclaimed that the words "**recognize the blessings of the Creator**."[252]

303. Stating as fact that there is "**a divine plan that stands above all human plans**,"[253] President Bush apparently missed the irony – glaringly obvious to Atheists such as Plaintiffs here – of his simultaneous proclamation that "our country stands strong as a beacon of religious freedom."[254]

304. Although President Obama has generally avoided discussions involving "In G-d We Trust," he has repeatedly demonstrated a complete lack of regard for the nation's Atheists. On November 2, 2011, for example, he alluded to "legislation reaffirming that 'In G-d We Trust' is our motto,"[255] and then completely ignored the anti-Atheist bias inherent in that legislation. Rather, he reminded everyone that "I trust in G-d."[256]

305. Just months ago, in a keynote "Address to the Nation" concerning a terrorist attack that killed fourteen "fellow citizens … [who] were part of our American family,"[257] President Obama made it clear that the overwhelming number of Muslims who don't support terrorism are a welcome part of that family.

306. In doing so, he spoke of the importance of "the values of religious tolerance, mutual respect and human dignity"[258] and decried "divisiveness [as a] betrayal of our values."[259]

---

[252] George W. Bush, *50th Anniversary of Our National Motto, "In G-d We Trust,"* [July 27,] *2006* (emphasis added)*,* http://georgewbush-whitehouse.archives.gov/news/releases/2006/07/20060727-12.html.

[253] *Id.* (emphasis added).

[254] *Id.*

[255] *Remarks by the President Urging Congress to Pass the Infrastructure Piece of the American Jobs Act* (Nov. 2, 2011), https://www.whitehouse.gov/the-press-office/2011/11/02/remarks-president-urging-congress-pass-infrastructure-piece-american-job (last visited Dec. 28, 2015).

[256] *Id.*

[257] *Address to the Nation by the President* (Dec. 6, 2015), available at www.whitehouse.gov/the-press-office/2015/12/06/address-nation-president.

[258] *Id.*

[259] *Id.*

307. Despite the foregoing, the President then proceeded to show complete disrespect for the religious views of Atheistic Americans such as Plaintiffs here, as he divided our nation on the basis of belief or disbelief in G-d by contending that "no matter … what religion you practice, you are equal in the eyes of G-d and in the eyes of the law."[260]

308. He then further insulted the millions of American nonbelievers as he concluded his speech with the now-standard line that completely denigrates their religious views: "G-d bless you, and may G-d bless the United States of America."[261]

309. Although the "In G-d We Trust" phrase issue has not yet appeared in the current race for President, it proved to be a major issue in at the last go-around.

310. For instance, Marco Rubio – currently a leading candidate for the Republican Party's presidential nomination – introduced 2012 nominee Mitt Romney at the party's National Convention by claiming **"[o]ur national motto, 'in G-d we trust', remind[s] us that faith in our creator** is the most important American value of them all."[262]

311. In response, the Democrats altered their party platform (which had not included any (Christian) Monotheistic material), proclaiming "**that our faith and belief in G-d is central to the American story** and informs the values we've expressed in our party's platform."[263]

312. Still, Republican candidate Romney opted to capitalize on the American majority's religious leanings by alluding to the Democrats' initial lack of favoritism for (Christian) Monotheism by subsequently stating, "**I will not take 'G-d' off our coins, and I will not take G-d out of my heart. We're a nation bestowed by G-d.**"[264]

---

[260] *Id.*

[261] *Id.*

[262] *Transcript of Marco Rubio's Speech at the RNC,* Aug. 30, 2012 (emphasis added), www.foxnews.com/politics/2012/08/30/transcript-marco-rubio-speech-at-rnc/ (last visited Dec. 28, 2015).

[263] Jessica Yellin, *Just In: Democrats Update Platform with Jerusalem, G-d Reference*, CNN.COM (Sept. 5, 2012, 4:53 pm) (emphasis added), politicalticker.blogs.cnn.com/2012/09/05/just-in-democrats-to-update-platform-with-jerusalem-reference/ (last visited Dec. 28, 2015).

[264] Ashley Parker, *In Romney's Hands, Pledge of Allegiance is Framework for Criticism* (Sept. 9, 2012), at A16 (emphasis added), *available at* http://www.nytimes.com/2012/09/09/us/politics/romney-uses-pledge-of-allegiance-to-criticize-obama.html.

**(b) Congress Continues to Use the Motto to Advocate for (Christian) Monotheism**

    **i. The Sequence of Events Regarding Edge-Incusion Demonstrates that the Motto Stands for (Christian) Monotheism**

313. Evidence of the unique religious importance of the motto can be seen in the sequence of events regarding the edge-incusion design for the Presidential $1 coins, introduced pursuant to the Presidential $1 Coin Act of 2005:

> In order to revitalize the design of United States coinage and return circulating coinage to its position as not only a necessary means of exchange in commerce, but also as an object of aesthetic beauty in its own right, it is appropriate to move many of the mottos and emblems, the inscription of the year, and the so-called ''mint marks'' that currently appear on the 2 faces of each circulating coin to the edge of the coin, which would allow larger and more dramatic artwork on the coins reminiscent of the so-called ''Golden Age of Coinage'' in the United States, at the beginning of the Twentieth Century, initiated by President Theodore Roosevelt, with the assistance of noted sculptors and medallic artists James Earle Fraser and Augustus Saint-Gaudens.[265]

314. Accordingly, it was decided that "[t]he inscription of the year of minting or issuance of the coin and the inscriptions 'E Pluribus Unum' and 'In G-d We Trust' shall be edge-incused into the coin."[266]

315. What turned out to be most "reminiscent" of the Roosevelt/Saint-Gaudens era, however, were the objections to the lack of prominence of the "In G-d We Trust" phrase.

316. For instance, Rep. Dan Burton of Indiana complained about "people in this country who have tried to get … **belief in G-d** taken off of all … coins and currency."[267]

317. Decrying the notion of "putting 'In G-d We Trust' in an obscure place on coins so that people can't read it," he continued by stating "This country was formed with a firm reliance on G-d Almighty, and **when we start taking G-d out of everything, as some people want to do, we run the risk of having him turn his back on us**."[268]

---

[265] Publ. L. 109-145, 119 Stat. 2664, 2665 (2005), § 101(10).

[266] *Id.* at 2666, § 102(n)(2)(C)(i).

[267] 153 Cong. Rec. H10311 (daily ed. Sept. 7, 2007) (statement of Rep. Burton) (emphasis added). It is noteworthy that this snippet speaks of "belief in G-d" and not "G-dly heritage."

[268] *Id.* (emphasis added).

318.  Rep. Burton thus introduced legislation to "demand or mandate that 'In G-d We Trust' be maintained and retained on our coinage in a prominent place."[269]

319.  Rep. Burton prevailed in his religious quest. As a result, the religious motto is no longer permitted to be edge-incused: "The design **on the obverse or the reverse** shall bear the inscription 'In G-d We Trust'."[270]

320.  The non-religious motto, on the other hand (i.e., "E Pluribus Unum," which embraced all Americans, which arose from within a committee created on July 4, 1776, and which was devised by John Adams, Benjamin Franklin and Thomas Jefferson[271]), could remain "in an obscure place."

