Michael Newdow
*Pro hac vice*
2985 Lakeshore Blvd
Upper Lake, CA  95485
(626) 532-7694
NewdowLaw@gmail.com

Thomas M. Horwitz
1991 Crocker Road, Suite 600
Westlake, OH   44145
(440) 892-3331
tmh@horwitzlpa.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

**Civil Action No. 5:16-cv-00059**

AMENDED COMPLAINT – APPENDIX A

NEW DOE CHILD #1; NEW DOE CHILD #2; NEW DOE PARENT; NEW ROE CHILD #1; NEW ROE CHILD #2; NEW ROE PARENT; NEW POE CHILD; NEW POE PARENT; NEW COE CHILD; NEW COE PARENT; NEW BOE CHILD; NEW BOE PARENT; NEW HOE CHILD #1; NEW HOE CHILD #2; NEW HOE PARENT #1; NEW HOE PARENT #2; HOLLY HUBER; MITCHELL KAHLE; BERNARD KLEIN; MARNI HUEBNER-TIBORSKY; LOREN MILLER; MARTIN MAIER; MICHAEL HOWARD; LARRY KNIGHT; DEVIN KUCHYNKA; TRACEY MARTIN; MARK PETRICCA; BEVERLY SHAPIRO; RON THOMAS; DEREK ROSE; GEORGE SHIFFER; NANCY DOLLARD; DENNIS ROSENBLUM; JOSEPH MILON; SALVATORE SALERNO; JESSICA MCQUARTER; SUSAN CARRIER; SARAH MAXWELL; STUART CHISHOLM; MICHAEL MARTINEZ; ADAM CLAYMAN; MICHIGAN ATHEISTS; NORTHERN OHIO FREETHOUGHT SOCIETY;

Plaintiffs,

v.

THE CONGRESS OF THE UNITED STATES OF AMERICA; THE UNITED STATES OF AMERICA; JACOB J. LEW, SECRETARY OF THE TREASURY; RHETT JEPPSON, PRINCIPAL DEPUTY DIRECTOR, UNITED STATES MINT; LEONARD R. OLIJAR, DIRECTOR, BUREAU OF ENGRAVING AND PRINTING;

Defendants.

# <u>LIST OF APPENDICES</u>

**APPENDIX A**

**H.R. REPORT 271 (1830) (SUNDAY MAIL DELIVERY) ...................APP-02**

APPENDIX B

JUSTICE WILLIAM STRONG'S 1873 STATEMENT ............................ APP-11

APPENDIX C

CONGRESSIONAL RECORD (CIRCA 1955) ......................................... APP-14

APPENDIX D

SELECTED EXCERPTS FROM THE CONGRESSIONAL RECORD .... APP-21

APPENDIX E

1994 SURVEY: AMERICAN VIEWS OF "IN G-D WE TRUST" ............ APP-31

APPENDIX F

SAMPLE LETTERS FROM MINORS ....................................................... APP-38

APPENDIX G

SUPREME COURT REFERENCES TO "IN G-D WE TRUST" ............... APP-42

**APPENDIX A**

H.R. Report 271 (1830) (Sunday mail delivery)

21st Congress,  [ Rep. No. 271. ]  Ho. of Reps
1st Session.

# SUNDAY MAIL

March 4, 1830.

Read, and committed to the Committee of the Whole House on the state of the Union.

March 5, 1830.

Printed by order of the House of Representatives.

Mr. Johnson, of Kentucky, from the Committee on the Post Office and Post Roads, to which had been referred petitions and remonstrances against the transportation and opening of the public mail on the Sabbath day, made the following

# REPORT:

*The Committee on Post Offices and Post Roads, to whom the memorials were referred for prohibiting the transportation of the Mails, and the opening of Post Offices, on Sundays, report:*

That the memorialists regard the first day of the week as a day set apart by the Creator for religious exercises; and consider the transportation of the mail, and the opening of the post offices on that day, the violation of a religious duty, and call for a suppression of the practice. Others, by counter memorials, are known to entertain a different sentiment, believing that no one day of the week is holier than another. Others, holding the universality and immutability of the Jewish decalogue, believe in the sanctity of the seventh day of the week as a day of religious devotion; and by their memorial now before the committee, they also request that it may be set apart for religious purposes. Each has hitherto been left to the exercise of his own opinion; and it has been regarded as the proper business of Government to protect all, and determine for none. But the attempt is now made to bring about a greater uniformity, at least, in practice; and, as argument has failed, the Government has been called upon to interpose its authority to settle the controversy.

