Michael Newdow
*Pro hac vice*
2985 Lakeshore Blvd
Upper Lake, CA  95485
(626) 532-7694
NewdowLaw@gmail.com

Thomas M. Horwitz
1991 Crocker Road, Suite 600
Westlake, OH  44145
(440) 892-3331
tmh@horwitzlpa.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

**Civil Action No. 5:16-cv-00059**

AMENDED COMPLAINT – APPENDIX G

NEW DOE CHILD #1; NEW DOE CHILD #2; NEW DOE PARENT; NEW ROE CHILD #1; NEW ROE CHILD #2; NEW ROE PARENT; NEW POE CHILD; NEW POE PARENT; NEW COE CHILD; NEW COE PARENT; NEW BOE CHILD; NEW BOE PARENT; NEW HOE CHILD #1; NEW HOE CHILD #2; NEW HOE PARENT #1; NEW HOE PARENT #2; HOLLY HUBER; MITCHELL KAHLE; BERNARD KLEIN; MARNI HUEBNER-TIBORSKY; LOREN MILLER; MARTIN MAIER; MICHAEL HOWARD; LARRY KNIGHT; DEVIN KUCHYNKA; TRACEY MARTIN; MARK PETRICCA; BEVERLY SHAPIRO; RON THOMAS; DEREK ROSE; GEORGE SHIFFER; NANCY DOLLARD; DENNIS ROSENBLUM; JOSEPH MILON; SALVATORE SALERNO; JESSICA MCQUARTER; SUSAN CARRIER; SARAH MAXWELL; STUART CHISHOLM; MICHAEL MARTINEZ; ADAM CLAYMAN; MICHIGAN ATHEISTS; NORTHERN OHIO FREETHOUGHT SOCIETY;

Plaintiffs,

v.

THE CONGRESS OF THE UNITED STATES OF AMERICA; THE UNITED STATES OF AMERICA; JACOB J. LEW, SECRETARY OF THE TREASURY; RHETT JEPPSON, PRINCIPAL DEPUTY DIRECTOR, UNITED STATES MINT; LEONARD R. OLIJAR, DIRECTOR, BUREAU OF ENGRAVING AND PRINTING;

Defendants.

# LIST OF APPENDICES

APPENDIX A

      H.R. REPORT 271 (1830) (SUNDAY MAIL DELIVERY) ...................... APP-02

APPENDIX B

      JUSTICE WILLIAM STRONG'S 1873 STATEMENT ............................ APP-11

APPENDIX C

      CONGRESSIONAL RECORD (CIRCA 1955) ........................................ APP-14

APPENDIX D

      SELECTED EXCERPTS FROM THE CONGRESSIONAL RECORD .... APP-21

APPENDIX E

      1994 SURVEY: AMERICAN VIEWS OF "IN G-D WE TRUST" ............ APP-31

APPENDIX F

      SAMPLE LETTERS FROM MINORS ....................................................... APP-38

**APPENDIX G**

      **SUPREME COURT REFERENCES TO "IN G-D WE TRUST".........APP-42**

**APPENDIX G**


**United States Supreme Court**
**Mentions of "In G-d We Trust"**

**APPENDIX G**

**U.S. SUPREME COURT MENTIONS OF "IN G-D WE TRUST"**

**Table of Contents**

(1) *Engel v. Vitale*, 370 U.S. 421 (1962)..................................................... APP-44

(2) *Abington School District v. Schempp*, 374 U.S. 203 (1963) ............. APP-47

(3) *Wooley v. Maynard*, 430 U.S. 705 (1977)........................................... APP-48

(4) *Stone v. Graham*, 449 U.S. 39 (1980) ................................................. APP-49

(5) *Marsh v. Chambers*, 463 U.S. 783 (1983) ......................................... APP-50

(6) *Lynch v. Donnelly*, 465 U.S. 668 (1984)............................................ APP-51

(7) *Regan v. Time, Inc.*, 468 U.S. 641 (1984) ......................................... APP-53

(8) *County of Allegheny v. ACLU*, 492 U.S. 573 (1989) ........................ APP-54

(9) *Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004) ... APP-56

(10) *Van Orden v. Perry*, 545 U.S. 677 (2005)......................................... APP-57