### ii.  The 62 Congressmen Who Sponsored H. Con. Res. 411 Reveal that Our Legislators Continue to Believe the Motto Stands for (Christian) Monotheism

321.  In 2006, Rep. John Duncan (TN) introduced H. Con. Res. 411 in the House of Representatives. That resolution, co-sponsored by 61 of his congressional colleagues, was entitled, "Commemorating the anniversary of, commending, and reaffirming the national motto of the United States on the 50th anniversary of its formal adoption."[272]

322.  Accordingly, more than 14% of the members of the House of Representatives were willing to place in the Congressional Record their belief that "In G-d We Trust" reflects and/or relates, among other things, to:

(a)  "[T]he fundamental trust of the American people upon **the G-d of the Bible**;"

(b)  "American trust in **the Christian deity**;"

(c)  "**Psalm 33:12** [which] states, 'Blessed is the nation whose **G-d is the Lord**;'"

(d)  The fact that the colonial charter of Virginia referenced "**the Providence of Almighty G-d**" and "the Glory of his Divine Majesty, in **propagating of Christian Religion** to such People, as yet live in Darkness and miserable Ignorance of the **true Knowledge and Worship of G-d**;"

---

[269] *Id.*

[270] 31 U.S.C. § 5112 (2012). *See also* Consolidated Appropriations Act of 2008, Pub. L. 110-161, § 623(a)(2), 121 Stat. 1844 (2007).

[271] 5 *Journals of the Continental Congress 1774-1789*, at 517-18 (1904)

[272] H. Con. Res. 411, 109th Cong. (2006). *See* www.congress.gov/bill/109-congress/ house-concurrent-resolution/411/all-info#cosponsors.

1      (e)  The fact that "Virginia settlers acknowledged **the hand of G-d** as central to the
2            success of their endeavor;" and

3      (f)  The fact that "the Mayflower Compact of 1620, written and signed by the Pilgrims,
4            established 'for the glory of G-d, and **advancement of the Christian faith**' a 'civil
5            body politick' that rested on their **firm reliance on G-d** for its success."[273]

6  323.  Those congressmen concluded by admitting that, to them, there is "the concept
7       embodied in that motto: the proper role of **civil government as under the authority**
8       **and protection of the Lord**, and its success fully dependent upon divine sovereignty,"
9       and that the "right understanding of **the appropriate place of civil society [is] under**
10      **the authority of the Almighty**."[274]

11  324.  Thus, they unabashedly sought to have **a Congress that "encourages … love of G-d,"**
12       **"personal acts of piety," "sacred assembly," "prayer," and "a rededication of trust**
13       **in G-d."**[275]

14          **iii.  Congress's Motto "Reaffirmations" Reveal that Our Legislators**
15               **Continue to Believe the Motto Stands for (Christian) Monotheism**
16

17  325.  In 2011, with 396 "yeas" and 9 "nays," the entire House of Representatives passed a
18       "reaffirmation" of the motto.[276]

19  326.  That "reaffirmation" contended that "in times of national challenge or trage**dy, the**
20       **people of the United States have turned to G-d as their source for sustenance,**
21       **protection, wisdom, strength, and direction**."[277]

22  327.  Of course, only some of "the people of the United States" have done this, just as only
23       some have turned to Jesus, the Koran or the myriad other religious figures and texts that
24       are inherently exclusive in terms of religious belief and practice.

25  328.  The legislators felt it was appropriate to recall the remarkably exclusionary statement of
26       President Eisenhower (later repeated by President Ford) that "'**Without G-d, there**
27       **could be no American form of government, nor, an American way of life**.'"[278]

---

[273] H. Con. Res. 411, 109th Cong. (2006).
[274] *Id.*
[275] *Id.*
[276] H.R. Con. Res. 13, 112th Cong. (2011).
[277] 157 Cong. Rec. H7169 (daily ed. Nov. 1, 2011) (emphasis added).
[278] *Id.* (emphasis added).

329. That "reaffirmation" resolved that Defendant Congress "supports and encourages the public display of ['In G-d we trust'] in all public buildings, public schools, and other government institutions."[279]

330. Although Rep. Jerrold Nadler of New York noted that "this country is a country for all people—whether they are religious or not, whether they believe in G-d or not, whether they believe in one G-d or not,"[280] Rep. Lamar Smith of Texas contended that it was important "to show that we still believe and recognize" that "'G-d intended for us to be free,'" that **"'the rights of man come** not from the generosity of the state, but **from the hand of G-d**,'" and that "'upon the spirit of G-d shall our democracy be founded.'"[281]

331. Rep. Daniel Lungren of California spoke of "**the G-d in whom we trust**."[282]

332. Rep. Jeff Miller of Florida reminded his colleagues that "'if we ever forget that **we are one nation under G-d**, that we will then be one nation gone under.'"[283]

333. **"[I]n G-d we must continue to trust now**," stated Rep. Ted Poe of Texas.[284]

334. Speaking of the motto representing "Judeo-Christian principles" and "the inclusion of these [Judeo-Christian] principles into our government," Rep. Gregg Harper of Mississippi asserted that "we are indeed endowed by our Creator with certain inalienable rights,"[285] and seemed to take pride in being **constantly surrounded by the reminders of G-d's presence**" in the "Nation's Capitol."[286]

335. Rep. Paul Broun of Georgia felt the motto should be reaffirmed because "**we must continue to affirm that G-d has a place in blessing our government**, in guiding our lawmakers, and that He has the ability to lead our Nation back to a path of righteousness and prosperity."[287]

---

[279] *Id.*
[280] *Id.* at H7170 (remarks of Rep. Nadler).
[281] *Id.* at H7171 (remarks of Rep. Smith) (citations omitted) (emphases added).
[282] *Id.* (remarks of Rep. Lungren) (emphasis added).
[283] *Id.* at H7172 (remarks of Rep. Miller) (citation omitted) (emphasis added).
[284] *Id.* at H7173 (remarks of Rep. Poe) (emphasis added).
[285] *Id.* at H7173 (remarks of Rep. Harper).
[286] *Id.* (emphasis added).
[287] *Id.* (remarks of Rep. Broun) (emphasis added).