Congress acts under a constitution of delegated and limited powers. The committee look in vain to that instrument for a delegation of power authorizing this body to inquire and determine what part of time, or whether any, has been set apart by the Almighty for religious exercises. On the contrary, among the few prohibitions which it contains, is one that prohibits a religious test; and another, which declares that Congress shall pass no law respecting an establishment of religion, or prohibiting the free exercise thereof. The committee might here rest the argument, upon the ground that the question referred to them, does not come within the cognizance of Congress; but the perseverance and zeal with which the memorialists pursue their object, seems to require a further elucidation of the subject. And,

APP-003

as the opposers of Sunday mails disclaim all intention to unite church and state, the committee do not feel disposed to impugn their motives; and whatever may be advanced in opposition to the measure, will arise from the fear entertained of its fatal tendency to the peace and happiness of the nation. The catastrophe of other nations, furnished the framers of the constitution a beacon of awful warning, and they have evinced the greatest possible care in guarding against the same evil.

The law, as it now exists, makes no distinction as to the days of the week, but is imperative that the Postmasters shall attend at all reasonable hours, in every day, to perform the duties of their offices; and the Postmaster General has given his instructions to all Postmasters, that, at post offices, where the mail arrives on Sunday, the office is to be kept open one hour, or more, after the arrival and assorting the mail; but in case that would interfere with the hours of public worship, the office is to be kept open for one hour after the usual time of dissolving the meeting. This liberal construction of the law does not satisfy the memorialists But the committee believe that there is no just ground of complaint, unless it be conceded that they have a controlling power over the consciences of others. If Congress shall, by the authority of law, sanction the measure recommended, it would constitute a legislative decision of a religious controversy, in which even Christians, themselves, are at issue. However suited such a decision may be to an ecclesiastical council, it is incompatible with a republican legislature, which is purely for political, and not religious purposes.

In our individual character, we all entertain opinions, and pursue a corresponding practice upon the subject of religion. However diversified these may be, we all harmonize as citizens, while each is willing that the other shall enjoy the same liberty which he claims for himself. But in our representative character, our individual character is lost. The individual acts for himself; the representative for his constituents. He is chosen to represent their *political*, and not their *religious* views—to guard the rights of man; not to restrict the rights of conscience. Despots may regard their subjects as their property, and usurp the Divine prerogative of prescribing their religious faith. But the history of the world furnishes the melancholy demonstration, that the disposition of one man to coerce the religious homage of another, springs from an unchastened ambition, rather than a sincere devotion to any religion. The principles of our Government do not recognize in the majority, any authority over the minority, except in matters which regard the conduct of man to his fellow man. A Jewish monarch, by grasping the holy censer, lost both his sceptre and his freedom; a destiny as little to be envied, may be the lot of the American people, who hold the sovereignty of power, if they, in the person of their representatives, shall attempt to unite, in the remotest degree, Church and State.

From the earliest period of time, religious teachers have attained great ascendancy over the minds of the people; and in every nation, ancient, or modern, whether Pagan, Mohamedan, or Christian, have succeeded in the incorporation of their religious tenets with the political institutions of their country. The Persian idols, the Grecian oracles, the Roman auguries, and the modern priesthood of Europe, have all, in their turn, been the subject of popular adulation, and the agents of political deception. If the measure recommended should be adopted, it would be difficult for human sagacity to forsee how rapid would be the succession, or how numerous the train of measures which might follow, involving the dearest rights of all—the rights of conscience.