(11) *McCreary County v. ACLU*, 545 U.S. 844 (2005)............................. APP-58

(12) *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014) ....................... APP-61

**(1)** *Engel v. Vitale*, 370 U.S. 421 (1962)

370 U.S. at 437 n.1 (Douglas, J., concurring)

It is customary in deciding a constitutional question to treat it in its narrowest form. Yet at times the setting of the question gives it a form and content which no abstract treatment could give. The point for decision is whether the Government can constitutionally finance a religious exercise. Our system at the federal and state levels is presently honeycombed with such financing.[1] Nevertheless, I think it is an unconstitutional undertaking whatever form it takes.

Footnote 1: "There are many 'aids' to religion in this country at all levels of government. To mention but a few at the federal level, one might begin by observing that the very First Congress which wrote the First Amendment provided for chaplains in both Houses and in the armed services. There is compulsory chapel at the service academies, and religious services are held in federal hospitals and prisons. The President issues religious proclamations. The Bible is used for the administration of oaths. N. Y. A. and W. P. A. funds were available to parochial schools during the depression. Veterans receiving money under the 'G. I.' Bill of 1944 could attend denominational schools, to which payments were made directly by the government. During World War II, federal money was contributed to denominational schools for the training of nurses. The benefits of the National School Lunch Act are available to students in private as well as public schools. The Hospital Survey and Construction Act of 1946 specifically made money available to non-public hospitals. The slogan 'In G-d We Trust' is used by the Treasury Department, and Congress recently added G-d to the pledge of allegiance. There is Bible-reading in the schools of the District of Columbia, and religious instruction is given in the District's National Training School for Boys. Religious organizations are exempt from the federal income tax and are granted postal privileges. Up to defined limits -- 15 per cent of the adjusted gross income of individuals and 5 per cent of the net income of corporations -- contributions to religious organizations are deductible for federal income tax purposes. There are no limits to the deductibility of gifts and bequests to religious institutions made under the federal gift and estate tax laws. This list of federal 'aids' could easily be expanded, and of course there is a long list in each state." Fellman, The Limits of Freedom (1959), pp. 40-41.

370 U.S. at 440 n.5 (Douglas, J., concurring)

> What New York does on the opening of its public schools is what each House of Congress[3] does at the opening  [440]  of each day's business.[4] Reverend Frederick B. Harris is Chaplain of the Senate; Reverend Bernard Braskamp is Chaplain of the House. Guest chaplains of various denominations also officiate.[5]

> Footnote 5: It would, I assume, make no difference in the present case if a different prayer were said every day or if the ministers of the community rotated, each giving his own prayer. For some of the petitioners in the present case profess no religion.

> The Pledge of Allegiance, like the prayer, recognizes the existence of a Supreme Being. Since 1954 it has contained the words "one Nation under G-d, indivisible, with liberty and justice for all." 36 U. S. C. § 172. The House Report recommending the addition of the words "under G-d" stated that those words in no way run contrary to the First Amendment but recognize "only the guidance of G-d in our national affairs." H. R. Rep. No. 1693, 83d Cong., 2d Sess., p. 3. And see S. Rep. No. 1287, 83d Cong., 2d Sess. Senator Ferguson, who sponsored the measure in the Senate, pointed out that the words "In G-d We Trust" are over the entrance to the Senate Chamber. 100 Cong. Rec. 6348. He added:

> "I have felt that the Pledge of Allegiance to the Flag which stands for the United States of America should recognize the Creator who we really believe is in control of the destinies of this great Republic.

> "It is true that under the Constitution no power is lodged anywhere to establish a religion. This is not an attempt to establish a religion; it has nothing to do with anything of that kind. It relates to belief in G-d, in whom we sincerely repose our trust. We know that America cannot be defended by guns, planes, and ships alone. Appropriations and expenditures for defense will be of value only if the G-d under whom we live believes that we are in the right. We should at all times recognize G-d's province over the lives of our people and over this great Nation." Ibid. And see 100 Cong. Rec. 7757 et seq. for the debates in the House.