336. Oklahoma Rep. James Lankford's support for the motto "reaffirmation" stemmed from his claim that "**[w]e as Americans believe our rights are from G-d. It is in G-d we trust**."[288]

337. Insulting Plaintiffs here and millions of other Americans, Rep. Trent Franks of Arizona stated:

> If man is G-d, then an atheist state is as brutal as the thesis that it rests upon and there is no longer any reason for us to gather here in this place. We should just let anarchy prevail because, after all, we are just worm food. So indeed we have the time **to reaffirm that G-d is G-d and in G-d do we trust**.[289]

338. Under the version of history adhered to by Alabama's Rep. Robert B. Aderholt, "the Founding Fathers … fully endorsed the idea of the acknowledgement of G-d."[290] That version also presumes that those Founding Fathers sought to create "**a Christian and g-dly Nation**."[291]

339. Meanwhile, Rep. Nadler noted that the resolution served "to make people who may not agree with it feel that they're not as American as we are."[292]

340. After the resolution's chief sponsor, Rep. Randy Forbes of Virginia, responded to Rep. Nadler, Indiana's Rep. Mike Pence thanked Rep. Forbes "for his tireless and ongoing **defense of America's Christian heritage**."[293]

341. According to Rep. Pence, one cannot "adequately explain the near boundless prosperity and advancement of the United States of America since 1776 other than the hand of Providence."

342. Rep. Sheila Jackson Lee of Texas apparently missed the oxymoron involved in contending that the "In G-d we trust" phrase "reflects our nation's rich history of religious freedom and tolerance" and "is an acknowledgement of our nation's unwavering commitment to religious freedom."[294]

---

[288] *Id*. (remarks of Rep. Lankford) (emphasis added).

[289] *Id*. (remarks of Rep. Franks) (emphasis added).

[290] *Id*. at H7174 (remarks of Rep. Aderholt).

[291] *Id*. (emphasis added).

[292] *Id*. (remarks of Rep. Nadler).

[293] *Id*. (remarks of Rep. Pence) (emphasis added).

[294] *Id*. (remarks of Rep. Jackson Lee).

343. After referencing "**the Supreme Being, the creator and ruler of the universe**," Rep. Jackson Lee extolled the virtues of our nation's diversity, with its "many different religions, faiths and customs."[295] Unfortunately, Americans such as Plaintiffs here – whose religious beliefs specifically deny the existence of any "creator" or "Supreme Being" – are apparently outside of the Representative's diversity community:

> Reaffirming 'In G-d We Trust' as the national motto is a reaffirmation of faith, a reaffirmation of a creator and Supreme Being, and uniting all religions under the comfort this brings.[296]

344. Rep. Mike McIntyre of North Carolina argued that "our continued trust in G-d is critical and must not wane" and that "**our faith in G-d must remain steadfast** through the dark times."[297] He followed this by citing to a Thanksgiving proclamation made by the Continental Congress in 1777, which spoke "**of that kingdom which consisteth in righteousness, peace and joy in the Holy Ghost.**"[298]

345. Of note is that the actual "reaffirmation" itself had seven historical (Christian) Monotheistic references juxtaposed to the motto to show its propriety.

346. Similar "reaffirmations" of the "In G-d we trust" phrase – with similar (Christian) Monotheistic religious juxtapositions – were passed by the Senate in 2006, and by both the House and the Senate in 2002.[299]

347. In the 2002 "reaffirmation," the motto was supported by juxtaposing eight historical (Christian) Monotheistic references,[300] and in 2006 (while writing that "the success of civil government relies firmly on the protection of divine Providence") the Senate opted to "commemorate, celebrate, and reaffirm" the motto by juxtaposing thirteen historical (Christian) Monotheistic references to it.[301]

---

[295] *Id.* (emphasis added).

[296] *Id.*

[297] *Id.* at H7174-75 (remarks of Rep. McIntyre) (emphasis added).

[298] *Id*. at H7175 (emphasis added).

[299] Other bills that were proposed but not passed also demonstrate the religious essence of the "In G-d we trust" phrase. For instance, a House concurrent resolution that was referred to the Subcommittee on the Constitution in 2005 highlighted that "belief in a Supreme Power and the virtue of seeking strength and protection from that Power is … inscribed on our currency." H.R. Con. Res. 253, 109th Cong. (2005).

[300] An Act to Reaffirm the Reference to One Nation Under G-d in the Pledge of Allegiance, Pub. L. No. 107-293, 116 Stat. 2057 (2002).

[301] S. Con. Res. 96, 109th Cong. (2006).

348.  The Supreme Court, however, has written that "juxtaposing … other documents with highlighted references to G-d as their sole common element [reveals an] unstinting focus … on religious passages, showing … an impermissible purpose."[302]

349.  Thus, certain members of the House Committee on the Judiciary that considered the 2011 "reaffirmation" determined that the resolution "transgressed the clear line between government and religion in violation of the Establishment Clause,"[303] that it "does prefer religion over non-religion, which violates the Constitution,"[304] and that "**it endorses a specific type of religion, monotheism, over other religions**", which likewise is unconstitutional."[305]

350.  In other words, members of Congress themselves highlighted that the government's use of "In G-d We Trust" violates the Constitution.

### iv. Individual Congressmen Continue to Demonstrate that the Motto Stands for (Christian) Monotheism

351.  Of course, other congressmen still do not hesitate to use the motto for its purely religious aspects, as shown by the following small sampling just from the past three years.

352.  Immediately after he noted that "I'm standing under 4 words: 'In G-d We Trust,'" Rep. Jim Himes, in 2013, chose to "observe that the minister this morning opened the House with a prayer to our Lord and Savior, Jesus Christ."[306] The remainder of the Congressman's remarks consisted of nothing more than biblical citations.

353.  Later that year, Rep. Tim Walberg (MI) demonstrated his unabashed prejudice against sincere nonbelievers (such as Plaintiffs here) as he referred to the "In G-d We Trust" motto while quoting President Eisenhower's vile contention that "Atheism … leads inevitably to domination and dictatorship."[307]

---

[302] *McCreary County v. ACLU of Kentucky*, 545 U.S. 844, 870 (2005).
[303] H.R. Rep. 112-47 (2011) ("Dissenting Views") at 6.
[304] *Id.* ("Dissenting Views") at 8.
[305] *Id.* (emphasis added).
[306] 159 Cong. Rec. H3371 (daily ed. June 13, 2013) (remarks of Rep. Jim Himes).
[307] 159 Cong. Rec. H5410 (daily ed. Sep. 9, 2013) (remarks of Rep. Tim Walberg).

354. In his remarks regarding the 2014 National Day of Prayer, then Rep. Lankford (OK) found it appropriate to point out that "[t]he words of our national motto, 'In G-d We Trust,' are emblazoned on the wall right over my right shoulder," while espousing his belief that "the gift of G-d is eternal life through Christ Jesus, our Lord."[308]

355. Joining him that day was Rep. Mike McIntyre (NC), who repeatedly alluded to the motto as he contended that "[t]he true source of power is found on our knees before the throne of grace, before almighty G-d," and that "the power of prayer knows no bounds. May we be a Nation that does stand for our motto, 'In G-d We Trust.' Indeed, we pray, may G-d bless America."[309]

356. In June of this year, Rep. Barry Loudermilk (GA) contended that "In G-d We Trust" above the Speaker's rostrum refers to "the rights that G-d has given."[310]

357. Rep. Roger Williams (TX) called for the end to congressional funding of Planned Parenthood because "When I first ran for Congress, I promised that I would vote with my conscience and use G-d's word as my guide."[311]