## [ Rep. No. 271. ] 3

It is perhaps fortunate for our country, that the proposition should have been made at this early period, while the spirit of the Revolution yet exists in full vigor. Religious zeal enlists the strongest prejudices of the human mind; and, when misdirected, excites the worst passions of our nature, under the delusive pretext of doing God service. Nothing so infuriates the heart to deeds of rapine and blood; nothing is so incessant in its toils; so persevering in its determinations; so appalling in its course; or so dangerous in its consequences. The equality of rights secured by the constitution, may bid defiance to mere political tyrants; but the robe of sanctity too often glitters to deceive. The constitution regards the conscience of the Jew as sacred as that of the Christian; and gives no more authority to adopt a measure affecting the conscience of a solitary individual, than that of a whole community. That representative who would violate this principle, would lose his delegated character, and forfeit the confidence of his constituents. If Congress shall declare the first day of the week holy, it will not convince the Jew nor the Sabbatarian. It will dissatisfy both; and, consequently, convert neither. Human power may extort vain sacrifices; but Deity alone can command the affections of the heart. It must be recollected, that, in the earliest settlement of our country, the spirit of persecution which drove the pilgrims from their native home, was brought with them to their new habitations; and that some Christians were scourged, and others put to death, for no other crime than dissenting from the dogmas of their rulers.

With these facts before us, it must be a subject of deep regret, that a question should be brought before Congress, which involves the dearest privileges of the constitution, and even by those who enjoy its choicest blessings. We should all recollect that Cataline, a professed patriot, was a traitor to Rome; Arnold, a professed whig, was a traitor to America; and Judas, a professed disciple, was a traitor to his Divine Master.

With the exception of the United States, the whole human race, consisting, it is supposed, of eight hundred millions of rational beings, is in religious bondage; and, in reviewing the scenes of persecution which history every where presents, unless the committee could believe that the cries of the burning victim, and the flames by which he is consumed, bear to Heaven a grateful incense, the conclusion is inevitable, that the line cannot be too strongly drawn between Church and State. If a solemn act of legislation shall, in *one* point, define the law of Gd, or point out to the citizen one religious duty, it may, with equal propriety, proceed to define *every* part of divine revelation; and enforce *every* religious obligation, even to the forms and ceremonies of worship; the endowment of the church, and the support of the clergy.

It was with a kiss that Judas betrayed his Divine Master, and we should all be admonished,—no matter what our faith may be—that the rights of conscience, cannot be so successfully assailed as under the pretext of holiness. The Christian religion made its way into the world in opposition to all human Governments. Banishment, tortures, and death, were inflicted in vain to stop its progress. But many of its professors, as soon as clothed with political power, lost the meek spirit which their creed inculcated, and began to inflict on other religions, and on dissenting sects of their own religion, persecutions more aggravated than those which their own apostles had endured. The ten persecutions of Pagan Emperors, were exceeded in atrocity by the massacres and murders perpetrated by Christian hands; and in vain shall we examine the records of Imperial tyranny for an engine of cru-

**APP-005**

4 [ Rep. No. 271. ]

elty equal to the *Holy Inquisition.* Every religious sect, however meek in its origin, commenced the work of persecution as soon as it acquired political power. The framers of the constitution recognised the eternal principle, that man's relation with his G-d is above human legislation, and his rights of conscience inalienable. Reasoning was not necessary to establish this truth: we are conscious of it in our own bosoms. It is this consciousness which, in defiance of human laws, has sustained so many martyrs in tortures and in flames. They *felt* that their duty to God was superior to human enactments, and that man could exercise no authority over their consciences: it is an inborn principle which nothing can eradicate.