> The Act of March 3, 1865, 13 Stat. 517, 518, authorized the phrase "In G-d We Trust" to be placed on coins. And see 17 Stat. 427. The first mandatory requirement for the use of that motto on coins was made by

the Act of May 18, 1908, 35 Stat. 164. See H. R. Rep. No. 1106, 60th Cong., 1st Sess.; 42 Cong. Rec. 3384 et seq. The use of the motto on all currency and coins was directed by the Act of July 11, 1955, 69 Stat. 290. See H. R. Rep. No. 662, 84th Cong., 1st Sess.; S. Rep. No. 637, 84th Cong., 1st Sess. Moreover, by the Joint Resolution of July 30, 1956, our national motto was declared to be "In G-d We Trust." 70 Stat. 732. In reporting the Joint Resolution, the Senate Judiciary Committee stated:

"Further official recognition of this motto was given by the adoption of the Star-Spangled Banner as our national anthem. One stanza of our national anthem is as follows:

"'O, thus be it ever when freemen shall stand

Between their lov'd home and the war's desolation!

Blest with vict'ry and peace may the heav'n rescued land

Praise the power that hath made and preserved us a nation!

Then conquer we must when our cause it is just,

And this be our motto -- "In G-d is our trust."

And the Star-Spangled Banner in triumph shall wave

O'er the land of the free and the home of the brave.'

"In view of these words in our national anthem, it is clear that 'In G-d we trust' has a strong claim as our national motto." S. Rep. No. 2703, 84th Cong., 2d Sess., p. 2.

370 U.S. at 449 (Stewart, J., concurring)

In 1954 Congress added a phrase to the Pledge of Allegiance to the Flag so that it now contains the words "one Nation under G-d, indivisible, with liberty and justice for all."[6] In 1952 Congress enacted legislation calling upon the President each year to proclaim a National Day of Prayer.[7] Since 1865 the words "IN G-D WE TRUST" have been impressed on our coins.[8]

Footnote 8: 13 Stat. 517, 518; 17 Stat. 427; 35 Stat. 164; 69 Stat. 290. The current provisions are embodied in 31 U. S. C. §§ 324, 324a.

**(2)** *School District of Abington Township v. Schempp*, **374** U.S. **203** (**1963**)

374 U.S. at 303 (Brennan, J., concurring)

> [From page 296: It may be helpful for purposes of analysis to group these other practices and forms of accommodation into several rough categories.]
>
> F. Activities Which, Though Religious in Origin, Have Ceased to Have Religious Meaning. -- As we noted in our Sunday Law decisions, nearly every criminal law on the books can be traced to some religious principle or inspiration. But that does not make the present enforcement of the criminal law in any sense an establishment of religion, simply because it accords with widely held religious principles. As we said in *McGowan v. Maryland*, 366 U.S. 420, 442, "the 'Establishment' Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions." This rationale suggests that the use of the motto "In G-d We Trust" on currency, on documents and public buildings and the like may not offend the clause. It is not that the use of those four words can be dismissed as "de minimis" -- for I suspect there would be intense opposition to the abandonment of that motto. The truth is that we have simply interwoven the motto so deeply into the fabric of our civil polity that its present use may well not present that type of involvement which the First Amendment prohibits.

**(3) *Wooley v. Maynard*, 430 U.S. 705 (1977)**

430 U.S. at 717 n.15 (Burger, C.J., majority opinion)

We conclude that the State of New Hampshire may not require appellees to display the state motto[15] upon their vehicle license plates; and, accordingly, we affirm the judgment of the District Court.

Footnote 15: It has been suggested that today's holding will be read as sanctioning the obliteration of the national motto, "In G-d We Trust" from United States coins and currency. That question is not before us today but we note that currency, which is passed from hand to hand, differs in significant respects from an automobile, which is readily associated with its operator. Currency is generally carried in a purse or pocket and need not be displayed to the public. The bearer of currency is thus not required to publicly advertise the national motto.