358. In October, now Sen. James Lankford (OK) referred to the fact that "[i]n this Chamber, the words "In G-d We Trust" are written right above the main doors as we walk in, the same as it is in the House Chamber above the Speaker's chair" to support a public school teacher's decision to join with students in Christian prayer (while that teacher was serving as a governmental agent). Sen. Lankford ended his statement with "Thank You, Jesus, for the way that You sustain our Nation and for the freedom that we have. We ask Your help in protecting us. In Your Name I pray. Amen."[312]

359. Just months ago, Rep. Randy Forbes (VA) highlighted that "In G-d We Trust" is placed even higher than the American flag in the House chamber. This was noted in a statement entitled "Personal Faith," in which he worried about governmental agents that "trample on the religious freedom and the religious liberty of all of us."[313]

---

[308] 160 Cong. Rec. H3246 (daily ed. Apr. 29, 2014) (remarks of Rep. James Lankford).
[309] 160 Cong. Rec. H3247 (daily ed. Apr. 29, 2014) (remarks of Rep. Mike McIntyre).
[310] 161 Cong. Rec. H4536 (daily ed. June 18, 2015) (remarks of Rep. Barry Loudermilk).
[311] 161 Cong. Rec. H6124 (daily ed. Sep. 17, 2015) (remarks of Rep. Roger Williams). Rep. Williams apparently ends all of his remarks with "In G-d We Trust."
[312] 161 Cong. Rec. S7561 (daily ed. Oct. 28, 2015) (remarks of Sen. James Lankford).
[313] 161 Cong. Rec. H7628 (daily ed. Nov. 4, 2015) (remarks of Rep. Randy Forbes).

### v. "In G-d We Trust" Clearly Has a (Christian) Monotheistic Meaning to Congress's Chaplains

360. Those who are arguably the official religious deans of the nation – Congress's chaplains – often employ the "In G-d We Trust" language to further (Christian) Monotheistic messages.

361. A good example is the February 16, 2011, prayer offered by that day's guest chaplain, Rev. Bill Shuler. Before reaching his "**In Jesus' name**" conclusion, he stated:

> Heavenly Father, we … worship You, for **You are an awesome and personal G-d**. Make us ever mindful of the words engraved over the Speaker's chair, **"In G-d We Trust**." … It is in You we trust. You are the G-d who founded our Nation, the G-d who gave us liberty, and **it is by turning to You that we are blessed**.[314]

362. Two months later, Bishop Henry Fernandez (who also used the "**In Jesus' name**" conclusion) addressed his "**Heavenly Father**" by saying, "And let Your peace rest upon them and this great Nation, as we continue to live out the words written over the chair of the Speaker of the House: **In G-d we trust**."[315]

363. In the middle of his tenure, Rev. Daniel P. Coughlin (the official House Chaplain from 2000 to 2011) claimed that "this Chamber proclaims what America prays: 'In G-d we trust' now and forever."[316]

364. Moreover, speaking specifically about money, Rev. Coughlin inquired, "[W]hat is the meaning of money? Does money really talk? In the United States the dollar bill says 'In G-d we trust.' So be it now and forever. Amen."[317]

365. In his June 11, 2013 prayer, guest chaplain Rabbi Moshe Feller twice referenced "In G-d We Trust" as he spoke with reverence of the goal "to make all mankind aware of Your sacred presence."[318]

---

[314] 157 Cong. Rec. H949 (daily ed. Feb. 16, 2011) (prayer by Rev. Shuler) (emphases added).
[315] 157 Cong. Rec. H2334 (daily ed. Apr. 6, 2011) (prayer by Bishop Fernandez) (emphases added).
[316] 151 Cong. Rec. H6386 (daily ed. July 25, 2005) (prayer by Rev. Coughlin).
[317] 153 Cong. Rec. H2674 (daily ed. Mar. 20, 2007) (prayer by Rev. Coughlin).
[318] 159 Cong. Rec. S4069 (daily ed. June 11, 2013) (prayer by Rabbi Feller).

366. Senate Chaplain Barry Black specifically noted, "Lord, on our coins and currency, we have placed the words 'In G-d We Trust,'" as he noted that "We pray in Your great Name. Amen."[319]

367. These examples, provided by chaplains as they lead others in prayer to G-d, make it abundantly clear that the "In G-d We Trust" language is treated as it was meant to be treated – i.e., as purely (Christian) monotheistic religious verbiage.

### (c) Society Continues to Use the Motto for (Christian) Monotheistic Advocacy

368. Endorsing (Christian) Monotheism is how society sees the motto as well.

369. The 2012 Honorary Chairman of the National Task Force, for example (in his official prayer that ended "**[i]n the name of Your Son, and our Savior**"), noted that "[o]ur currency proclaims **'In G-d We Trust**,'… ."[320]

370. In G-d We Trust~America, another advocacy group, seeks to have "Elected Officials to 'Vote Yes' to Legally Display Our Congressionally Approved National Motto *IN G-D WE TRUST* In Every City, County Chamber and State Capitol In America."[321]

371. The group explained its purposes: "to keep G-d's name in America, and acknowledge and affirm the role that **faith in G-d** plays in the public lives of the citizens in this country, and in the core values of our nation."[322]

372. Congressional Prayer Caucus Foundation, Inc., is yet one more organization that uses the motto to serve religious ends. For its members, the "In G-d We Trust" phrase means "that **G-d our Creator is still the foundation of our nation's trust**, not man."[323]

373. The Family Research Council (FRC) states its mission is "to advance faith, family and freedom in public policy and the culture **from a Christian worldview**."[324]

---

[319] 159 Cong. Rec. S7433 (daily ed. Oct. 13, 2013) (prayer by Chaplain Black).

[320] Dr. David Jeremiah, *2012 National Prayer*, www.nationaldayofprayer.org/2012_dr_david_jeremiah_bio (last visited on Dec. 10, 2015).

[321] In G-d We Trust~America, *Our Mission*, 0168828.netsolhost.com/ing-dwetrust/our-mission/ (last visited Dec. 13, 2015).

[322] *Id*. (emphasis added).

[323] Congressional Prayer Caucus Foundation, Inc., *About the Cause: Why Is This Significant?* www.ing-dwetrustmotto.us/about-the-cause (emphasis added) (last visited Dec. 10, 2015).

[324] Family Research Council, www.frc.org/mission-statement (emphasis added) (last visited Dec. 10, 2015).

374. In an email sent on September 14, 2012, FRC president Tony Perkins wrote about the organization's recent "Value Voters Summit." Under the heading "Value Voters Accept G-d to their Platform," Perkins wrote: "I opened our "Values Voters Convention" by amending our theme of "Limit government, reduce spending, champion traditional values and protect America" by adding at the end – "**No apologies: In G-d We Trust**."[325]

375. This amendment was "approved following three unanimous votes by those gathered in the hall."[326]

376. Internet searches of "'In G-d We Trust' products" show overwhelming use of that phrase related to (Christian) Monotheistic religious products proffered by (Christian) Monotheistic enterprises.