The bigot in the pride of his authority, may lose sight of it—but strip him of his power; prescribe a faith to him which his conscience rejects; threaten him in turn with the dungeon and the faggot; and the spirit which G-d has implanted in him, rises up in rebellion and defies you. Did the primitive Christians ask that Government should recognise and observe their religious institutions? All they asked was *toleration;* all they complained of, was persecution. What did the Protestants of Germany, or the Hugenots of France, ask of their Catholic superiors? *Toleration.* What do the persecuted Catholics of Ireland ask of their oppressors? *Toleration.*

Do not all men in this country enjoy every religious right which martyrs and saints ever asked? Whence, then, the voice of complaint? Who is it, that, in the full enjoyment of every principle which human laws can secure, wishes to arrest a portion of these principles from his neighbor? Do the petitioners allege that they cannot conscientiously participate in the profits of the mail contracts and post offices, because the mail is carried on Sunday? If this be their motive, then it is worldly gain which stimulates to action, and not virtue or religion. Do they complain that men, less conscientious in relation to the Sabbath, obtain advantages over them, by receiving their letters and attending to their contents? Still their motive is worldly and selfish. But if their motive be to induce Congress to sanction, by law, their *religious opinions* and *observances,* then their efforts are to be resisted, as in their tendency fatal, both to religious and political freedom. Why have the petitioners confined their prayer to the mails? Why have they not requested that the Government be required to suspend *all* its executive functions on that day? Why do they not require us to enact that our ships shall not sail? that our armies shall not march? that officers of justice shall not seize the suspected, or guard the convicted? They seem to forget that government is as necessary on Sunday as on any other day of the week. The spirit of evil does not rest on that day. It is the Government, ever active in its functions, which enables us all, even the petitioners, to worship in our churches in peace. Our Government furnishes very few blessings like our mails. They bear from the centre of our Republic to its distant extremes, the acts of our legislative bodies, the decisions of the judiciary, and the orders of the Executive. Their speed is often essential to the defence of the country, the suppression of crime, and the dearest interests of the people. Were they suppressed one day of the week, their absence must be often supplied by public expresses; and, besides, while the mail bags might rest, the mail coaches would pursue their journey with the passengers. The mail bears, from one extreme of the Union to the other, letters of relatives and friends, preserving a communion of heart between those far separated, and increasing the most pure and refined pleasures of our existence: also, the letters of commercial men convey the state of the markets, prevent ruinous

**APP-006**

[ Rep. No. 271. ]  5

speculations, and promote general, as well as individual interest: they bear innumerable religious letters, newspapers, magazines and tracts, which reach almost every house throughout this wide Republic.  Is the conveyance of these a violation of the Sabbath?  The advance of the human race in intelligence, in virtue, and religion itself, depends in part upon the speed with which a knowledge of the past is disseminated.  Without an interchange between one country and another, and between different sections of the same country, every improvement in moral or political science, and the arts of life, would be confined to the neighborhood where it originated.  The more rapid and the more frequent this interchange, the more rapid will be the march of intellect, and the progress of improvement.  The mail is the chief means by which intellectual light irradiates to the extremes of the Republic.  Stop it one day in seven, and you retard one seventh the advancement of our country. So far from stopping the mail on Sunday, the committee would recommend the use of all reasonable meanse to give it a greater expedition and a greater extension.  What would be the elevation of our country, if every new conception could be made to strike every mind in the Union at the same time? It is not the distance of a Province or State from the seat of Government, which endangers its separation; but it is the difficulty and unfrequency of intercourse between them.  Our mails reach Missouri and Arkansas in less time than they reached Kentucky and Ohio in the infancy of their settlements; and now, when there are three millions of people extending a thousand miles West of the Alleghany, we hear less of discontent, than when there were a few thousands scattered along their Western base.