430 U.S. at 722 (Rehnquist, J., dissenting)

The logic of the Court's opinion leads to startling, and I believe totally unacceptable, results. For example, the mottoes "In G-d We Trust" and "E Pluribus Unum" appear on the coin and currency of the United States. I cannot imagine that the statutes, see 18 U.S.C. §§ 331 and 333, proscribing defacement of United States currency impinge upon the First Amendment rights of an atheist. The fact that an atheist carries and uses United States currency does not, in any meaningful sense, convey any affirmation of belief on his part in the motto "In G-d We Trust." Similarly, there is no affirmation of belief involved in the display of state license tags upon the private automobiles involved here.

**(4) Stone v. Graham, 449 U.S. 39 (1980)**

449 U.S. at 45 (Rehnquist, J., dissenting)

The Court rejects the secular purpose articulated by the State because the Decalogue is "undeniably a sacred text," ante, at 41. It is equally undeniable, however, as the elected representatives of Kentucky determined, that the Ten Commandments have had a significant impact on the development of secular legal codes of the Western World. The trial court concluded that evidence submitted substantiated this determination. App. to Pet. for Cert. 38. See also *Anderson v. Salt Lake City Corp.*, 475 F.2d 29, 33 (CA10 1973) (upholding construction on public land of monument inscribed with Ten Commandments because they have "substantial secular attributes"). Certainly the State was permitted to conclude that a document with such secular significance should be placed before its students, with an appropriate statement of the document's secular import. See id., at 34 ("It does not seem reasonable to require removal of a passive monument, involving no compulsion, because its accepted precepts, as a foundation for law, reflect the religious nature of an ancient era").[2] See also Opinion of the Justices, 108 N. H. 97, 228 A. 2d 161 (1967) (upholding placement of plaques with the motto "In G-d We Trust" in public schools).

**(5)** *Marsh v. Chambers*, 463 U.S. 783 (1983)

463 U.S. at 818 (Brennan, J., dissenting)

Of course, the Court does not rely entirely on the practice of the First Congress in order to validate legislative prayer. There is another theme which, although implicit, also pervades the Court's opinion. It is exemplified by the Court's comparison of legislative prayer with the formulaic recitation of "G-d save the United States and this Honorable Court." Ante, at 786. It is also exemplified by the Court's apparent conclusion that legislative prayer is, at worst, a "'mere shadow'" on the Establishment Clause rather than a "'real threat'" to it. Ante, at 795, quoting *Schempp*, supra, at 308 (Goldberg, J., concurring). Simply put, the Court seems to regard legislative prayer as at most a de minimis violation, somehow unworthy of our attention. I frankly do not know what should be the proper disposition of features of our public life such as "G-d save the United States and this Honorable Court," "In G-d We Trust," "One Nation Under G-d," and the like. I might well adhere to the view expressed in Schempp that such mottos are consistent with the Establishment Clause, not because their import is de minimis, but because they have lost any true religious significance. 374 U.S., at 303-304 (BRENNAN, J., concurring). Legislative invocations, however, are very different.

**(6)** *Lynch v. Donnelly*, 465 U.S. 668 (1984)

465 U.S. at 676 (Burger, C.J., majority opinion)

Other examples of reference to our religious heritage are found in the statutorily prescribed national motto "In G-d We Trust," 36 U. S. C. § 186, which Congress and the President mandated for our currency, see 31 U. S. C. § 5112(d)(1) (1982 ed.), and in the language "One nation under G-d," as part of the Pledge of Allegiance to the American flag. That pledge is recited by many thousands of public school children -- and adults -- every year.

465 U.S. at 693 (O'Connor, J., concurring)

These features combine to make the government's display of the creche in this particular physical setting no more an endorsement of religion than such governmental "acknowledgments"  [693]  of religion as legislative prayers of the type approved in *Marsh v. Chambers*, 463 U.S. 783 (1983), government declaration of Thanksgiving as a public holiday, printing of "In G-d We Trust" on coins, and opening court sessions with "G-d save the United States and this honorable court." Those government acknowledgments of religion serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs. The display of the creche likewise serves a secular purpose -- celebration of a public holiday with traditional symbols. It cannot fairly be understood to convey a message of government endorsement of religion. It is significant in this regard that the creche display apparently caused no political divisiveness prior to the filing of this lawsuit, although Pawtucket had incorporated the creche in its annual Christmas display for some years. For these reasons, I conclude that Pawtucket's display of the creche does not have the effect of communicating endorsement of Christianity.