377. Internet searches of "'In G-d We Trust' books" show overwhelming use of that phrase related to (Christian) Monotheistic religious books by (Christian) Monotheistic authors.

### (2) In Extolling (Christian) Monotheism, "In G-d We Trust" Contributes to a Culture that Denigrates Atheism and Atheists

378. By espousing the motto "In G-d We Trust" and placing it on every coin and currency bill, Defendants contribute to the fact that Atheists are viewed unfavorably by more than half of their fellow Americans merely on the basis of their deeply felt religious views.[327]

379. The (Christian) Monotheistic coinage is also partly responsible for the astounding 57% of the population holding the view that nonbelievers are incapable of being moral.[328]

380. In fact, research has shown that our society finds that Atheists – solely on the basis of their disbelief in G-d – are felt to be less trustworthy than rapists![329]

---

[325] Emphasis added. Email in files of the undersigned (Michael Newdow).

[326] *Id.*

[327] Pew Forum on Religious & Pub. Life, *Public Expresses Mixed Views of Islam,* Mormonism (Sept. 25, 2007), pewforum.org/Public-Expresses-Mixed-Views-of-Islam-Mormonism.aspx.

[328] Pew Res. Ctr., The Pew Global Attitudes Project 33, Oct. 4, 2007, pewglobal.org/files/pdf/258.pdf.

[329] Will M. Gervais et al., *Do You Believe in Atheists? Distrust Is Central to Anti-Atheist Prejudice*, 101 J. of Personality & Soc. Psychol. 1189, 1195-96 (2011).

1  381. The environment created by the pervasive and persistent governmental employment of
2       "In G-d We Trust" has also helped create "symbolic boundaries that clearly and sharply
3       exclude atheists in both private and public life."[330]
4  382. "[N]ot only [are] atheists … less accepted than other marginalized groups but …
5       attitudes toward them have not exhibited the marked increase in acceptance that has
6       characterized views of other racial and religious minorities over the past forty years."[331]
7  383. This notion was corroborated by a recent Gallup poll which found that (as has been the
8       case since the question was first asked by the Gallup organization in 1958) fewer people
9       would vote for a generally well-qualified Atheist than for a member of any other
10      religious minority.[332] A full 43% stated they would not vote for such a person.[333]
11 384. This marginalization of Atheists, perpetuated by the inscription of "In G-d We Trust" on
12      the coins and currency, is also responsible for the persistence – in the year 2016 – of
13      patently discriminatory anti-Atheistic provisions **in the constitutions** of eight states.[334]

---

[330] Penny Edgell et al., *Atheists as "Other": Moral Boundaries and Cultural Membership in American Society*, 71 Am. Soc. Rev. 211, 212 (2006).
[331] *Id.*
[332] Jeffrey M. Jones, Gallup, *Atheists, Muslims See Most Bias as Presidential Candidates* (June 21, 2012), www.gallup.com/poll/155285/Atheists-Muslims-Bias-Presidential-Candidates.aspx (citing a poll conducted June 7-10, 2012).
[333] *Id.*
[334] Ark. Const. art. XIX, § 1 ("No person who denies the being of a G-d shall hold any office in the civil departments of this State, nor be competent to testify as a witness in any court."); Md. Const. art. XXXVII ("That no religious test ought ever to be required as a qualification for any office of profit or trust in this State, other than a declaration of belief in the existence of G-d."); Miss. Const. art. XIV, § 265 ("No person who denies the existence of a Supreme Being shall hold any office in this state."); N.C. Const. art. VI, § 8 ("The following persons shall be disqualified for office: First, any person who shall deny the being of Almighty G-d."); Pa. Const. art. I, § 4 ("No person who acknowledges the being of a G-d and a future state of rewards and punishments shall, on account of his religious sentiments, be disqualified to hold any office or place of trust or profit under this Commonwealth."); S.C. Const. art. XVII, § 4 ("No person who denies the existence of a Supreme Being shall hold any office under this Constitution."); Tenn. Const. art. IX, § 2 ("No person who denies the being of G-d, or a future state of rewards and punishments, shall hold any office in the civil department of this state."); Tex. Const. art. I, § 4 ("No religious test shall ever be required as a qualification to any office, or public trust, in this State; nor shall any one be excluded from holding office on account of his religious sentiments, provided he acknowledge the existence of a Supreme Being.").

385.  Surely no state constitutional provision discriminating in a similar manner against Jews, Catholics, women, blacks, Latinos, Asians, or any other minority group would ever be proposed, and, were such provisions in place, none would ever be tolerated.

386.  Only such bigotry against Atheists – signaled as permissible by the pervasive national motto – is deemed acceptable.

### (3) Pursuant to Their Religious Beliefs, Plaintiffs Are Burdened by "In G-d We Trust" on the Money

387.  The U.S. Code states that "it is important that the Nation's coinage and currency bear dignified designs of which the citizens of the United States can be proud … ."[335]

388.  Atheists, however, are no more proud of "In G-d We Trust" than Christians would be of "G-d is a Product of Human Weakness"[336] or "G-d is a Childish Superstition."[337]

389.  This is especially true when the "In G-d We Trust" phrase is inextricably linked with the (Christian) Bible (as James Pollock's "King of Kings and Lord of Lords" reference, *see supra* note 70, demonstrates is the case).

390.  In addition to its insulting and threatening language, *see supra* ¶ 278, that book – deemed to be holy and worshipped by the (Christian) Monotheistic majority responsible for "In G-d We Trust" on our money – states "Trust in the LORD with all your heart and lean not on your own understanding." *See Proverbs* 3:5.

391.  Trust in any "Lord" (i.e., G-d) represents the antithesis of Plaintiffs' religious ideals.

392.  To Plaintiffs, trust in G-d was largely responsible for the slavery that stains our nation's history.[338]

393.  To Plaintiffs, trust in G-d allowed the United States Supreme Court to deny women the right to practice law.[339]

---

[335] 31 U.S.C. § 3112 (t)(3)(E) (2012).

[336] *See* Letter of Albert Einstein to Erik Gutkind (Jan. 3, 1954), www.lettersofnote.com/2009/10/word-g-d-is-product-of-human-weakness.html.

[337] *Id.*

[338] *See* Raymund Harris, *Scriptural Researches on the Licitness of the Slave-Trade, Shewing Its Conformity with the Principles of Natural Religion, Delineated in the Sacred Writings of the Word of G-d* (1788).

[339] "The paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator." *Bradwell v. State*, 83 U.S. 130, 141 (1873) (Bradley, J., concurring).

394. To Plaintiffs, trust in G-d allowed the people of Virginia to criminalize interracial marriage.[340]

395. To Plaintiffs, trust in G-d has also led to the hugely embarrassing fact that currently some 46% of Americans believe "G-d created human beings pretty much in their present form at one time within the last 10,000 years or so."[341]

396. Thus, rather than pride, Plaintiffs sense shame in having "In G-d We Trust" displayed on the money, and they bridle at the fact that they must bear that motto as they engage in the routine commercial transactions that occur in daily life.