To stop the mails one day in seven would be to thrust the whole Western country, and other distant parts of this Republic, one day's journey from the seat of Government.  But, were it expedient to put an end to the transmission of letters and newspapers on Sunday, because it violates the law of God, have not the petitioners begun wrong in their efforts?  If the arm of Government be necessary to compel men to respect and obey the laws of God, do not the State Governments possess infinitely more power in this respect?  Let the petitioners turn to *them*, and see if they can induce the passage of laws to respect the observance of the Sabbath: for, if it be sinful for the mail to carry letters on Sunday, it must be equally sinful for individuals to write, carry, receive, or read them.  It would seem to require that these acts should be made penal, to complete the system.  Travelling on business or recreation, except to and from church; all printing, carrying, receiving, and reading of newspapers; all conversations and social intercourse, except upon religious subjects, must necessarily be punished, to suppress the evil. Would it not also follow, as an inevitable consequence, that every man, woman, and child, should be compelled to attend meeting? and, as only one sect, in the opinion of some, can be deemed orthodox, must it not be determined, by law, which *that* is, and compel all to hear those teachers, and contribute to their support?  If minor punishments would not restrain the Jew, or the Sabbatarian, or the Infidel, who believes Saturday to be the Sabbath, or disbelieves the whole, would not the same system require that we should resort to imprisonment, banishment, the rack, and the faggot, to force men to violate their own consciences, or compel them to listen to doctrines which they abhor?  When the State Governments shall have yielded to these measures, it will be time enough for Congress to declare that the rattling of the mail coaches shall no longer break the silence of this despotism.  It is the duty of this Government to afford to *all*—to Jew or Gentile, Pagan or

**APP-007**

6                        [ Rep. No. 271. ]

Christians, the protection and the advantages of our benignant institutions, on *Sunday*, as well as every day of the week. Although this Government will not convert itself into an ecclesiastical tribunal, it will practice upon the maxim laid down by the founder of Christianity—that it is lawful to do *good* on the Sabbath day. If the Almighty has set apart the first day of the week as time which man is bound to keep holy, and devote exclusively to his worship, would it not be more congenial to the precepts of Christians, to appeal exclusively to the Great Lawgiver of the Universe to aid them in making men better—in correcting their practices by purifying their hearts? Government will protect them in their efforts. When they shall have so instructed the public mind, and awakened the consciences of individuals, as to make them believe that it is a violation of G–d's law to carry the mail, open post offices, or receive letters, on Sunday, the evil of which they complain will cease of itself, without any exertion of the strong arm of civil power. When man undertakes to be G–d's avenger, he becomes a demon. Driven by the frenzy of a religious zeal, he loses every gentle feeling; forgets the most sacred precepts of his creed; and becomes ferocious and unrelenting.

Our fathers did not wait to be oppressed, when the mother country asserted and exercised an unconstitutional power over them. To have acquiesced in the tax of three pence upon a pound of tea, would have led the way to the most cruel exactions; they took a bold stand against the principle, and liberty and independence was the result. The petitioners have not requested Congress to suppress Sunday mails upon the ground of political expediency, but because they violate the sanctity of the first day of the week.

This being the fact, and the petitioners having indignantly disclaimed even the wish to unite politics and religion, may not the committee reasonably cherish the hope, that they will feel reconciled to its decision, in the case; especially, as it is also a fact, that the counter memorials, equally respectable, oppose the interference of Congress, upon the ground that it would be legislating upon a religious subject, and therefore unconstitutional.

*Resolved,* That the committee be discharged from the further consideration of the subject.

**APP-008**

[ Rep. No. 271. ]                    7

MARCH 5, 1830.

Mr. McCREERY, from the Committee on the Post Office and Post Roads, to which was referred sundry memorials and petitions upon the subject of transporting and opening the public mail on the Sabbath day, submits the following as his view of the subject:

*The minority of the Committee, to whom were referred the memorials relative to the transportation of the mail, and the delivering of letters, &c. on the Sabbath, beg leave to state the reasons of their dissent from the report made by the committee on that subject:*

All Christian nations acknowledge the first day of the week, to be the Sabbath. Almost every State in this Union have, by positive legislation, not only recognized this day as sacred, but has forbidden its profanation under penalties imposed by law.

It was never considered, by any of those States, as an encroachment upon the rights of conscience, or as an improper interference with the opinions of the few, to guard the sacredness of that portion of time acknowledged to be holy by the many.