465 U.S. at 714 and 716 (Brennan, J., dissenting).

Although the Court's relaxed application of the Lemon test to Pawtucket's creche is regrettable, it is at least understandable and properly limited to the particular facts of this case. The Court's opinion, however, also sounds a broader  [714]  and more troubling theme. Invoking the celebration of Thanksgiving as a public holiday, the legend "In G-d We Trust" on our coins, and the proclamation "G-d save the United States and this Honorable Court" at the opening of judicial sessions, the Court asserts, without explanation, that Pawtucket's inclusion of a creche in its annual Christmas display poses no more of a threat to Establishment Clause values than these other official "acknowledgments" of religion. Ante, at 674-678, 685-686; see also ante, at 692-693 (O'CONNOR, J., concurring).

…

Finally, we have noted that government cannot be completely prohibited from recognizing in its public actions the religious beliefs and practices of the American people as an aspect of our national history and culture. See *Engel v. Vitale*, supra, at 435, n. 21; *Schempp*, supra, at 300-304 (BRENNAN, J., concurring). While I remain uncertain about these questions, I would suggest that such practices as the designation of "In G-d We Trust" as our national motto, or the references to G-d contained in the Pledge of Allegiance to the flag can best be understood, in Dean Rostow's apt phrase, as a form a "ceremonial deism," 24 protected from Establishment Clause scrutiny chiefly because they have lost through rote repetition any significant religious content. See *Marsh v. Chambers*, 463 U.S., at 818 (BRENNAN, J., dissenting).  [717]  Moreover, these references are uniquely suited to serve such wholly secular purposes as solemnizing public occasions, or inspiring commitment to meet some national challenge in a manner that simply could not be fully served in our culture if government were limited to purely nonreligious phrases. Cf. *Schempp*, supra, at 265 (BRENNAN, J., concurring). The practices by which the government has long acknowledged religion are therefore probably necessary to serve certain secular functions, and that necessity, coupled with their long history, gives those practices an essentially secular meaning.

**(7)** *Regan v. Time, Inc.*, **468 U.S. 641 (1984)**

468 U.S. at 683 (Brennan, J., concurring and dissenting)

"[Equally] banned by the statute are a Polaroid snapshot of a child proudly displaying his grandparent's birthday gift of a $ 20 bill; a green, six-foot enlargement of the portrait of George Washington on a $ 1 bill, used as theatrical scenery by a high school drama club; a copy of the legend, 'In G-d We Trust', on the leaflets distributed by those who oppose Federal aid to finance abortions; and a three-foot by five-foot placard bearing an artist's rendering of a 'shrinking' dollar bill, borne by a striking worker  [684]  to epitomize his demand for higher wages in a period of inflation." Brief for Appellee 5-6.

**(8)** *County of Allegheny v. ACLU*, 492 U.S. 573 (1989)

492 U.S. at 602 (Blackmun, J., plurality opinion)

In *Marsh*, the Court relied specifically on the fact that Congress authorized legislative prayer at the same time that it produced the Bill of Rights. See n. 46, supra. Justice Kennedy, however, argues that Marsh legitimates all "practices with no greater potential for an establishment of religion" than those "accepted traditions dating back to the Founding." Post, at 670, 669. Otherwise, the Justice asserts, such practices as our national motto ("In G-d We Trust") and our Pledge of Allegiance (with the phrase "under G-d," added in 1954, Pub. L. 396, 68 Stat. 249) are in danger of invalidity.

Our previous opinions have considered in dicta the motto and the pledge, characterizing them as consistent with the proposition that government may not communicate an endorsement  [603]  of religious belief. *Lynch*, 465 U.S., at 693 (O'Connor, J., concurring); id., at 716-717 (Brennan, J., dissenting). We need not return to the subject of "ceremonial deism," see n. 46, supra, because there is an obvious distinction between creche displays and references to G-d in the motto and the pledge. HN12 However history may affect the constitutionality of nonsectarian references to religion by the government, 52 history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed.