397. Moreover, they are constantly placed in the position of either abstaining from those transactions (and thus undergoing the burden of finding alternatives to using the sole legal coins and currency bills provided by their government) or violating their religious tenets.

398. Accordingly, "In G-d We Trust" on the money substantially burdens Plaintiffs in the free exercise of their religious beliefs.

399. Such burdening of religious beliefs violates 42 U.S.C. § 2000bb through § 2000bb-4, the Religious Freedom Restoration Act (RFRA), which states in pertinent parts:

> § 2000bb(a)(3): "The Congress finds that … governments should not substantially burden religious exercise without compelling justification."
>
> § 2000bb(b)(1) and (b)(2): "The purposes of this chapter are … to restore the compelling interest test … and to guarantee its application in all cases where free exercise of religion is substantially burdened; and … to provide a claim or defense to persons whose religious exercise is substantially burdened by government."
>
> § 2000bb-1(b)(1) and (b)(2): "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person … is in furtherance of a compelling governmental interest; and … is the least restrictive means of furthering that compelling governmental interest."

---

[340] "Almighty G-d created the races white, black, yellow, malay and red, and he placed them on separate continents.  … The fact that he separated the races shows that he did not intend for the races to mix." *Loving v. Virginia*, 388 U.S. 1, 3 (1967) (quoting Judge Leon Bazile).
[341] Frank Newport, Gallup Politics, *In U.S., 46% Hold Creationist View of Human Origins* (June 1, 2012) (citing a Gallup poll conducted May 3-6, 2012, www.gallup.com/poll/155003/ Hold-Creationist-View-Human-Origins.aspx).

400. To do as Defendants have done, forcing individuals to bear a religious message that is contrary to what they believe to be religious truth, unquestionably burdens them in the exercise of their religion.

401. As Rep. Emanuel Cleaver of Missouri stated, "**no respectable atheist would walk around with something in his pocket that said 'In G-d We Trust.'**"[342]

402. Rep. Cleaver apparently recognized that just as there would be substantial burdens on the exercise of religion for Jews forced to bear the message "Jesus is Our Saviour," for Catholics forced to bear "Abhor that arrant whore of Rome,"[343] or for Monotheists to bear "G-d is a Myth," Atheists are substantially burdened in the exercise of their religion by being forced to bear the message "In G-d We Trust."[344]

403. Atheists are also substantially burdened by being forced to proselytize for this religious claim that is completely contrary to their personal religious beliefs.

404. This proselytization is both expected and desired by Defendants, as can be seen in a number of the statements that they (or their members and associates) have made.

405. Early last century, for instance, Rep. Ollie M. James stated "we are engaged in sending to foreign countries and to distant people our missionaries **to preach the religions of Jesus Christ,**" and sending the nation's money "across the ocean" will teach others that "'**Here are the dollars of the greatest nation on earth, one that does not put its trust in floating navies or in marching armies, but places its trust in G-d.'**"[345]

406. Rep. Charles G. Edwards similarly maintained that the "In G-d We Trust" phrase "is a declaration not only to our people at home, but to all peoples, and to all nations, all over the world, that **ours is a nation with a firm and steadfast faith in G-d**."[346]

---

[342] Congressman Urges Respect for Nonbelievers … but Doesn't Think Atheists Truly Exist in America (May 5, 2012), www.g-ddiscussion.com/96308/congressman-urges-respect-for-nonbelievers-but-doesnt-think-atheists-truly-exist-in-america/.

[343] This phrase comes from what was the nation's most commonly-used schoolbook. *See* Sabbath Sch. Soc., *New England Primer, or, An Easy and Pleasant Guide to the Art of Reading: Adorned with Cuts; to Which is Added, the Catechism* 25 (rev. ed. 1843). Thus, it, too, is part of our nation's history and "heritage."

[344] Rep. Cleaver, a United Methodist pastor, was one of the very few congressmen to vote against the motto's reaffirmation. Reaffirming "In G-d We Trust" as the Official Motto of the United States: Roll Vote No. 816, 157 Cong. Rec. H7186 (Nov. 1, 2011).

[345] *See supra* ¶ 168 (emphases added).

[346] *See supra* ¶ 177 (emphasis added).

407. When Matthew H. Rothert first wrote to the Secretary of the Treasury, he noted that placing "In G-d We Trust" on the currency would "**affirm our trust in G-d** in such a manner that it will be heard around the world."[347]

408. At a hearing before the House Banking and Currency Committee (on Mr. Rothert's proposal), Rep. Herman P. Eberharter (PA) echoed this idea:

> [T]he American dollar travels all over the world, into every country of the world, and frequently gets behind the Iron Curtain, and if it carries this message in that way I think it would be very good. I think that is one of the most compelling reasons why we should put it on our currency.[348]

409. Rep. Eberharter then sought permission to place in the record "[a] resolution which was unanimously passed by the American Legion Convention."[349]

410. When that permission was granted, the resolution's contention that "the principles laid down by G-d and the teachings of our way of life should be kept alive in the hearts and minds of our friends enslaved behind the Iron Curtain" was entered into the Congressional Record as well.[350]

411. Advocating also for global diffusion of the religious ideals incorporated within the "In G-d We Trust" language, Rep. Lawrence Fountain (NC) stated that "that inscription … indicates **to the world** that … **the material is not the thing upon which we should rely, but it is G-d.**"[351]

412. Barely over a decade ago, the idea of proselytization was reiterated yet once more on the inner front cover of the United States Mint Annual Report:

> **Wherever United States coins travel**, they serve as reminders of **the values that all Americans share**. The words and symbols that define us as Americans have a permanent place in our coins: "Liberty" … "**In G-d We Trust**" … "E Pluribus Unum" ….[352]

---

[347] *See supra* ¶ 192 (emphasis added).

[348] *United States Currency Inscription*, *supra* note 159, at 53.

[349] *Id.* at 54.

[350] *Id.*

[351] *Id.* at 56 (emphases added).

[352] U.S. Mint, *2003 United States Mint Annual Report*, inner front cover, *available at* www.usmint.gov/downloads/about/annual_report/2003AnnualReport.pdf (first two ellipses in original) (emphases added).

413.  The Report continued by claiming that:

> Our coins are small **declarations of our beliefs**. They showcase how we see ourselves and our sense of sovereign identity. And **they serve as ambassadors of American values and ideals**.[353]

414.  Thus, it is again seen that Defendants consider "In G-d We Trust" as being one of the "**declarations of our beliefs**."

415.  Moreover, Defendants ignore Atheists such as Plaintiffs by viewing the motto as being a declaration "**that all Americans share**." Plaintiffs definitely do not share the belief that there is a G-d or that they trust in such an entity.

416.  Above all, Plaintiffs do not wish to proselytize for such a declaration of belief.

417.  For the foregoing reasons – especially when the "In G-d We Trust" inscriptions further the anti-Atheist prejudices they have been forced to endure in this alleged "beacon of religious freedom"[354] – Plaintiffs are substantially burdened.