The petitioners ask not Congress to expound the moral law; they ask not Congress to meddle with theological controversies, much less to interfere with the rights of the Jew or the Sabbatarian, or to treat with the least disrespect the religious feelings of any portion of the inhabitants of the Union; they ask the introduction of no religious coercion into our civil institutions; no blending of religion and civil affairs; but they do ask, that the agents of Government, employed in the Post Office Department, may be permitted to enjoy the same opportunities of attending to moral and religious instruction, or intellectual improvement, on that day, which is enjoyed by the rest of their fellow citizens. They approach the Government, not for personal emolument, but as patriots and Christians, to express their high sense of the moral energy and necessity of the Sabbath for the perpetuity of our republican institutions; and respectfully request that Congress will not, by legislative enactments, impair those energies.

Among the many reasons which might be advanced, that it is both expedient and a duty to grant the prayer of the petitioners, the following are only submitted:

The petitioners ask the enactment of no law establishing the first day of the week as the Christian Sabbath; they only ask the extension and application, to one Department of Government, a principle which is recognized, and has, since the foundation of our Government, been acknowledged in every other Department. The principle embraced in the petitions, has been recognized by Congress, by adjourning over the first day of the week. At the first session of the first Congress, a law was passed establishing Judicial Courts, and in that law Sunday is excepted from the days on which that court may commence its sessions. All the other Executive Departments of Government are closed on that day. Congress has never, by this, considered itself as expounding the moral law, or as introducing any religious coercion into our civil institutions, or making any innovations on the religious rights of the citizens, or settling by legislation any theological question that

**APP-009**

8      [ Rep. No. 271. ]

may exist between Jews, Sabbatarians, and other denominations. The good of society requires the strict observance of one day in seven. Paley, and other writers on moral philosophy, have shown, that the resting of men every seventh day; their winding up their labors and concerns once in seven days; their abstraction from the affairs of the world, to improve their minds and converse with their Maker; their orderly attendance upon the ordinances of public worship and instruction, have a direct and powerful tendency to improve the morals and temporal happiness of mankind.

The wise and good Ruler of the universe made the appointment, not by a mere arbitrary exercise of authority, but for our good; and whatever difference of opinion may exist in respect to the proper day to be observed, almost all agree, that one day in seven should be devoted to religious exercises. That being admitted, can any thing be more reasonable than the request of the petitioners, that, at least, so much of the law should be repealed, as requires the post offices to be kept open every day of the week. Does not the enactment of that law plainly imply, that mankind is under no moral obligation to refrain from secular labor on any day of the week? Is it not in direct opposition to the received opinion of almost all professing Christians? It is to that part of the law, more particularly, which requires, in terms, all the postmasters throughout the United States to deliver letters, packets, and papers, on every day of the week, to which the minority of your committee object, and which is most offensive to the petitioners. In this statute is at once seen, a palpable encroachment on the rights of conscience. It either drives every man, who feels himself morally bound to observe the Sabbath in a religious manner, from the service of his country, and equal participation in her favors, or subjects him to the hard terms of remaining in office, at the expense of his principles. It is freely acknowledged, that the works of necessity and mercy are not forbidden; and, if the transportation of the mail on Sunday, could be justified on that ground, (which is not admitted) it cannot be contended, that the keeping open offices, where no mail arrives on that day is the work of necessity.

The arguments which have been urged for the transportation of the mail, &c. on the Sabbath, are mainly derived from commercial convenience, and from alleged derangement of business and intercourse. This doctrine militates against the first principles of good morals. If these are important at all, they are paramount to the claims of expediency: but this plea makes them subservient to the pressure of worldly business, and converts them into mere questions of profit and loss.

Granting the prayer of the petitioners cannot interfere with the religious feelings or consciences of any portion of the citizens; because, they ask no service to be performed; no principle to be professed. It is only asked that certain duties be not required on a certain day. Were it imposing any service, or requiring the profession of any opinions, those whose religious sentiments were different, might justly complain. But he who conscientiously believes that he is bound to observe the seventh day of the week, in a religious manner, can have no just reason to complain; because, Government takes nothing from him, in permitting all classes of citizens to observe the first day of the week, as a day of religious rest. The case would be quite different, did the privilege of resting on that day, impose any thing on any class of citizens, contrary to their conscience. Therefore,

*Resolved,* That it is expedient to grant the prayer of the petitioners,

WM. McCREERY,