492 U.S. at 625 (O'Connor, J., concurring)

I joined the majority opinion in *Lynch* because, as I read that opinion, it was consistent with the analysis set forth in my separate concurrence, which stressed that "[e]very government  [625]  practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." Id., at 694 (emphasis added). Indeed, by referring repeatedly to "inclusion of the creche" in the larger holiday display, id., at 671, 680-682, 686, the *Lynch* majority recognized that the creche had to be viewed in light of the total display of which it was a part. Moreover, I joined the Court's discussion in Part II of Lynch concerning government acknowledgments of religion in American life because, in my view, acknowledgments such as the legislative prayers upheld in *Marsh v. Chambers*, 463 U.S. 783 (1983), and the printing of "In G-d We Trust" on

our coins serve the secular purposes of "solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *Lynch*, 465 U.S., at 693 (concurring opinion). Because they serve such secular purposes and because of their "history and ubiquity," such government acknowledgments of religion are not understood as conveying an endorsement of particular religious beliefs. Ibid. At the same time, it is clear that "[g]overnment practices that purport to celebrate or acknowledge events with religious significance must be subjected to careful judicial scrutiny." Id., at 694.


492 U.S. at 673 (Kennedy, J., concurring and dissenting).

The United States Code itself contains religious references that would be suspect under the endorsement test. Congress has directed the President to "set aside and proclaim a suitable day each year . . . as a National Day of Prayer, on which the people of the United States may turn to G-d in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C. § 169h. This statute does not require anyone to pray, of course, but it is a straightforward endorsement of the concept of "turn[ing] to G-d in prayer." Also by statute, the Pledge of Allegiance to the Flag describes the United States as "one Nation under G-d." 36 U.S.C. § 172.  [673]  To be sure, no one is obligated to recite this phrase, see *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), but it borders on sophistry to suggest that the "'reasonable'" atheist would not feel less than a "'full membe[r] of the political community'" every time his fellow Americans recited, as part of their expression of patriotism and love for country, a phrase he believed to be false. Likewise, our national motto, "In G-d we trust," 36 U.S.C. § 186, which is prominently engraved in the wall above the Speaker's dias in the Chamber of the House of Representatives and is reproduced on every coin minted and every dollar printed by the Federal Government, 31 U.S.C. §§ 5112(d)(1), 5114(b), must have the same effect.

**(9)** *Elk Grove Unified School District v. Newdow*, **542 U.S. 1 (2004)**

542 U.S. at 29 (Rehnquist, C.J., concurring)

[From page 26: Examples of patriotic invocations of G-d and official acknowledgments of religion's role in our Nation's history abound.]

The motto "In G-d we Trust" first appeared on the country's coins during the Civil War. Secretary of the Treasury Salmon P. Chase, acting under the authority of an Act of Congress passed in 1864, prescribed that the motto should appear on the two cent coin. The motto was placed on more and more denominations, and since 1938 all United States coins bear the motto. Paper currency followed suit at a slower pace; Federal Reserve notes were so inscribed during the decade of the 1960's. Meanwhile, in 1956, Congress declared that the motto of the United States would be "In G-d We Trust." Act of July 30, 1956, ch. 795, 70 Stat. 732.

542 U.S. at 37 (O'Connor, J., concurring)

There are no de minimis violations of the Constitution--no constitutional harms so slight that the courts are obliged  [37]  to ignore them. Given the values that the Establishment Clause was meant to serve, however, I believe that government can, in a discrete category of cases, acknowledge or refer to the divine without offending the Constitution. This category of "ceremonial deism" most clearly encompasses such things as the national motto ("In G-d We Trust"), religious references in traditional patriotic songs such as The Star-Spangled Banner, and the words with which the Marshal of this Court opens each of its sessions ("G-d save the United States and this honorable Court"). See *Allegheny*, 492 U.S., at 630, 106 L. Ed. 2d 472, 109 S. Ct. 3086 (O'Connor, J., concurring in part and concurring in judgment). These references are not minor trespasses upon the Establishment Clause to which I turn a blind eye. Instead, their history, character, and context prevent them from being constitutional violations at all.