418.  Defendants have no compelling interest to justify these burdens they have imposed.

419.  This is readily seen by noting that the currency of myriad other nations functions just fine without religious advocacy.

420.  This is also seen by noting that this nation's money functioned just fine, as well, for more than seventy years without the motto having ever been inscribed.

421.  Additionally, during the subsequent ninety-plus years (through the 1955 mandate that required the motto's inscription on all coins and currency bills), there was no dysfunction resulting from the secular coinage and bills that Defendants continued to manufacture.

422.  In fact, Defendant Congress just recently acknowledged that "it is appropriate to move many of the mottos and emblems, the inscription of the year, and the so-called 'mint marks' that currently appear on the 2 faces of each circulating coin to the edge of the coin, which would allow larger and more dramatic artwork … ." *See supra* ¶ 313.

423.  This acknowledgement, too, demonstrates that there is no compelling interest to having "In G-d We Trust" on the money.

---

[353] *Id.*
[354] *See supra* ¶ 303. As noted, "Atheists – solely on the basis of their disbelief in G-d – are felt to be less trustworthy than rapists!" *See supra* ¶ 380.

424. Even if there were a compelling interest, Defendants would need to show they furthered that interest in the least restrictive manner. This is another requirement that Defendants have never met.

425. Whatever the compelling interest Defendants may claim, it is likely that some other motto would serve it without burdening Plaintiffs' religious exercise.

426. For instance, the European Union's motto, "United in Diversity,"[355] serves its purposes without infringing upon the religious rights of anyone within its very large jurisdiction.

427. In fact, even limiting the motto to the current format, a virtually endless number of nonreligious choices exist. "In Equality We Trust," "In Liberty We Trust," "In Diversity We Trust," and so on, all embrace the noble principles underlying our governmental structure without compromising (or even implicating) constitutional mandates.

428. It is likely that Defendants will claim (as Rep. Pence did, *see supra* ¶ 340) that the government's endorsement of "In G-d We Trust" is justified because it reflects "America's Christian heritage."

429. Even if this "heritage" argument were to be accepted, the fact that this particular heritage item was chosen from the thousands that exist is problematic. America has a "heritage" of discovery, innovation, foreign aid, exploration of space, the welcoming of immigrants and a host of other heritage items (including such things as slavery, denial of suffrage for the poor, racial discrimination, pollution, and the absence of property rights for married women).

430. That only belief in G-d was chosen from among the myriad potential candidates indicates that it was not merely "heritage" (or history) that led to the selection of "In G-d We Trust."

431. On the contrary, "In G-d We Trust" was chosen because it supports and advances a particular "heritage" – namely, the heritage of the specific religious belief that there exists a (Christian) g-d.

---

[355] Wikipedia, *Symbols of Europe*, en.wikipedia.org/wiki/European_symbols#Motto (last visited Dec. 9, 2015).

1    432.  Defendants are surely aware that many citizens find this choice highly objectionable.

2    433.  This awareness is apparent on the Treasury Department's website, where it is written

3          that "[t]his use of the national motto has been challenged in court many times over the

4          years that it has been in use … ."[356]

5    434.  Despite this awareness, Defendant Lew's Treasury Department has been almost defiant

6          as it snubs those who seek nothing more than to have their fundamental rights of

7          religious liberty and equal protection upheld: "The Department of the Treasury and the

8          Department of Justice intend to actively defend against challenges to the use of the

9          national motto."[357]

10   435.  This attitude, expressed while acknowledging that "[t]he motto IN G-D WE TRUST

11         was placed on United States coins largely **because of … increased religious**

12         **sentiment**,"[358] highlights the need for putting an end to this constitutional violation.

13

---

[356] Bureau of Engraving & Printing, U.S. Dep't of the Treas., *FAQs: "Why is the phrase In G-d We Trust on U.S. currency?"* www.moneyfactory.gov/resources/faqs.html (last visited Dec. 12, 2015). The Treasury Department contends at this website that "[t]his use of the national motto … has been … upheld by … the U.S. Supreme Court as recently as 1977." Apparently referring to *Wooley v. Maynard*, 430 U.S. 705 (1977), this is a flagrant and specious mischaracterization.

In fact, Chief Justice Burger's majority opinion in *Wooley* emphatically supports Plaintiffs here. *See, e.g.*, 430 U.S., at 714 ("A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts") and *id*., at 717 ("[T]he State's interest ... to disseminate an ideology ... cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." This was the penultimate prose, given in the last sentence before the Chief Justice's conclusion). What occurred in *Wooley* was that then-Associate Justice Rehnquist responded to those statements by applying them to the situation where "an atheist carries and uses United States currency." 430 U.S. at 722 (Rehnquist, J., dissenting). In other words, Justice Rehnquist readily foresaw that, under the majority opinion, Atheists would be justified in arguing that they have a right to not carry objects inscribed with "In G-d We Trust."

Specifically noting that "[t]hat question is not before us today," 430 U.S. at 717 n.15, Chief Justice Burger simply deflected Justice Rehnquist's point by stating that the "In G-d We Trust" phrase "need not be displayed to the public." *Id*. That statement, however, is a *non sequitur*. Religious items that individuals find to be of importance – such as crucifixes, Stars of David, St. Christopher medals and the like – are often not "displayed to the public." Yet surely neither Congress nor the federal judiciary has any power to decree that the government may interfere with an individual's decision to carry (or to not carry) such religious items. Nor may they properly deny that such interference would substantially burden that individual's religious exercise.

[357] U.S. Dep't of the Treas., *supra* note 356.

[358] U.S. Dep't of the Treas., *supra* note 52 (emphasis added).

**CLAIMS FOR RELIEF**

**CLAIM 1.   DEFENDANTS' ACTS SUBSTANTIALLY BURDEN PLAINTIFFS' EXERCISE OF RELIGION IN VIOLATION OF RFRA**

436.  The allegations set forth in the preceding paragraphs are realleged herein.

437.  This cause of action is pled against each and all Defendants.

438.  Pursuant to 42 U.S.C. § 2000bb through § 2000bb-4, the Religious Freedom Restoration Act of 1993 (RFRA), government may not substantially burden any individuals in the exercise of their religious beliefs.

439.  It is noteworthy that RFRA was intended to prevent government from substantially burdening religious exercise when government has acted in a religiously neutral manner. In this case, Defendants have gone far beyond that expected reach of RFRA, having acted (as both history and the text "In G-d We Trust" incontrovertibly make clear) in a purely (Christian) Monotheistic religious manner.

440.  By placing "In G-d We Trust" on the nation's coins and currency bills, Defendants have substantially burdened Plaintiffs in the exercise of their Atheistic (and similar) beliefs by requiring them – as the price to pay for using the nation's coins and currency bills – to personally bear a religious message that is the antithesis of what they consider to be religious truth. Similar, for Plaintiff Clayman, Defendants have required him to sin.