**(10)** *Van Orden v. Perry*, 545 U.S. 677 (2005)

545 U.S. at 716 (Stevens, J., dissenting)

The reason this message stands apart is that the Decalogue is a venerable religious text.[14] As we held 25 years ago, it is beyond dispute that "[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths." *Stone v. Graham*, 449 U.S. 39, 41, 66 L. Ed. 2d 199, 101 S. Ct. 192 (1980) (per curiam). For many followers, the Commandments represent the literal word of G-d as spoken to Moses and repeated to his followers after descending from Mount Sinai. The message conveyed by the Ten Commandments thus cannot be analogized to an appendage to a common article of commerce ("In G-d we Trust") or an incidental part of a familiar recital ("G-d save the United States and this honorable Court"). Thankfully, the plurality does not attempt to minimize the religious significance of the Ten Commandments. Ante, at 690, 162 L. Ed. 2d, at 619 ("Of course, the Ten Commandments are religious--they were so viewed at their inception and so remain"); ante, at 692, 162 L. Ed. 2d, at 620 (Thomas, J., concurring); see also *McCreary County v.* [717] *American Civil Liberties Union of Ky*., post, at 909, 162 L. Ed. 2d 729, 125 S. Ct. 2722 (Scalia, J., dissenting). Attempts to secularize what is unquestionably a sacred text defy credibility and disserve people of faith.

**(11)** *McCreary County v. ACLU*, 545 U.S. 844 (2005)

545 U.S. at 854 (Souter, J., majority opinion)

As directed by the resolutions, the Counties expanded the displays of the Ten Commandments in their locations, presumably along with copies of the resolution, which instructed that it, too, be posted, id., at 9. In addition to the first display's large framed copy of the edited King James version of the Commandments,[4] the second included eight other documents in smaller frames, each either having a religious  [854]  theme or excerpted to highlight a religious element. The documents were the "endowed by their Creator" passage from the Declaration of Independence; the Preamble to the Constitution of Kentucky; the national motto, "In G-d We Trust"; a page from the Congressional Record of February 2, 1983, proclaiming the Year of the Bible and including a statement of the Ten Commandments; a proclamation by President Abraham Lincoln designating April 30, 1863, a National Day of Prayer and Humiliation; an excerpt from President Lincoln's "Reply to Loyal Colored People of Baltimore upon Presentation of a Bible," reading that "[t]he Bible is the best gift G-d has ever given to man"; a proclamation by President Reagan marking 1983 the Year of the Bible; and the Mayflower Compact. 96 F. Supp. 2d, at 684; 96 F. Supp. 2d, at 695-696.

545 U.S. *at* 889 (Scalia, J., dissenting)

Nor have the views of our people on this matter significantly changed. Presidents continue to conclude the Presidential oath with the words "so help me G-d." Our legislatures, state and national, continue to open their sessions with prayer led by official chaplains. The sessions of this Court continue to open with the prayer "G-d save the United States and this Honorable Court." Invocation of the Almighty by our public figures, at all levels of government,  [889]  remains commonplace. Our coinage bears the motto, "IN G-D WE TRUST." And our Pledge of Allegiance contains the acknowledgment that we are a Nation "under G-d." As one of our Supreme Court opinions rightly observed, "We are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313, 96 L. Ed. 954, 72 S. Ct. 679 (1952), repeated with approval in *Lynch v. Donnelly*, 465 U.S. 668, 675, 79 L. Ed. 2d 604, 104 S. Ct. 1355

(1984); *Marsh*, 463 U.S., at 792, 77 L. Ed. 2d 1019, 103 S. Ct. 3330; *Abington Township*, supra, at 213, 10 L. Ed. 2d 844, 83 S. Ct. 1560.