441.  By placing "In G-d We Trust" on the nation's coins and currency bills, Defendants have substantially burdened Plaintiffs in the exercise of their Atheistic (and similar) beliefs by requiring them – as the price to pay for using the nation's money – to proselytize for a religious claim that is completely contrary to their personal religious opinions.

442.  By placing "In G-d We Trust" on the nation's coins and currency bills, Defendants have substantially burdened Plaintiffs in the exercise of their Atheistic (and similar) beliefs by requiring them to engage in activity that they believe furthers the anti-Atheist religious prejudices that pervade this nation's society.

443.  Defendants have no compelling interest to justify these burdens.

444.  Thus, by inscribing "In G-d We Trust" on the nation's coins and currency bills, Defendants have violated RFRA.

**CLAIM 2.   DEFENDANTS' HAVE VIOLATED PLAINTIFFS' FREE EXERCISE RIGHTS**

445.  The allegations set forth in the preceding paragraphs are realleged herein.

446.  This cause of action is pled against each and all Defendants.

447.  Defendants have repeatedly stated that they have placed "In G-d We Trust" on the money for the purpose of furthering (Christian) Monotheistic religious belief.

448.  Moreover (as revealed by the text, the legislative history, and the actual effect of having those words on the money), the statutes at issue are impermissibly "aimed at the promotion or restriction of religious beliefs." *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990).

449.  Defendants' actions have thus left Plaintiffs with only two alternatives regarding the use of the nation's legal tender: (i) employ a relatively burdensome alternative method for engaging in everyday commerce, or (ii) bear a religious message they believe to be untrue and completely contrary to their sincerely held religious beliefs (or, in the case of Plaintiff Clayman, sin).

450.  Thus, by inscribing "In G-d We Trust" on the nation's coins and currency bills, Defendants have violated Plaintiffs' free exercise rights.


**CLAIM 3.   DEFENDANTS HAVE VIOLATED PLAINTIFFS' FREE SPEECH RIGHTS**

451.  The allegations set forth in the preceding paragraphs are realleged herein.

452.  This cause of action is pled against each and all Defendants.

453.  In *Wooley v. Maynard*, 430 U.S. 705, 714 (1977), the Supreme Court stated that "[a] system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts."

454.  The High Court also wrote that "the State's interest ... to disseminate an ideology ... cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Id*., at 717.

455.  That notion was reiterated just last year in *Walker v. Texas Division, Sons of Confederate Veterans*, 135 S. Ct. 2239, 2246 (2015),: "[T]he Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech."

456.  Thus, by inscribing "In G-d We Trust" on the nation's coins and currency bills – with the specific intention of having individuals proselytize that religious message, Defendants have violated Plaintiffs' free speech rights.

**CLAIM 4.   DEFENDANTS HAVE VIOLATED PLAINTIFFS' EQUAL PROTECTION RIGHTS**

457.  The allegations set forth in the preceding paragraphs are realleged herein.

458.  This cause of action is pled against each and all Defendants.

459.  Choices related to religion are surely among the "personal choices central to individual dignity and autonomy ... [and that] define personal identity and beliefs." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2597 (2015) (discussing homosexuality and homosexual marriage).

460.  Of note is that, unlike the choices relating to homosexuality or marriage (which are mentioned nowhere in the Constitution), choices relating to religious belief are addressed both in the no religious test oath clause of the Constitution's Article VI and in the first sixteen words of the Bill of Rights.

461.  Surely, then, if "equal dignity in the eyes of the law," 135 S. Ct. at 2608, is something "[t]he Constitution grants," *id*.,  to a minority based on sexual orientation, it is something the Constitution grants to a minority based on religious belief.

462.  Defendants also impose upon children associated with this case "the stigma of knowing their families are somehow lesser … [and] thus harm and humiliate the children," *Id*. at 2600-01.

463.  Thus, by inscribing "In G-d We Trust" on the nation's coins and currency bills, Defendants have violated Plaintiffs' equal protection rights.[359]

---

[359] *See also Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 105 (2001) (noting that the Due Process Clause of the Fifth Amendment harbors an equal protection component).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief and judgment as follows:

I.    To declare that the inscription of "In G-d We Trust" on the nation's coins and currency bills (pursuant to 31 U.S.C. § 5112 (d)(1) and 31 U.S.C. § 5114 (b)) violates 42 U.S.C. § 2000bb through § 2000bb-4, the Religious Freedom Restoration Act (RFRA);

II.   To declare that the inscription of "In G-d We Trust" on the nation's coins and currency bills (pursuant to 31 U.S.C. § 5112 (d)(1) and 31 U.S.C. § 5114 (b)) violates the First Amendment's Free Exercise Clause;

III.  To declare that the inscription of "In G-d We Trust" on the nation's coins and currency bills (pursuant to 31 U.S.C. § 5112 (d)(1) and 31 U.S.C. § 5114 (b)) violates the First Amendment's Free Speech Clause;

IV.   To declare that the inscription of "In G-d We Trust" on the nation's coins and currency bills (pursuant to 31 U.S.C. § 5112 (d)(1) and 31 U.S.C. § 5114 (b)) violates the equal protection component of the Fifth Amendment's Due Process clause;

V.    To permanently enjoin Defendants from minting coins and/or printing currency bills on which is engraved "In G-d We Trust;"

VI.   To allow Plaintiffs – pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 2412 (the Equal Access to Justice Act), and as may otherwise be allowed by law – to recover all reasonable costs, expert witness fees, attorney fees, and other expenses; and

VII.  To provide such other and further relief as the Court may deem proper.

1

2          Respectfully submitted,

3          /s/ - Michael Newdow                          /s/ - Thomas Horwitz

4          Michael Newdow                               Thomas Horwitz
5          *Pro hac vice*                               Ohio Bar #0062323
6          2985 Lakeshore Blvd.                         1991 Crocker Road, Suite 600
7          Upper Lake, CA  95485                        Westlake, OH   44145
8          (916) 273-3798                               (440) 892-3331
9          NewdowLaw@gmail.com                          tmh@horwitzlpa.com

1
2                                **LIST OF APPENDICES**

3
4
5  APPENDIX A
6
7        H.R. REPORT 271 (1830) (SUNDAY MAIL DELIVERY) ...................... APP-02
8
9
10
11  APPENDIX B
12
13        JUSTICE WILLIAM STRONG'S 1873 STATEMENT ............................ APP-11
14
15
16
17  APPENDIX C
18
19        CONGRESSIONAL RECORD (CIRCA 1955) ......................................... APP-14
20
21
22
23  APPENDIX D
24
25        SELECTED EXCERPTS FROM THE CONGRESSIONAL RECORD .... APP-21
26
27
28
29  APPENDIX E
30
31        1994 SURVEY: AMERICAN VIEWS OF "IN G-D WE TRUST" ............ APP-31
32
33
34
35  APPENDIX F
36
37        SAMPLE LETTERS FROM MINORS ........................................................ APP-38
38
39
40
41  APPENDIX G
42
43        SUPREME COURT REFERENCES TO "IN G-D WE TRUST" ............... APP-42