With all of this reality (and much more) staring it in the face, how can the Court possibly assert that "'the First Amendment mandates governmental neutrality between . . . religion and nonreligion,'" ante, at ____, 162 L. Ed. 2d, at ____, and that "[m]anifesting a purpose to favor . . . adherence to religion generally," ante, at ____, 162 L. Ed. 2d, at ____, is unconstitutional? Who says so? Surely not the words of the Constitution. Surely not the history and traditions that reflect our society's constant understanding of those words. Surely not even the current sense of our society, recently reflected in an Act of Congress adopted unanimously by the Senate and with only five nays in the House of Representatives, see 148 Cong. Rec. 12041/S6226 (June 28, 2002); id., at 19518/H7186 (Oct. 8, 2002), criticizing a Court of Appeals opinion that had held "under G-d" in the Pledge of Allegiance unconstitutional. See Act of Nov. 13, 2002, §§ 1(9), 2(a), 3(a), 116 Stat. 2057, 2058, 2060-2061 (reaffirming the Pledge of Allegiance and the National Motto ("In G-d We Trust") and stating that the Pledge of Allegiance is "clearly consistent with the text and intent of the Constitution"). Nothing stands behind the Court's assertion that governmental affirmation of the society's belief in G-d is unconstitutional except the Court's own say-so, citing as support only the unsubstantiated say-so of earlier Courts going back no further than the mid-20th century. See ante, at ____, 162 L. Ed. 2d, at ____, citing *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335, 97 L. Ed. 2d 273, 107 S. Ct. 2862 (1987), in turn citing *Lemon v. Kurtzman*, 403 U.S. 602, 612, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971), in  [890]  turn citing *Board of Ed. of Central School Dist. No. 1 v. Allen*, 392 U.S. 236, 243, 20 L. Ed. 2d 1060, 88 S. Ct. 1923 (1968), in turn quoting *Abington Township*, 374 U.S., at 222, 10 L. Ed. 2d 844, 83 S. Ct. 1560, in turn citing *Everson v. Board of Ed. of Ewing*, 330 U.S. 1, 15, 91 L. Ed. 711, 67 S. Ct. 504 (1947). 2 And it is, moreover, a thoroughly discredited say-so. It is discredited, to begin with, because a majority of the Justices on the current Court (including at least one Member of today's majority) have, in separate opinions, repudiated the brain-spun "Lemon test" that embodies the supposed principle of neutrality between religion and irreligion. See *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 398-399, 124 L. Ed. 2d 352, 113 S. Ct. 2141 (1993) (Scalia, J., concurring in judgment) (collecting criticism of *Lemon*); *Van*

*Orden*, ante, at ____, ____, 162 L. Ed. 2d ____, 125 S. Ct. ____(Thomas, J., concurring); *Board of Ed. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 720, 129 L. Ed. 2d 546, 114 S. Ct. 2481 (1994) (O'Connor, J., concurring in part and concurring in judgment); *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 655-656, 672-673, 106 L. Ed. 2d 472, 109 S. Ct. 3086 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part); *Wallace*, 472 U.S., at 112, 86 L. Ed. 2d 29, 105 S. Ct. 2479 (Rehnquist, J., dissenting); see also *Committee for Public Ed. and Religious Liberty v. Regan*, 444 U.S. 646, 671, 63 L. Ed. 2d 94, 100 S. Ct. 840 (1980) (Stevens, J., dissenting) (disparaging "the sisyphean task of trying to patch together the 'blurred, indistinct, and variable barrier' described in Lemon"). And it is discredited because the Court has not had the courage (or the foolhardiness) to apply the neutrality principle consistently.

545 U.S. *at* 903 (Scalia, J., dissenting)

Entitled "The Foundations of American Law and Government Display," each display consisted of nine equally sized documents: the original version of the Magna Carta, the Declaration of Independence, the Bill of Rights, the Star Spangled Banner, the Mayflower Compact of 1620, a picture of Lady Justice, the National Motto of the United States ("In G-d We Trust"), the Preamble to the Kentucky Constitution, and the Ten Commandments. The displays did not emphasize any of the nine documents in any way: The frame holding the Ten Commandments was of the same size and had the  [904]  same appearance as that which held each of the other documents. See 354 F.3d 438, 443 (CA6 2003).

**(12)** *Town of Greece v. Galloway*, **134 S. Ct. 1811 (2014)**

134 S. Ct. at 1832-33 (Alito, J., concurring opinion)

The First Continental Congress convened in Philadelphia, and the need for the 13 colonies to unite was imperative. But "[m]any things set colony apart from colony," and prominent among these sources of division was religion.[7] "Purely as a practical matter," however, the project of bringing the colonies together required that these divisions be overcome.[8]

Footnote 8: N. Cousins, In G-d We Trust: The Religious Beliefs and Ideas of the American Founding Fathers 4-5, 13 (1958).